IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

---

Criminal No. 02-163

---

UNITED STATES OF AMERICA

v.

DOUGLAS B. LEUSCHEN

---

APPENDIX TO DEFENDANT'S REPLY
TO THE GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION TO DISMISS

---

W. Penn Hackney
Assistant Federal Public Defender
PA Attorney ID #29671

1450 Liberty Center
1001 Liberty Avenue
Pittsburgh, PA 15222
(412) 644-6565

CLIENT'S COPY

## CONTENTS TO APPENDIX

1.    Commonwealth of Pennsylvania v. Douglas Burton Leuschen
      Transcript of Jury Trial (Day 1 - July 13, 1989)

2.    Commonwealth of Pennsylvania v. Douglas Burton Leuschen
      Transcript of Jury Trial (Day 2 - July 14, 1989)

OCT 16 1990

SUPERIOR COURT
PITTSBURGH

# ORIGINAL

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE COURT OF COMMON PLEAS |
| VS | : | OF ERIE COUNTY, PENNSYLVANIA |
| DOUGLAS BURTON LEUSCHEN | : | CRIMINAL DIVISION |
| | : | NO. 696 OF 1989 |

RECORD-FILED

1030spon90

SEP 17 1990

SUPERIOR COURT
PITTSBURGH

CLERK OF RECORDS
CRIMINAL DIVISION
COUNTY COURT HOUSE
ERIE, PENNA.

JURY TRIAL

(Day 1)

Proceedings held before the Honorable

John R. Falcone, in Courtroom Number 3,

Erie County Courthouse, Erie, Pennsylvania,

on Thursday, July 13, 1989, commencing

at 11:15 a.m.   RECORD-FILED

AUG 16 1990

SUPERIOR COURT
PITTSBURGH

APPEARANCES:

Kenneth Zak, Esquire, appearing on behalf of
the Commonwealth.

Joseph J. D'Alba, Esquire, appearing on behalf of
the Defendant.

RECORD

MAR 25 1994

PITTSBURGH OFFICE OF
SUPERIOR COURT

Andrea C. DeBartolo, RPR-CM -- Official Court Reporter

I_N_D_E_X

WITNESSES:

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE COMMONWEALTH: | | | | |
| Richard Myers | 28 | 53 | 66 | 71 |
| William Marino | 75 | 83 | -- | -- |
| Shayne Hochlander | 84 | 92 | 94 | -- |
| FOR THE DEFENDANT: | | | | |
| Clark Daniel Seaman | 98 | 104 | 107 | -- |
| Duane Leuschen | 110 | 112 | -- | -- |
| Douglas Leuschen | 114 | 124 | 151 | -- |

EXHIBITS:

|  | MARKED | ADMITTED |
|---|---|---|
| FOR THE COMMONWEALTH: | | |
| 1 (photo) | 31 | 32 |
| 2 (photo) | 31 | 32 |
| 3 (photo) | 31 | 32 |
| 4 (.243 Remington rifle) | 33 | 35 |
| 5 (.243 clip) | 33 | 35 |
| 6 (.22 revolver) | 36 | 37 |
| 7 (.22 rounds) | 36 | 37 |
| 8 (9mm shells) | 38 | 39 |
| 9 (9mm semiautomatic) | 40 | 41 |
| 10 (clip for 9mm) | 41 | 42 |
| 11 (clip for 9mm) | 42 | 42 |
| 12 (storage box for Ruger) | 42 | 42 |
| 13 (.357 magnum) | 43 | 44 |
| 14 (.357 hollow point rounds) | 44 | 45 |
| 15 (ammo box) | 45 | 46 |
| 16 (blue bag containing ammo) | 45 | 46 |
| 17 (PSP Info Cert) | 78 | 80 |
| FOR THE DEFENDANT: | | |
| A (hunting regulations) | 73 | |

1       P_R_O_C_E_E_D_I_N_G_S

2

3   (Whereupon, the following occurred in chambers:)

4    MR. D'ALBA:  The Motion In Limine is as follows:

5 The offenses which my client is charged with involve

6 three firearms, in particular three pistols.  At the

7 time of his arrest, Mr. Leuschen was also in possession

8 of several other firearms, particularly rifles and

9 shotguns, along with a certain quantity of ammunition.

10 My Motion In Limine is to prevent or request to prevent

11 the Commonwealth from introducing additional -- any

12 evidence concerning firearms which are not the subject

13 of the offenses with which he's charged, and further,

14 to prevent and to request the prevention of

15 introduction by the Commonwealth in its case in chief

16 of any evidence regarding ammunition found outside of

17 the firearms, which are the basis of the offense for

18 which he's charged.

19    THE COURT:  Do you want to respond to that,

20 Attorney Zak?

21    MR. ZAK:  May it please the Court, first of all

22 the facts as they will be offered by the prosecution,

23 the evidence which will be offered at trial is that the

24 trooper approached the vehicle in question inquiring

25 about the driver of the vehicle.  He did not know that

4

1    there were firearms of any sort involved.  And then in

2    plain view, upon his questioning of the driver, he saw

3    the handguns in question, the firearms by the meaning

4    of the Firearms Act, and also found a large quantity of

5    ammunition in the vehicle.  Later on a search warrant

6    was obtained and the vehicle was searched.  And

7    pursuant to the search, two shotguns were found and

8    more ammunition and components for ammunition, not

9    primarily bullets, separate components were found.

10   Now, these were found in an ammunition box,

11   military-style ammunition box, a blue zipper bag and

12   perhaps other containers.  And handgun ammunition, .22

13   caliber handgun ammunition, .357 Magnum ammunition, 9mm

14   ammo were found intermixed with the other ammo.  Now,

15   we have ready to introduce into evidence those

16   containers containing all of the various types of ammo

17   and we have a right to present how the troopers

18   recovered these items.

19        Now, as I understand, the defendant may offer

20   evidence he doesn't have to, but he may offer evidence

21   to the effect that he was hunting and/or target

22   shooting.  The presence of various types of ammunition

23   is relevant as to whether he could have lawfully or

24   properly or even factually be target shooting at the

25   place he was and with the types of weapons that he had.

1    Also, it has come to our attention, and this may
2    be of some importance, that he had a rifle.  I do not
3    have the rifle here, we are trying to secure it.  The
4    rifle was confiscated by the Game Commission, the rifle
5    was in the front seat of the car and that is also
6    relevant as to what the man's activities were because
7    the rifle was within easy reach of the defendant in the
8    front seat of the car as were the handguns in question.
9    So, to summarize, the other weapons, even though
10   they weren't, quote, firearms in the Firearms Act and
11   the ammunitions were so intermixed, I think it would be
12   hard to separate them.  Also, it's our position we
13   can't see any prejudice to the defendant by introducing
14   these items because there is absolutely -- he's not
15   charged with any criminal violation connected with
16   these items and there is no former misconduct to have
17   the items.  I understand the shotguns were unloaded,
18   were in the back of the car and were only found
19   pursuant to the search.  So we're not alleging that at
20   that moment in any way the defendant was going to do
21   anything improper with the shotguns.  So we would
22   oppose the motion.
23   THE COURT:  I would grant the motion in part and
24   deny the motion in part in the following respects.
25   Pertaining to the Commonwealth's case in chief, I would

1    decide that testimony pertaining to anything other than

2    the three handguns would be irrelevant at that time and

3    I'm going to instruct the attorneys and the attorney to

4    instruct his witnesses to avoid testifying to anything

5    other than the handguns that were found in the vehicle

6    and any ammunition, whether it was in the handgun or in

7    the vehicle that would fit the handguns.  So as to the

8    second part of the motion, to exclude everything but

9    handguns and ammunition in it, I'm denying that and

10   allowing the Commonwealth to offer testimony pertaining

11   to handgun ammunition that would fit the three handguns

12   that were in the vehicle, okay?

13        MR. D'ALBA:  Thank you, Your Honor.

14        MR. ZAK:  Thank you.

15        (Whereupon, discussion in chambers was concluded.)

16        THE COURT:  Thank you.  Good morning, ladies and

17   gentlemen.  We are finally going to get started.   I

18   thought we had all the delays behind us when I sent you

19   home last night, but a matter occurred this morning at

20   ten o'clock and it needed immediate attention and it

21   conflicted with our schedule, so we did have to honor

22   that.  Hopefully, we have no more and we will bring

23   this thing right on through to a conclusion.

24        I have one more request that's going to amend our

25   schedule and I'm going to grant that as well, the best

1    I can, because that comes from two of the jurors.  And

2    I have been requested not to go beyond four-thirty as

3    they would like to leave at about that time.  And I'm

4    going to do everything I can to accommodate that.  We

5    may be in the middle of a witness and we will see that

6    through, but we will do it the best we can.

7        Now, you have been selected yesterday to perform

8    one of the most solemn duties of citizenship.  You are

9    to sit in judgment upon a criminal charge made by the

10   Commonwealth of Pennsylvania against one of your fellow

11   citizens.  The services that you render for the

12   Commonwealth are very important to us.  If you recall

13   yesterday, I mentioned that we have jurors come in to

14   help us in a couple of different areas.  We have them

15   here during the civil term, and that's not this term,

16   the Commonwealth normally isn't involved in that.  The

17   other time we use jurors, and that's what we are going

18   to do now, is in our criminal term.  And in the

19   criminal term, the party that brings the action is the

20   Commonwealth of Pennsylvania, and if the Commonwealth

21   feels that one of their laws have been broken, they

22   bring criminal charges.

23       Now, the matter that you have been sworn to hear

24   involves a defendant.  He's a fellow citizen just like

25   you are.  His name is Douglas Burton Leuschen and he is

8

1    seated at the counsel table next to his attorney.

2        Now, you have before you one trial, but it

3    involves three different counts and you will hear

4    evidence as we go along pertaining to those counts.

5        Now, basically, the charges are that Douglas

6    Burton Leuschen committed the crime of firearms not to

7    be carried without a license, which is a crime.  Now,

8    there are three different charges and each pertains to

9    a different handgun.  I presume you will hear testimony

10   pertaining to a 9mm semiautomatic firearm, you probably

11   will hear about a .357 caliber revolver, and you also

12   will probably hear about a .22 caliber recover.

13       Now, let me explain in a general way again this

14   morning what we are going to do.  Now, first as a

15   judge, I have a certain job and certain responsibility,

16   and mine deals with the law that's applicable to this

17   situation.  You have an equally important task, and

18   that is to determine the factual situation.  If there

19   is a dispute in facts, you're the ones to figure out

20   what you're going to believe and what you're not.  I

21   have nothing to do with that, that's your job, so you

22   should pay close attention throughout the trial so that

23   you can faithfully perform this duty when the time

24   comes.

25       Now, looking ahead schedule-wise, what I have in

1    mind is this:  We are going to go this morning until

2    about 12:30, then we will take an hour break for lunch

3    and reconvene, and I'll give you more particulars about

4    that later, and we will get as much done as we can

5    today.  Later on, I'll tell you what we are going to do

6    tomorrow, but the problem we have is we start working

7    at 8:30, but there is not a courtroom available because

8    of other routine matters until about 10:30, so I would

9    guess that we are going to do as much as we can today,

10   and then we will come back tomorrow about 10:30 and

11   finish it up, but there will be more on that later.

12       Now, let me tell you sort of generally what's

13   going to happen.  Our District Attorney's name is Ken

14   Zak, you met him yesterday and when I finish talking,

15   he will make an opening statement to you.  And when he

16   does that, he will outline the case that he believes he

17   has against Douglas Burton Leuschen.  Now, when he

18   finishes, the defense attorney, who's name is Joseph

19   D'Alba, and he's sitting to the counsel table and I

20   think you met him yesterday, he may make an opening

21   statement when Mr. Zak finishes or he may decide not to

22   do anything and do it later on in the trial.  It's his

23   choice and we will see what he wants to do.

24       Now, after those opening statements, it's up to

25   the District Attorney's Office, Mr. Zak, to present his

10

3

1   evidence to you.  And he does that because he calls

2   witnesses to the stand, they are sworn in under oath

3   and he asks them questions that are pertinent to what

4   we are doing and they respond.  He may also offer a

5   number of exhibits in a case like this where the

6   violation involves firearms, I'm sure we will see some

7   of those during the course of this trial.

8        At any rate, after Mr. Zak talks to his witnesses,

9   Mr. D'Alba, is allowed to ask witnesses of those -- ask

10  questions of the same witnesses; that's called

11  cross-examination.  And that's a process we have

12  developed over the years to try to get to the truth of

13  the matter.  When Mr. Zak believes his case has been

14  presented, then he will rest.  And when he does that,

15  it's now up to Mr. D'Alba to have his side presented in

16  any manner that he wants to do that.

17       Now, the Commonwealth, as I indicated, charges Mr.

18  Leuschen with these three violations.  I want you to

19  know that those charges are only accusations, it is not

20  proof that the defendant is guilty.  Now, you all know,

21  I think, that under our Constitution, the defendant is

22  presumed innocent until he is proven guilty.  Mr.

23  Leuschen is as innocent as he sits there as you are.

24  Now, the District Attorney as counsel for the

25  Commonwealth of Pennsylvania has the burden to prove

1    that Mr. Leuschen is guilty beyond a reasonable doubt;

2    that's his job.  I don't know whether Mr. Leuschen will

3    testify in the course of this trial or not, but it's

4    entirely up to him.  If he chooses to remain silent and

5    offer no evidence, he's allowed to do that.

6        Now, under the Constitution of Pennsylvania and

7    also the United States, every defendant is presumed

8    innocent and he has the right to remain silent.

9    Therefore in a criminal case, and that's what we are

10   going to hear, the burden is on the District Attorney's

11   Office to prove Mr. Leuschen guilty beyond a reasonable

12   doubt.  If the defense, that's Mr. D'Alba, for Mr.

13   Leuschen does offer witnesses for you to listen to,

14   then the District Attorney, Mr. Zak has a right to

15   cross-examine those witnesses, the same as it was when

16   Mr. Zak put in testimony.

17       Now, let me point out to you that the testimony

18   you are to consider is what the witnesses say.  When

19   the attorneys ask a question, it really isn't evidence,

20   but it's a vehicle that's used so that the responses

21   are elicited for you to weigh.  You should not

22   speculate that a fact is true or not merely because the

23   lawyer asks a question.

24       Now, during the course of the trial, if it's

25   moving the way I think it should, I'm not going to get

1    too involved until later when I instruct you as to the

2    applicable law.  But during the course of the trial, I

3    may decide to ask some questions of the witnesses

4    myself.  I don't want you to interpret that as meaning

5    that I have any opinion about this case, and my only

6    purpose would be maybe to clear something up that I

7    would like to know about.

8        Now, after all of the evidence has been presented

9    by the witnesses, that's the question and answer

10   scenario, then each attorney has an opportunity to

11   address you, we call them closing arguments.  And I

12   will then after that is done give you my final

13   instructions and that will tell you what law is

14   involved and what it is you should consider when you

15   deliberate.  After I have done that, then your tipstaff

16   will take you to a jury room to deliberate and decide

17   what your verdict will be.

18       Now, later on we will talk more about it, but we

19   have three charges and we need three verdicts.  Those

20   verdicts can be guilty or they can be innocent.  They

21   can be all guilty, they can be all innocent or they can

22   be some of each.  Now, as the judge, it's my

23   responsibility to decide all questions of law and which

24   evidence is supposed to be admitted, and this has been

25   developed over the centuries.  Occasionally, a question

13

1    is asked that the opposing counsel will object to.  If

2    I overrule, I will decide that it's not a proper

3    question -- or if I overrule, I will decide the

4    question is proper and allow it to be answered.  If I

5    sustain the objection, the question won't be answered.

6    You're not to concern yourself with the objections or

7    my decisions or the reasons for it.  Occasionally there

8    is a question that's improper and I will ask the

9    stenographer to strike it from the record.  Now, I'm

10   going to ask you to forget that it ever happened.  It's

11   sort of difficult, but I think if you do that

12   conscientiously, if I order something stricken from the

13   record, it's really not to be considered when you

14   deliberate.

15        Now, sometimes there are matters that the

16   attorneys and I have to talk about.  In fact, that

17   happened about ten minutes ago, and we do that out of

18   your hearing because we don't want you to be slanted in

19   either direction by it.  Now, when that happens, we

20   either meet up here at sidebar and we talk about it or

21   we will take a break and talk about it in chambers.

22        Now, just to remind you, I'm the judge of the law

23   and you will be the judge of the facts.  It will be

24   your responsibility to weigh the evidence, find the

25   facts, apply the facts to the rules of law that I will

14

1  give you and decide whether or not Mr. Leuschen has

2  been proven guilty.

3      Now, as you listen to this case, you are not

4  permitted to take notes.  There is a couple of reasons

5  for that, I'll just tell you basically.  When you go to

6  the jury room to deliberate, you should each have an

7  equal voice.  If one of the members take notes, then

8  the others are going to have a tendency to give more

9  weight to that person because they have notes and we

10  don't want that.  The other thing is if we would allow

11  you to take notes, you might be writing down something

12  when you should be listening to it.  What you have to

13  do is rely on your memory and what you hear.  Now, it's

14  obviously important then that you pay very close

15  attention to everything that's said.

16      In front of me we have a court reporter and a

17  permanent record of the testimony is taken.  If you are

18  unable to hear a question of the attorneys or an answer

19  of the witness, I'd like you to raise your hand.  And

20  if that's the problem, I'll have the stenographer read

21  back for you what it was you missed.  Now, we don't

22  want a lot of interruptions.  If it gets too much, I'll

23  tell you, but that's the way we will start.  If you

24  don't hear something you'd like to hear, you raise your

25  hand.

1    Now, it's difficult to tell you, especially in a

2    case where we have witnesses who conflict, but you have

3    to observe the witnesses as they testify, you be alert

4    for what they say and how they say it because you're

5    going to have to decide which ones you want to believe.

6    Now, because we have a certain procedure to go

7    through, the district attorney is going to present

8    their case first.  I want you to keep an open mind.  I

9    don't want you to decide it after the first couple of

10   witnesses because things swing around during the course

11   of a trial.  I'd like you to keep an open mind until

12   you have heard everything you have to hear.  I would

13   like you to avoid forming opinions about Mr. Leuschen's

14   guilt or innocence until the time comes for you to

15   deliberate in the jury room.  Now, you should not talk

16   to each other about the evidence or any matters that

17   you hear in this courtroom until the time comes that

18   you deliberate privately in your jury room.  Only then

19   will you know enough about this case to render what we

20   think is an intelligent and fair decision.

21   Now, as I cautioned you yesterday, you also

22   shouldn't talk about what you hear to anybody, it

23   should stay in the courtroom.  Now, that includes

24   members of your family, it includes other members of

25   the jury and other members of the jury panel.  Now,

16

1    casual conversations are okay, excepting you should

2    even avoid casual conversation with the attorneys, the

3    prosecuting officers and the defendant.  It would just

4    be safer not to even talk about the weather to those

5    parties.  Now, I don't know if this will be in the

6    newspaper or on the television or radio, but assuming

7    it is, I don't know if the results of what happened

8    will be fairly reported or not, so you should avoid

9    that.

10        Now, sometimes jurors try to be very conscientious

11   and they want to go to the scene and they want to do

12   some things on their own.  We don't want to do that.

13   We don't want you to visit the scene of the incident

14   unless we decide it's proper, then we will get a bus

15   and we will all go.  So I don't want you to conduct any

16   experiment or anything on your own.  The only

17   information that you should have with you when you

18   decide to render a decision is what you hear in this

19   courtroom.

20        Now, we are almost finished.  I don't want you to

21   concern yourself during the course of this trial with

22   what the penalty might be if Mr. Leuschen is determined

23   to be guilty; that's not your job.  Your job is to

24   decide guilt or innocence and then the Courts will

25   render an appropriate conclusion.  It's the duty of the

1    trial judge to do that.  Now, we don't want possible

2    penalties to affect your deliberations.

3         Now, this is a criminal case, as I have told you

4    three or four times, and that means that the jury's

5    verdict has to be unanimous.  We have 14 jurors, 2 are

6    alternates.  When the case is ready to deliberate, if

7    we still have our 14 intact, we will excuse the 2

8    alternates and the 12 jurors, then make a decision and

9    it has to be unanimous.  And when you get into the jury

10   room, you would decide what your conclusion is and then

11   we will get back and we will announce that decision in

12   an open courtroom.

13        Now, each of you have a responsibility.  Some of

14   you are probably more anxious to fill this than others,

15   but we appreciate the fact that you're all here and I

16   expect it will be a relatively brief trial and I would

17   like you to pay whatever attention you feel is

18   appropriate.

19        Now, we are going to start our trial and we are

20   going to do that with the opening for the Commonwealth.

21   Now, I just want to tell you one more thing, when the

22   attorneys get up and speak before you, that is not

23   evidence.  They are going to tell you which direction

24   they think the trial is going to take and they are

25   going to tell what you it is they think they are going

1    to prove, but merely because they say they are going to

2    do it doesn't mean it's done, you have to get that from

3    the witnesses.  Now, it's very proper for you to be

4    guided by what the attorneys tell you.  And they are

5    going to talk to you now and they are going to tell you

6    what they think they are going to do, and they are

7    going to talk to you in the end and they are going to

8    tell you what they think they did.  Now, that's not

9    testimony.  What you hear from the witness stand and

10   the exhibits is what are to be considered.

11        Now, with that, I would ask Attorney Zak to open.

12        MR. ZAK:  May it please the Court, Mr. D'Alba,

13   ladies and gentlemen of the jury.  Judge Falcone has

14   given you a useful outline of what this case is about

15   and that is a criminal case.  Now, it may well develop

16   and we anticipate at least on the prosecution's side

17   that it will be a relatively brief case.  And as I'm

18   sure Mr. D'Alba will point out to you, that no criminal

19   case is really a small case or small matter, there is a

20   very serious interest involved.  We have accused that

21   man, Mr. Leuschen, of violating the laws of our

22   Commonwealth, of our state.  There are serious

23   violations, they involve firearms.  And it's in your

24   hands.

25        Now, nobody in this case can tell you what to

1    decide, the Judge can't tell you, the defense attorney

2    can't tell you, the defendant can't tell you, neither

3    can the officers.  You'll have to decide what, but we

4    are going to ask you to listen to this evidence

5    objectively in this fashion and rationally.  And it's

6    for you to decide what makes sense in this case, what

7    doesn't make sense and what really happened.

8        Now, what I'm doing now is called an opening

9    statement.  And what it is, it's not evidence.  I'm not

10   giving evidence now just as the charges against the

11   defendant are not evidence.  But I'm giving you a road

12   map, an overview of where this case is going so that

13   you know when you hear the witnesses from the witness

14   box, where they are leaning, what this case is about

15   and whether we will have fulfilled to you our promise,

16   which I'm making to you right now, that we will prove

17   this case beyond a reasonable doubt.

18       Now, what this case is about is a number of months

19   ago, February 24th of this year, later in the

20   afternoon, Trooper Myers, from the Pennsylvania State

21   Police, was on patrol.  He was working that day, he was

22   on Old French Road -- excuse me, he was on Old Lake

23   Road in Springfield Township.  There was a car, an old

24   blue car parked on the side of the road with a man in

25   it slumped over the steering wheel.  Well, it attracts

1    his attention.  He stops.  He's working alone in full
2    uniform.  He goes over to this car, maybe something is
3    wrong.  It's a part of his job as a State Police
4    Officer, as a State Trooper.  He goes over to the car,
5    the man in the car gets out wearing a camouflage
6    outfit.  Trooper's talking to him.  The trooper notices
7    in the car a rifle in the front seat area, right in the
8    front seat between the passenger's seat and the
9    driver's seat.  He starts talking to the man and he
10   looks in the car and it turns out in the car are three
11   firearms.
12       Now, the law in Pennsylvania, a firearm isn't the
13   normal Webster's dictionary definition of firearm, it's
14   something else.  A firearm is a handgun with a barrel
15   less than 12 inches, it's a shotgun with a barrel less
16   than 24 inches, it's a rifle with a barrel of less than
17   16 inches; that's what's defined as firearm for legal
18   purposes because those are concealable weapons.
19       Well, three firearms emerge and the trooper's very
20   concerned.  For one thing, the rifle is loaded.  He
21   looked in the car and it's loaded.  .243 caliber rifle,
22   that's a high-powered rifle, it was loaded.  There was
23   a Ruger, that's the make, 9mm automatic pistol which we
24   are going to see here in this courtroom which has two
25   clips, two magazines, each of those contain 15, 16

21

1    rounds and they're separate cartridges plus one's in

2    the chamber; in other words, it's ready to fire.  Then

3    there is an extra loaded magazine with 15, 16 rounds

4    with 9mm ammunition, some regular ammunition, some

5    hollow ammunition; also, there is a .357 caliber

6    revolver, which is loaded, all six chambers, plus there

7    is some .357 caliber ammunition in the car; also, there

8    is extra 9mm ammunition in the car, which hasn't been

9    loaded into the magazine, the clips.  Finally, there is

10   a .22 caliber revolver, also made by the Ruger Company,

11   which contains 6 rounds in the cylinder and there is

12   several boxes of .22 caliber ammunition.

13       Well, the trooper is kind of concerned.  Mr.

14   Leuschen makes a few statements at that point, he's not

15   under arrest yet, he makes a few statements at that

16   point about target shooting.  There is no evidence of

17   any target shooting going on.  The trooper says, well,

18   look, you know, these are loaded guns, I'm kind of

19   concerned.  Why don't we go down to the State Police

20   barracks and we will straighten this out, follow me.

21   Mr. Leuschen follows him.  They go down to the State

22   Police barracks.  There is further questioning, further

23   examination and Mr. Leuschen is charged with a

24   violation of the Uniformed Firearms Act, carrying a

25   firearm without a license.  Firearms are not to be

1     carried without a license.

2         State Game Commission is called because of the

3     rifle as well as the other weapons in the car of which

4     happened to be loaded.  And Mr. Hochlander, who is

5     sitting there -- I'm sure I'm butchering his name --

6     cited the defendant for violation of that.  Now, you're

7     not to consider that charge, but it will be mentioned

8     in open court.  The judge will consider that, but that

9     you're entitled to know about it.  And we will

10    introduce evidence on that for both your benefit and

11    also the judge.

12        Now, Mr. Leuschen makes further statements to the

13    officers, to Trooper Marino, who filed these charges,

14    concerning what he was doing, that he mentions hunting,

15    that he was hunting.  And while it's not -- the burden

16    of proof in this case is on the Commonwealth, on us,

17    the prosecution, we made these charges, you have to

18    consider, however, as you hear the evidence in this

19    case, whether this man actually was hunting or was

20    target shooting or whether there was any hunting or

21    target shooting involved in this case at all in a

22    legitimate fashion.

23        Now, the evidence will also show that this man had

24    no permit issued in this state, in the State of

25    Pennsylvania, in the Commonwealth of Pennsylvania, to

23

1    carry a firearm concealed and/or about his person and
2    that includes in his vehicle.  He had no permit to
3    carry these weapons, these three handguns in question,
4    that he had no right under the law to have a loaded
5    rifle in his car, hunting, target shooting or not, and
6    further, that while he had what we'll called
7    provisional firearm permits       o of the handguns in
8    question, the .357 magnum, the make is Dan Wesson, and
9    for the .22 caliber revolver, he had no permit of any
10   sort for the 9mm.  And those permits were only for
11   hunting purposes.  And it's our position that in this
12   case, the evidence will prove beyond a reasonable doubt
13   that he did not have them in the car at that time for
14   hunting and, indeed, if hunting is for that area in
15   this case, you should decide.  The evidence will also
16   show there will be a hunting license, but once again,
17   hunting is not an issue in this case.
18        Now, I'm going to ask you to consider the evidence
19   impartially as you all promised us during the voir
20   dire, during jury selection, consider it
21   conscientiously and call them as you see them, that's
22   what you're here for, just like an umpire in a game,
23   call them as you see them, listen to it carefully,
24   listen to it objecively, consider it all, consider the
25   law as Judge Falcone will give it to you and render a

1   fair and just verdict.  And in this case, a fair and

2   just verdict will be a verdict of guilty on all counts,

3   thank you.

4        THE COURT:  Attorney D'Alba, are you going to open

5   at this time?

6        MR. D'ALBA:  Yes, I will, Your Honor.  Ladies and

7   gentlemen, Douglas Leuschen is 40 years of age and up

8   until last July he worked as shipwright on the

9   reconstruction of the Flagship Niagara.  Sometime

10  during July, he suffered an accident and severely

11  injured his knee, as a result of which he's been off of

12  work since that time.  He grew up in Erie County and

13  ever since before -- in his own words -- before he was

14  old enough to carry a gun, he's been hunting.  He'd go

15  out with his father, meet his family.  Before he was

16  old enough to carry a gun, he'd act as bird dog.  He's

17  grown up, as many people in this area have,

18  appreciating the outdoors and partaking in activities

19  such as hunting and fishing.

20       On the day in question, which was February 24th of

21  this year, Mr. Leuschen had gone out earlier in the day

22  for two purposes; one, to pursue his hobby, his

23  recreation of being in the woods of hunting and of

24  shooting, and the other was a collateral benefit of

25  exercise and outdoors, that's to get some exercise to

1    ██████ his knee] he's an avid outdoorsman, not only when

2    he's hurt, but at any other time when he has the

3    opportunity to get out into the woods to hunt, to fish,

4    to just enjoy nature, he does it.  But now he's had a

5    lot of time on his hands, got cabin fever, he's been

6    sitting through a long winter, was a relatively cold

7    winter, so he's going out every chance he can get and

8    he went out on February 24th.  But you'll hear evidence

9    that on that day it was a little bit warmer than what

10   we unfortunately experience in February.  It was

11   somewhere around 40 degrees, there was a thaw, there

12   was snow on the ground, the snow was somewhat muddy,

13   the area was thawing, there was some snow.

14        He's charged with carrying a concealed weapon in

15   his car.  There is an exception to that statute which

16   says that if you're hunting or if you're going to or

17   from hunting, you're allowed to carry weapons in your

18   vehicle.

19        Well, after he had gotten done being in the woods

20   for several hours that day, he returned to his vehicle,

21   proceeded to unpack his things.  He did have with him

22   his hunting license, he did have with him his fishing

23   license.  He was dressed in hunting apparel, he was

24   wearing his hunting -- bright orange florescent hunting

25   cap.  He gets back to his vehicle, proceeds to unpack

1     his things that he's had with him when he was out,
2     steps into the woods to relieve himself, hearing a
3     motor vehicle coming back up, gets back into his car.
4     It's a police officer, police officer comes up to him
5     and says who are you? He says I'm Doug Leuschen. Do
6     you have any identification? Yes, I do, sir, what
7     would you like? He gives him his hunting license, I
8     believe also gives him his driver's license. He
9     properly identified himself to the individual. He
10    looks and he says you have got a rifle there; he says,
11    yes, I do, sir. What are you doing? Well, I have been
12    out in the woods and I was shooting. He says, you have
13    any other guns? He says, yes, sir, I do. He says, I
14    see some other ammunition. He says, I have got three
15    pistols in my car. I've got a .22, I have got a 9mm
16    and I have got a .357. He says can I see them? He
17    gives them to the police officer. No problems. Police
18    officer says, sir, I'd like you to come down to the
19    station, will you please follow me? Mr. Leuschen
20    complies, drove down to the police station. During the
21    course of this entire affair, there are no allegations
22    of any misconduct involving those firearms other than
23    his mere possession of them.
24         So, ladies and gentlemen, this is going to be a
25    short case because there is simply one question that

1    you have to decide, and that is whether or not you

2    accept our evidence that Mr. Leuschen was indeed out

3    with a -- he has to have a hunting license.  And I

4    suggest to you that we will establish that he did have

5    his hunting license, did have it with him.  He did

6    fulfill that part of the law that he was going to be

7    coming from or participating in the act of hunting.

8         That was -- now, it was during February and there

9    is very limited game that you can hunt during February,

10   but the evidence will also show that every time you go

11   out and hunt, you don't hunt just for the sake of

12   killing, you hunt for other reasons.  The evidence will

13   show you that Mr. Leuschen was hunting for other

14   reasons.  Sure, if a woodchuck came out, he was going

15   to shoot it.  Was it likely on February 4th?  Perhaps

16   not.  Is it possible?  Sure, it was, these type of game

17   can be hunted year-round.  He was acting in accordance

18   with the law.  He had those pistols, he complied with

19   the law and he falls within the exception.

20        So I suggest to you, after hearing the evidence in

21   total, that you'll reach one conclusion based upon the

22   entire facts and circumstances, his apparel, presence

23   of the license, presence of the hunting license, the

24   cap that he was wearing, his voluntary cooperation with

25   the police, no attempt to flee, no attempt to evade, no

28

1      attempt to do anything improper, that you will realize

2      that Mr. Leuschen was -- what Mr. Leuschen was doing or

3      what he was tending to do, he was out there exercising

4      his right as a free American to participate and enjoy

5      the outdoors, and as a result of which, falls within

6      the exception of requiring a license to carry these

7      pistols and as a result, after your deliberations, will

8      be one of not guilty on all counts.  I thank you.

9           THE COURT:  Mr. Attorney, do you want to call your

10     witness?

11          MR. ZAK:  The first witness will be Trooper Myers.

12

13               RICHARD MYERS,

14

15  having been first duly placed under oath, was examined and

16  testified as follows:

17

18               DIRECT EXAMINATION

19

20  BY MR. ZAK:

21  Q      Trooper Myers, will you please state your full name and

22  your place of employment?

23  A      Richard Myers, Pennsylvania State Police in Girard,

24  Pennsylvania.

25  Q      How long have you been so employed?

1    A      Twenty-five and a half years.

2    Q      And calling your attention back to February 24th of

3    this year, were you so employed?

4    A      Yes, I was.

5    Q      Were you working that day?

6    A      I was.

7              MR. D'ALBA:  Mr. Zak, just to expedite things,

8              we'd stipulate that the officer was acting in

9              accordance with the scope of his authority as a

10           Pennsylvania State Police officer at the time.

11           MR. ZAK:  Fine.

12           THE COURT:  Excuse me, just a minute, let me tell

13           the jury what that means.  Occasionally, during the

14           course of a trial, the two attorneys will agree to a

15           fact and they say we stipulate to that.  That saves us

16           the time and the trouble of having to prove it or hear

17           it from the witness stand.  And I'm not sure how many

18           of those we will have, but I just tell you now and I

19           won't do this again later, but what they are doing is

20           Attorney D'Alba has stipulated that the trooper who is

21           on the stand was on duty doing his job at the time of

22           the alleged incident, and that needn't be a matter for

23           you to decide in the jury room, that's already been

24           stipulated to.  Thank you.

25    BY MR. ZAK:

30

1    Q        Now, Trooper Myers, what were your duties that day?

2    A        I was on patrol in the west county.

3    Q        Were you working alone?

4    A        Yes, I was.

5    Q        In a car?

6    A        In a marked patrol vehicle.

7    Q        And in uniform?

8    A        In uniform.

9    Q        Okay.  Now, were you on Old Lake Road at any point that

10   day?

11   A        Yes, approximately 3:50 I was traveling west on Old

12   Lake Road.

13   Q        Did anything unusual happen?

14   A        Yes, as I was approaching a curb in the road, I noticed

15   ahead of me a blue vehicle, a blue vehicle was parked actually

16   across the westbound lane, the lane what I was traveling in.  I

17   was -- it was parked at an angle across the lane when I spotted

18   the vehicle.  I slowed up.  We have a lot of problems in that

19   area, it's US Steel property, and slowed to a stop and to

20   observe the vehicle to see if I could see an infraction of

21   garbage or what have you.  As I started to approach the vehicle

22   very slowly, a couple miles an hour, while I was watching it, I

23   noticed there was an operator in the vehicle.  And as I slowly

24   approached it, probably took me a minute or longer to drive up

25   to the vehicle, the operator had his head down through the

1    entire approach sequence.  Just as I got to the vehicle, the

2    operator looked up, spotted me and I drove to the -- into the

3    oncoming lane to go around it.  Of course, I was suspicious and

4    curious as to what was going on.  As soon as I started to get by

5    the vehicle, the operator turned his head back around.  I looked

6    to the rear of the vehicle for the plate, I observed a Virginia

7    registration on the vehicle.  I noticed that the inside of the

8    vehicle was full of clothing, items of household goods and so

9    forth in the vehicle.  The sticker on the back of the plate, the

10   only sticker I could see, said '87 on the vehicle.  I stopped,

11   just to the left rear corner of it, it turned out to be a '78

12   Toyota vehicle.

13   Q       Okay.  At this time, I'm going to stop you and I'm

14   going to ask that these exhibits be marked as Commonwealth 1

15   through 3.

16           (Whereupon, Commonwealth's Exhibit Nos. 1 through 3

17       were produced and marked for identification.)

18   BY MR. ZAK:

19   Q       Now, trooper, at this point I'm going to show you

20   what's been marked as Commonwealth's Exhibit 1, would you tell

21   us what that is?

22   A       This is a rearview of the '78 Toyota showing the

23   Virginia registration on it and also the type of items that were

24   in the back of the vehicle, it was a hatchback.

25           MR. D'ALBA:  Excuse me, Your Honor, may I have an

32

1    opportunity to see the exhibits prior to him showing

2    them to the witness?

3            MR. ZAK:  Very well.

4            THE COURT:  Yeah, that would be fine.

5    BY MR. ZAK:

6    Q    So it would be a hatchback-type car, would that be

7    right?

8    A    Two-door hatchback, yes.

9    Q    That's Exhibit 1 and -- okay, this is Exhibit 2, would

10   you tell us what that is?

11   A    It's another view of the left side of the motor

12   vehicle.

13   Q    And Number 3?

14   A    This would be the right side of the vehicle,

15   approximately my view of the vehicle as I stopped.

16   Q    Okay.  And from your view, from these photographs,

17   where -- what -- where do they appear to have been taken?

18   A    Those were taken at the State Police Barracks, Girard,

19   in the parking lot.

20           MR. ZAK:  Okay.  At this time I'd offer Exhibits

21       1, 2 and 3 into evidence.

22           MR. D'ALBA:  No objection, Your Honor.

23           THE COURT:  They are accepted.

24   BY MR. ZAK:

25   Q    Okay.  Now, trooper, what happened next?

1    A       As I started to get out of my patrol vehicle and

2    approached the rear of the Toyota, the operator immediately got

3    out of his vehicle and came back to meet me, nearing the left

4    rear of his vehicle.  He'd left the door open of the motor

5    vehicle.  I proceeded up to him cautiously.  At that time I

6    could look into the vehicle and I saw the rifle that was

7    actually sitting across towards the floor on the passenger's

8    side of the seat.

9    Q       Okay.  At this point, now, how was the defendant

10   dressed?

11   A       He had no hat on, he had camouflage coveralls on.

12   Q       Did he have any -- is he wearing a hunting license at

13   the time?

14   A       No, he wasn't, there was no hunting license on him or

15   on his coveralls.

16   Q       Okay.  And you say he didn't have a hat?

17   A       No, he did not have a hat on.

18   Q       Now, I'm going to show you --

19           THE COURT:  Ken, we want to make sure the weapon

20       is unloaded.

21           MR. ZAK:  We just did, we just opened the action.

22           THE COURT:  Okay.

23           (Whereupon, Commonwealth's Exhibit Nos. 4 and 5

24       were produced and marked for identification.)

25   BY MR. ZAK:

34

1    Q        Now, trooper, I'm showing you what's been marked as

2    Commonwealth's Exhibit 4, is this the weapon that you saw in the

3    car?

4    A        Yes, it was.  It was setting, as I said, across the --

5    actually the barrel was towards the floor of the motor vehicle

6    with the butt sitting up on the passenger's seat.

7    Q        Okay.  And did you unload it?

8    A        Not right at that time, I simultaneously, with spotting

9    the rifle and walking up to the car with, Mr. Leuschen I

10   observed a .22 Ruger revolver that was also sitting on the

11   passenger's seat next to the rifle.

12   Q        Okay.  Before we get to the revolver, at any point did

13   you unload this weapon?

14   A        Yes, as the sequence of events progressed, I did unload

15   it.

16   Q        But when you opened it up, did you find it to be

17   loaded?

18   A        Yes, it was, it was loaded, there was one in the

19   chamber.

20   Q        I'm showing you Commonwealth's Exhibit 5, what is this?

21   A        This is a clip containing four .243 caliber shells.

22   Q        And there was one in the chamber?

23   A        There was one in the chamber.

24   Q        Firing chamber?

25   A        Yes, there was.

1          MR. ZAK:  I'd offer Exhibits 4 and 5 into

2     evidence.

3          THE COURT:  Any objection, Attorney D'Alba?

4          MR. D'ALBA:  4 being the clip and 5 being the

5     weapon?

6          THE COURT:  4 is the weapon and 5 is the magazine.

7          MR. D'ALBA:  No objection.

8          THE COURT:  They are admitted.

9          MR. D'ALBA:  Could we lean the gun up so it's not

10     pointing at anyone?

11  BY MR. ZAK:

12  Q      So after that rifle came to your attention, your

13  attention came to a revolver?

14  A      Yes, at the same time, within seconds, I noticed the

15  revolver sitting on the seat.  There was several boxes of .22

16  shells laying about the car and on the seat.

17  Q      Boxes?

18  A      Pardon?

19  Q      Boxes?

20  A      Boxes.  I also noticed between the two front seats in

21  some type of, like, an ashtray or some type of container, there

22  was a -- several loose 9mm shells, loaded shells, that were

23  sitting in this container.

24  Q      Okay.  What else did you -- were you able to see?

25  A      I was -- during this period of time, I was talking to

1   Mr. Leuschen, trying to keep him in an area where I could keep
2   an eye on him.
3   Q        Okay.
4   A        I asked him if the gun was loaded and he stated, yes,
5   it was.
6   Q        You asked him if the .22 was loaded?
7   A        If the .22 was loaded, yes.
8   Q        At this point, I'm going to show you what's going to be
9   marked as Exhibits 6 and 7.
10               (Whereupon, Commonwealth's Exhibit Nos. 6 and 7
11          were produced and marked for identification.)
12               MR. D'ALBA:  Do you mind if I check the gun?
13               THE COURT:  Deputy, would you do that please, make
14          sure it's empty.
15               MR. ZAK:  I was about to do that, Your Honor.
16               THE COURT:  Okay.  Thank you.
17               MR. ZAK:  I'm going to show you what's been marked
18          as Commonwealth Exhibit 6.  Do you care to examine it,
19          Mr. D'Alba?
20               MR. D'ALBA:  No, thank you.
21   BY MR. ZAK:
22   Q        Is this the weapon you're referring to?
23   A        Yes, but this was not inside the holster.
24   Q        Where was the holster?
25   A        I'm not sure, it was sitting somewhere in around the

1    front seat of the vehicle.

2    Q        So your testimony it was outside the holster?

3    A        This gun was sitting outside the holster, it was

4    sitting on the passenger's seat closest to the driver's seat, on

5    the edge of the passenger's seat.

6    Q        All right.  Now, there is an envelope here which is

7    marked as Commonwealth's Exhibit 7, it's sealed.  Did you place

8    the items in this envelope?

9    A        No, I didn't, Trooper Marino did that.  I personally

10   handed them to Trooper Marino.  Those should be six .22 rounds

11   that I took out of the pistol.

12   Q        Okay.  I'm opening the corner of it right now.  Does

13   that appear to be six .22 rounds?

14   A        Yes.

15           MR. ZAK:  Okay.  I'd offer into evidence Exhibits

16       6 and 7.

17           THE COURT:  Any objection, Attorney D'Alba?

18           MR. D'ALBA:  None, Your Honor.

19           THE COURT:  Trooper, is that a .22 caliber

20       revolver?

21           THE WITNESS:  Yes, it is.

22           THE COURT:  That's what 6 is, okay, they are both

23       admitted.

24           MR. ZAK:  Your Honor, I have the hammer at half

25       cock and the cylinder open.

38

BY MR. ZAK:

1

2    Q       Okay.  Now, you mentioned 9mm shells in an ashtray?

3    A       It was the -- either an ashtray -- it was full of

4    whatever.  It originally could have been a can, it was full of

5    different items and on top were the 9mm shells.

6                    (Whereupon, Commonwealth's Exhibit No. 8

7             was produced and marked for identification.)

8    BY MR. ZAK:

9    Q       About how many were there?

10   A       I believe eight.

11   Q       Okay.  I'm showing you an envelope marked as

12   Commonwealth's Exhibit 8 and I'm opening a corner.  If you'd

13   glance inside and tell us what you see?

14   A       Those are eight 9mm shells.

15   Q       I'm going to take one out, is that a 9mm cartridge?

16   A       Yes.

17           MR. ZAK:  Would you care to examine it, Mr.

18           D'Alba.

19           MR. D'ALBA:  No thank you, sir.

20           MR. ZAK:  I'm going to offer Exhibit 8 into

21           evidence?

22           MR. D'ALBA:  No objection.

23           THE COURT:  Is that Number 8?  Do you have any

24           objection?

25           MR. D'ALBA:  No.

1        THE COURT:  That's admitted as well.

2    BY MR. ZAK:

3    Q        What did you find next?

4    A        As I reached in, after I basically got Mr. Leuschen

5    into a position where I could allow --

6            MR. D'ALBA:  Excuse me, Your Honor, I'd ask that

7            he be responsive to the question.  He was asked what's

8            found, not with regards to getting Mr. Leuschen into

9            whatever position he was asking.

10           MR. ZAK:  I mean, he can describe how he found the

11           item.

12           THE COURT:  Let me hear the question.

13           MR. ZAK:  I asked him what he found next.

14           THE WITNESS:  As I reached in to get the .22 out

15           of the vehicle, I noticed the 9mm semiautomatic sitting

16           on the passenger's seat, kind of in the crease where

17           the back -- in the actual seat portion would have been.

18   BY MR. ZAK:

19   Q        Okay.

20   A        I first removed the .22, unloaded that, took the

21   shells, set the .22 on the hood of the vehicle.

22   Q        Okay.  Now, where again was the 9mm pistol?

23   A        It was sitting on the seat basically under the butt of

24   the rifle in the crease.  There was other items that were

25   sitting also on the passenger's seat, but the .22 was in view

1    when I reached in to get the .22 out.

2    Q       All right.   Now, the 9mm, was it in any sort of

3    container?

4    A       The container was there, I'm not positive whether it

5    was on the seat or on the floor of the car, I believe it was on

6    the seat along with a blue bag.   When I went in for the 9mm, I

7    could see that it did have a clip in it, I checked the vehicle,

8    the gun and it was loaded also.

9                THE COURT:  Excuse me, would you clear that weapon

10               for us, trooper?

11               MR. ZAK:  It's clear.

12               THE COURT:  Okay.

13               (Whereupon, Commonwealth's Exhibit No. 9

14          was produced and marked for identification.)

15   BY MR. ZAK:

16   Q       I'm showing you what's been marked as Commonwealth's

17   Exhibit 9, is this the weapon you recovered?

18   A       Yes, it is, it had a full clip in it, it also had one

19   in the chamber.

20               MR. D'ALBA:  Would you also check the clip?

21               MR. ZAK:  The clip is not in the weapon right now.

22               THE COURT:  It's on the table.

23               MR. D'ALBA:  Okay.  As soon as you close that --

24               MR. ZAK:  Would you care to examine it, Mr.

25          D'Alba?

1          MR. D'ALBA:  No.

2          MR. ZAK:  I'd offer Exhibit 9 into evidence.

3          THE COURT:  Objection?

4          MR. D'ALBA:  No objection.

5          THE COURT:  Trooper, is that the 9mm

6      semiautomatic?

7          THE WITNESS:  Yes, it is.

8          THE COURT:  That's accepted as well.

9  BY MR. ZAK:

10  Q      Now, the make on this is Ruger, is that correct?

11  A      Yes.

12  Q      I'm showing you Exhibit 10 --

13          (Whereupon, Commonwealth's Exhibit No. 10

14      was produced and marked for identification.)

15  BY MR. ZAK:

16  Q      What is this?

17  A      This is a clip for a 9mm automatic, 15-round clip from

18  the indication on the back, it's fully loaded.

19  Q      Are all those bullets the same?

20  A      Yes, they are -- well, no, the top one is a hollow

21  point, the others -- the ones I could see, we never did eject

22  all of them, are solid round, hard round.

23  Q      All right.  And I'm showing you Exhibit --

24  Commonwealth's Exhibit 11 --

25          (Whereupon, Commonwealth's Exhibit No. 11

1          was produced and marked for identification.)

2   BY MR. ZAK:

3   Q       And what is this?

4   A       This is also a clip for the same weapon, this clip was

5   actually in the plastic container sitting in the clip storage

6   place.

7   Q       Okay.  Now, there is a plastic container -- before I

8   proceed to that, I'd offer Exhibits 10 and 11 into evidence.

9              MR. D'ALBA:  No objection.

10             THE COURT:  They are admitted.

11  BY MR. ZAK:

12  Q       Now, showing you what's been marked as Exhibit --

13             (Whereupon, Commonwealth's Exhibit No. 12

14         was produced and marked for identification.)

15  BY MR. ZAK:

16  Q       What is this?

17  A       This is a plastic storage box for Ruger, it says P-85.

18  It's the box that was on the seat, the clip was stored, the

19  second clip was stored in this box.  The gun itself was not in

20  the box at the time.

21             MR. ZAK:  I'd offer Exhibit 12 into evidence.

22             THE COURT:  Any objection?

23             MR. D'ALBA:  I don't know what the relevance is,

24         but I don't have any objection, no, Your Honor.

25             THE COURT:  All right.  We will accept that at

1          this time.

2    BY MR. ZAK:

3    Q        What happened next?

4    A        I removed the 9mm, I unloaded it, set it on the hood of

5    the vehicle also.   I then proceeded around to the passenger's

6    side of the vehicle to remove the rifle, which at that time I

7    took it out of the vehicle, checked it, found it to be loaded

8    and I unloaded the rifle, and at that time I set it on top of

9    the hood of the vehicle.

10   Q        Okay.  At that time did you find any other firearms,

11   handguns in the vehicle?

12   A        Very shortly I did find -- Mr. Leuschen gave me a Dan

13   Wesson .357 that he took from the vehicle, which was also loaded

14   and was in the styrofoam case at that time.

15   Q        Styrofoam case.  Now, he gave it to you?

16   A        Yes, I asked him for it.

17            THE COURT:  Excuse me, will the deputy observe the

18            contents of the weapon?

19            (Whereupon, the witness complies.)

20            MR. D'ALBA:  Thank you, Your Honor.

21            THE COURT:  Thank you.

22   BY MR. ZAK:

23   Q        I'm showing you what's been marked as Exhibit 13,

24   Commonwealth's Exhibit 13.

25            (Whereupon, Commonwealth's Exhibit No. 13

44

1        was produced and marked for identification.)

2   BY MR. ZAK:

3   Q        Very oily Exhibit 13; is this the revolver in question?

4   A        Yes, it is, at the time it was also fully loaded, .357

5   magnum, it was also inside the box, the box was between the

6   seats behind -- underneath the clothing and so forth.

7   Q        Okay.  The box came from underneath clothing.

8   A        It was actually out of sight under the clothing between

9   the driver and passenger's seat.

10               MR. ZAK:  Do you care to examine it, Mr. D'Alba?

11               MR. D'ALBA:  No thank you.

12               MR. ZAK:  I'd offer Exhibit 13 into evidence.

13               THE COURT:  We will accept that as well.

14               (Whereupon, Commonwealth's Exhibit No. 14

15        was produced and marked for identification.)

16   BY MR. ZAK:

17   Q        I'm showing you what's been marked as Commonwealth

18   Exhibit 14, an envelope, I'm going to open the corner of it,

19   take a look at it and tell us what's inside.

20   A        .357 hollow point rounds, there is six of them I

21   removed from the .357.

22   Q        All right.

23               MR. ZAK:  Would you care to examine it, Mr.

24          D'Alba?

25               MR. D'ALBA:  No thank you, Mr. Zak.

1        MR. ZAK:  I'd offer Exhibit 14 into evidence.

2        THE COURT:  It's admitted.

3    BY MR. ZAK:

4    Q      Now, at that time did you find any other ammunition in

5    the vehicle?

6    A      There was visible a lot of ammunition in the vehicle.

7        MR. ZAK:  If we may have the Court's indulgence

8        for one moment.

9        MR. D'ALBA:  Your Honor, again, to expedite

10       things, we would stipulate that the ammunition which

11       the Commonwealth is in possession of, which I

12       anticipate they will move into evidence, was in the

13       defendant's vehicle.

14       THE COURT:  Is that acceptable?

15       MR. ZAK:  That's acceptable.  We still wish to

16       offer it into evidence.

17       THE COURT:  You have no objection?

18       We're going to mark that as Number 15, is that

19       where we are?

20       MR. D'ALBA:  Yes, sir.

21       MR. ZAK:  Okay.  I'm going, for the sake of

22       convenience in moving things along, mark both these

23       items as the next numbered exhibits, 15 and 16.

24   BY MR. ZAK:

25   Q      Trooper, I'm showing you what's been marked as

46

1    Commonwealth Exhibit 15, if you can tell us basically what's

2    contained therein?

3    A        It's an ammo box containing many rounds of 9mm, .357,

4    and .22 ammunition.  This box was on the floor of the car in

5    front of the driver -- or in front of the passenger's seat.

6    Q        Okay.  And Exhibit 16, what is this?

7    A        This is a blue bag which contained other ammo.  There

8    is .22 rounds in here, this was either on the seat or on the

9    floor at the time that we went to the passenger's seat of the

10   car.

11   Q        Okay.  Was the ammunition in it?

12   A        It was.

13            MR. ZAK:  Mr. D'Alba, would you care to examine

14        these items?

15            MR. D'ALBA:  No thank you, sir.

16            MR. ZAK:  I'd offer them into evidence.

17            THE COURT:  Do you have objection to 16, Attorney

18        D'Alba, are both okay?

19            MR. D'ALBA:  That's correct 15 and 16.

20            THE COURT:  I'll accept them both.

21   BY MR. ZAK:

22   Q        Now, while you were there recovering these firearms

23   from the vehicle in question, did Mr. Leuschen make any

24   statements to you?

25   A        During this period of time, we -- of course, there was

1  a discussion going on about the guns, about the legality of them

2  guns, about any permits for them guns.  Mr. -- plus attempting

3  to obtain identification from Mr. Leuschen as to who he was,

4  what he was doing out there at that time.

5  Q       Okay.  And what did he say he was doing out there at

6  that time?

7  A       Of course, during this period of time of giving these

8  guns and getting them unloaded, he mentioned that he was target

9  shooting.  I looked around at that time, I remember there was a

10 lane very close to that that went actually to the lake back, and

11 looked around there to see if there was any signs of targets or

12 anything.  This is a heavily grown up area where the car was

13 actually stopped.  There was no open fields or no place where

14 you could actually set up targets or do any target shooting.

15 Q       Did he tell you where he was target shooting?

16 A       No, he did not.  This was just something that he

17 mentioned during our conversation.

18 Q       Did he say anything about hunting that particular day?

19 A       He'd mentioned the guns were for hunting.  Actually

20 state that he, yes, was out hunting woodchuck or whatever, no,

21 he did not say that he was actually hunting, but they were --

22 and I asked him about a hunting license, which he did produce.

23 Q       And he produced it from where?

24 A       From -- we were on the passenger's side of the vehicle.

25 At the same time I was inquiring about permits, which he said he

1  had permits to carry all them weapons, he was actually going

2  into the blue bag in the car, after I removed the rifle, and

3  getting his permits, identification, hunting license and so

4  forth and so on, and I was standing right next to him observing

5  when he did so.

6  Q        Okay.  And did he mention any particular animals that

7  he may have been hunting or would have hunted with these

8  weapons?

9  A        No, he did not.

10  Q        Now, did you see any signs of weapons being discharged

11  around there?

12  A        No, they were all fully loaded.  I saw no loose empty

13  rounds around the vehicle.

14  Q        And did you arrest him at that point?

15  A        No, I did not at that point.

16  Q        Okay.  What did you do?

17  A        After he produced the two provisional permits for the

18  two Rugers, that's when he produced the provisional permit for

19  the Dan Wesson .357, as if they were permits for him to carry

20  it, probation permits.  I inquired at that time, because he gave

21  me the permit for the .357, where the .357 was at that time.  He

22  told me it was in the vehicle.  I asked him if it was loaded, he

23  said yes, and I asked him where and he told me, and with that I

24  told him to get out, and he did bring the box out that contained

25  the .357.  During that sequence of events, I took Mr. Leuschen