49

1   and placed him in the rear of the patrol vehicle.  During that

2   period of time he was getting very upset at the fact that I was

3   taking possession of the weapons.

4   Q        Okay.  Because of the nature of the --

5   A        Because of the nature of the situation.  At that time

6   Mr. Leuschen was at times being very defensive, offensive,

7   upset, questioning my right to do this and so forth and so on.

8   I felt I was by myself, that the best thing would be to do is

9   get him from the scene.  I did not remove all the ammo from the

10  car.  At that time I basically tried to check to see if any more

11  weapons were in the vehicle.  I did manage to pat Mr. Leuschen

12  around the waist to see if he had any weapons underneath his

13  overalls.  He became offensive with that, so I told him in order

14  to get this straightened out, he would have to follow me to the

15  State Police station.

16  Q        Did he do that?

17  A        He did.  I pulled out and he did follow me from that

18  point to the Girard Station.  During that drive, I got on the

19  radio, advised him of the situation, that was my first chance

20  back to the radio to actually get to use it.

21  Q        Okay.  What happened at the police barracks?

22  A        As I arrived, the officers came out of the station, Mr.

23  Leuschen was --

24                MR. D'ALBA:  Excuse me, Your Honor.

25                THE WITNESS:  -- escorted into the station.

1        THE COURT:  Just a minute, trooper.

2        MR. D'ALBA:  I question the relevancy of what

3    happened at the station.

4        MR. ZAK:  Well, I think that I'm trying to elicit

5    evidence as to what the trooper did which lead to these

6    charges being filed.

7        MR. D'ALBA:  What he did, again, what relevance is

8    it, more or less likely to prove a fact in evidence and

9    I don't see that it is, Your Honor.

10        THE COURT:  I would accept the line of questioning

11    as long as we don't get any further astray, and I

12    presume you're about to the end of this line of inquiry

13    anyway, aren't we?

14        MR. ZAK:  I am.

15        THE COURT:  I'll overrule the objection and allow

16    the testimony.

17        MR. D'ALBA:  Thank you, Your Honor.

18        MR. ZAK:  All right.

19  BY MR. ZAK:

20  Q        So what did you do at the station?

21  A        Mr. Leuschen was placed under arrest when we got back

22  to the station and there was other officers around.

23  Q        All right.

24        MR. ZAK:  Cross-examine?

25        THE COURT:  Before you do that, Attorney D'Alba,

1    if we are going to be protracted cross-examination, it

2    might be a good time to break.  If it would be

3    relatively brief, we will let you do it.  But I don't

4    want to curtail your questioning, it might be smarter

5    just to break at this point.

6        MR. D'ALBA:  I don't think I'll be all that long,

7    Your Honor, but it might be best.

8        THE COURT:  Let's do that because we still have a

9    preliminary matter that we want to get on the record.

10       (Whereupon, Court recessed at 11:20 a.m. and

11   reconvened at 11:30 a.m.)

12       (Whereupon, the following discussion occurred in

13   chambers.)

14       THE COURT:  I think we want to put on the record

15   your motion to amend the information and Mr. D'Alba's

16   comments to that.

17       MR. ZAK:  I have -- also there is a housekeeping

18   matter.  The record should reflect that the jury was

19   selected in the absence of the court and off the record

20   without the stenographer present, and that's the normal

21   Erie County practice.  And I just want confirmation

22   from Mr. D'Alba that was done with his consent.

23       MR. D'ALBA:  So confirmed and consented to.

24       MR. ZAK:  And I would make a motion at this time

25   to amend Count 4 of the Information as drawn by the

1    District Attorney's Office, that's a summary offense,

2    loaded firearms a violation of 34 PS 2503.  There is a

3    reference to the .22 caliber revolver with six shells,

4    that's being amended to the .243 caliber rifle and

5    whatever cartridges it had in it that was already

6    admitted into evidence.  That was a clerical error and

7    I don't believe there is any prejudice to the defense.

8         THE COURT:  Do you have a comment to that request,

9    Attorney D'Alba.

10        MR. D'ALBA:  No, Your Honor, we don't object to

11   that.

12        THE COURT:  We will accept the amendment as such

13   and we will delete the reference to the .22 caliber

14   revolver that is in Count 4, which is the summary that

15   I'm to decide, and in its place, substitute the .243

16   caliber rifle and cartridges pertaining to that.

17        MR. ZAK:  That's all that the Commonwealth would

18   have at this time.

19        THE COURT:  Do you have anything further at this

20   time, Attorney D'Alba?

21        MR. D'ALBA:  No, Your Honor.

22        THE COURT:  Do we have any matters preliminarily?

23   Attorney D'Alba has submitted some points, we can do

24   those at the end of the day or we can at one-thirty.

25        MR. ZAK:  I'd be willing to do them any time at

53

1    the Court's convenience because of -- I would like to

2    finish our case, in fact, all testimony today because

3    one of my witnesses, one of the trooper's got -- the

4    charging officer is scheduled for vacation tomorrow.

5        (Whereupon, a discussion was held off the

6    record.)

7        (Whereupon, discussion in chambers was concluded.)

8        THE COURT:  Mr. D'Alba, I think you were ready to

9    cross-examine the trooper?

10       MR. D'ALBA:  That is correct, Your Honor.

11

12                CROSS-EXAMINATION

13

14   BY MR. D'Alba:

15   Q    Trooper Myers, is it?

16   A    Yes.

17   Q    Thank you, sir.  Trooper Myers, I'm going to ask you

18   several questions and if at any point, you have difficulty

19   hearing me, don't understand my questions, simply ask me and

20   I'll repeat it.

21       Now, trooper, you indicated that you were patrolling

22   alone in your marked police car, correct?

23   A    Yes.

24   Q    And that was along Old Lake Road?

25   A    Old Lake Road.

14

1    Q        It was near an intersection, I believe, correct?

2    A        It's about a half a mile west of Rudd Road in

3    Springfield Township.

4    Q        Would you tell us what's along -- what's adjacent to

5    Old Lake Road?

6    A        Lake Erie.

7    Q        And in between the road and Lake Erie, is there any

8    houses there, sir?

9    A        No.

10    Q        No houses, there is no businesses, no amusement parks,

11    nothing of that nature, correct?

12    A        No.

13    Q        And to the south of Old Lake Road is all woods,

14    correct?

15    A        Yes.

16    Q        And to the north of Old Lake Road is also wooded,

17    correct?

18    A        Wooded area, then the lake.

19    Q        Drops down to the lake?

20    A        Right.

21    Q        Would you agree with me, sir, that this area is used

22    primarily for hunting?

23    A        During hunting season, yes.

24    Q        You also testified that when you arrived upon Mr.

25    Leuschen's vehicle, that his head was down, is that correct?

55

1   A       Yes.

2   Q       The positioning of his head being down, would that be

3   consistent with someone if they were zipping up a jacket?  It

4   would be, correct?

5   A       Yes.

6   Q       Thank you.  And you also indicated that his car

7   contained other items of clothing?

8   A       A good deal of items.

9   Q       And it also contained a bright orange or bright red

10  hunting cap, did it not?

11  A       I did not see one, no.

12  Q       Okay.  Are you saying that it didn't or you just don't

13  recall that?

14  A       I don't recall it, I went through the vehicle.

15  Q       Now, regarding his clothing that Mr. Leuschen was

16  wearing, he was wearing a camouflage jump suit, is that right?

17  A       Insulated coveralls.

18  Q       That zip up the front?

19  A       Right.

20  Q       The type that you'd wear when you do outdoor activities

21  such as hunting, correct?

22  A       They can be in different situations, yes.

23  Q       But the camouflage nature of it makes it more geared to

24  hunting, generally speaking, correct?

25  A       Hunter orange is generally for hunting, yes.

1   Q        Okay.  Now, would you agree with me also, sir, that if

2   you were out in the woods, although it may be 40 or 45 degrees

3   out, that being out in the woods and walking and being quite

4   physical at times could cause your body to warm up, would you

5   agree with that statement?

6   A        I imagine if you walked hard enough.

7   Q        Okay.  And you'd also agree that when you got back to

8   your car, the first thing you might take off might be your hat,

9   correct?

10  A        Could be.

11  Q        Could be, thank you.  Do you recall what type of

12  footwear Mr. Leuschen was wearing?

13  A        Nothing as far as any big boots or anything like that.

14  Q        If I told you that he was indeed wearing a pair of

15  boots, would you have a present recollection to the contrary,

16  sir?

17  A        No.

18  Q        So, in fact, he could very well have been wearing

19  boots?

20  A        Type of a boot, yes.

21  Q        Perhaps a hunting-type boot?

22  A        I don't recall.

23  Q        Now, when you pulled up alongside or in the proximity

24  of Mr. Leuschen's vehicle, Mr. Leuschen voluntarily exited his

25  vehicle, correct?

1    A      Yes.

2    Q      And at that point he ran from the vehicle, right?

3    A      Pardon?

4    Q      Did he run from the vehicle?

5    A      No.

6    Q      He didn't -- never fled, did he?

7    A      No.

8    Q      And when he exited his vehicle, he didn't have any guns
9    on him?

10   A      No.

11   Q      He didn't make any attempt to hide the guns in the car,
12   did he?  He left them sitting on the seat, correct?

13   A      Correct.

14   Q      And, in fact, the .22 revolver was sitting in your
15   plain view on the front seat of the car?

16   A      Yes, it was.

17   Q      Despite the fact that he would have had an opportunity
18   to hide the gun or attempt to hide the gun, correct?

19   A      It's possible.

20   Q      I mean -- I'm sorry, I don't want to interrupt you.

21   A      It's possible, he could have.

22   Q      Okay.  Thank you.  You began talking with him, you
23   asked him if the gun was loaded, he said yes, sir, it is,
24   correct?

25   A      Yes.

58

1   Q      And also the 9mm gun was also on the front seat,

2   correct?

3   A      Yes.

4   Q      Plain view?

5   A      Yes.

6   Q      You asked him if it was loaded, he said yes?

7   A      Yes.

8   Q      And, in fact, the gun was loaded?

9   A      It was.

10  Q      And there was also a holder for that 9mm, is that also

11  correct?

12  A      It was the box that it was probably purchased in, yes.

13  Q      And the gun was not in that box, was it?

14  A      No, it wasn't.

15  Q      So the gun was removed from that box for some purpose?

16  A      Yes.

17  Q      And likewise with the .22 caliber revolver, there was a

18  holster, I believe you testified to, for that .22 caliber

19  revolver, but the gun was not in that revolver, was it?

20  A      No, it wasn't.

21  Q      Thank you.  Now, the .357, however, that was not on the

22  front seat?

23  A      Correct.

24  Q      That was under the seat?

25  A      That was not under the seat, it was in the back between

1    the two seats under clothing and whatnot.

2    Q        Okay.  So it wasn't clearly visible to you?

3    A        No, it wasn't.

4    Q        Did you ask Mr. Leuschen if there was any other guns in

5    the car or did he voluntarily tell you that?

6    A        He gave me the permit for the .357.  I asked him where

7    the .357 was.

8    Q        And he told you its correct location?

9    A        It was in the car.

10   Q        Thank you.  So, in fact, your subsequent investigation

11   of every question you asked Mr. Leuschen was confirmed, what he

12   stated to you?

13   A        As far as the weapons, yes.

14   Q        As far as the weapons okay.  Now, how about as far as

15   identification?  You asked him for a driver's license, correct?

16   A        Yes.

17   Q        Before you asked him for a driver's license, did you

18   ask him his name?

19   A        I don't believe.

20   Q        Isn't it your normal procedure to ask someone for their

21   name?

22   A        No.

23   Q        Okay.  But at no point did he lie to you about his

24   name, did he?

25   A        No.

60

1    Q        He gave you the driver's license, which correctly

2    identified him, it wasn't falsified in terms of his name?

3    A        No.

4    Q        Now, you indicated that at some point he became on the

5    offense?

6    A        Yes.

7    Q        That was -- he became upset because you placed him

8    under arrest, correct?

9    A        No, he became upset when I questioned his legality of

10   having them guns loaded in the car.

11   Q        Okay.  But you used the word offensive earlier today,

12   by offensive, you didn't mean that he tried to hit you in any

13   way, did he?

14   A        No, argumentative, upset.

15   Q        Did he raise his voice to you?

16   A        Not so much.

17   Q        If --

18   A        Not so much yell, it was the manner in which he became

19   very --

20   Q        Mad?

21   A        -- upset whenever I questioned him about the guns.

22   Q        But he never yelled at you?

23   A        No.

24   Q        In fact, you never had to handcuff him at the scene?

25   A        I didn't handcuff him at the scene.

1   Q       Now, in addition to the driver's license, you also took

2   several other documents from him, did you not?

3   A       He produced -- if you're talking about the license,

4   yes, two provisional licenses.

5   Q       So you took a hunting license, correct?

6   A       Hunting license.

7   Q       Fishing license?

8   A       No, I never saw a fishing license.

9   Q       Archery license?

10  A       No archery license that I know of, unless it was -- the

11  stamps may have been in the container for the hunting license, I

12  didn't look.

13  Q       Do you recall the duck stamp?

14  A       I didn't recall the duck stamp.

15  Q       And the guns that were seized from Mr. Leuschen all

16  were registered to Mr. Leuschen, correct?

17  A       I am not aware of that.

18  Q       But you don't have any information to the contrary?

19  A       The three --

20  Q       The question calls for a yes or no answer.

21  A       Ask the question again.

22              THE COURT:  Let me explain so that the jury

23          understands where we are going.  Ladies and gentlemen

24          of the jury, normally it's easier to follow if the

25          witness will answer yes or no to the question; however,

1        he's not limited to that.   After he answers yes or no,

2        he's certainly welcome to explain his answer and I

3        guess there would be occasions when the answer would be

4        "I don't know."  So if we try to follow that question

5        and answering method, it will be clearer to all of us.

6        So trooper, if you can, we'd appreciate that.

7               THE WITNESS:  Yes.

8               THE COURT:  Thank you.  Would you want to answer

9        that question?

10              THE WITNESS:  If he would ask it again, please.

11              THE COURT:  Would you read the question?

12   BY MR. D'ALBA:

13   Q       It is true, trooper, is it not, that you don't have any

14   information to the contrary that the guns were registered to Mr.

15   Leuschen?

16   A       I do have information to the contrary on one of them.

17   Q       Do you have information that the gun was registered to

18   someone else other than Mr. Leuschen?

19   A       No.

20   Q       So, in fact, the information that you have is all

21   consistent that the guns are Mr. Leuschen's?

22   A       Yes.

23   Q       Thank you.  And in your conversations with Mr.

24   Leuschen, you asked him what he was doing and he told you he was

25   out shooting?

1    A       Yes.

2    Q       And you also testified that you didn't see any targets

3    around, correct?

4    A       No, there wasn't any.

5    Q       That you're aware of?

6    A       That I'm aware of.

7    Q       And you also testified that you didn't see any spent

8    casings?

9    A       Right.

10   Q       How far from the vehicle did you go in an attempt to

11   determine if there were any spent casings?

12   A       I never searched any further than right around the

13   vehicle.

14   Q       Generally, sir, when people hunt, do they hunt standing

15   on the road or do they go into the woods?

16   A       Normally in the woods.

17   Q       So if there were any spent casings and if he was

18   hunting, the spent casings would tend to be in the woods and not

19   at the roadside where you were, correct?

20   A       Yes.

21   Q       Thank you officer.  And, in fact, Mr. Leuschen told you

22   that the guns he had were for hunting?

23   A       Yes.

24   Q       And you testified earlier that his hunting license was

25   not on his clothing, but was in the blue bag?

1    A        Was in the car, he got it from the inside of the car.

2    Q        Okay.  Did he have any difficulty locating it or he

3    went right to it, didn't he?

4    A        He looked through his glove compartment, the blue bag

5    and somewhere within the passenger's side.  He did, you know,

6    bring it out.

7    Q        So you're not exactly sure as to the specific detail

8    there?

9    A        No, because he brought out several papers.

10   Q        Okay.  Then the only other time that he was or became

11   upset or offended in your words was when he was patted down?

12   A        Yes.

13   Q        It's not unlikely that he was -- may have felt that he

14   was being placed under arrest at that point, correct?

15   A        I made no inference to it and it wasn't a full pat

16   down, I just checked around his waist.

17   Q        You generally pat people down before you arrest them,

18   don't you?

19   A        Yes, I do.

20   Q        Thank you.  Then you told Mr. Leuschen to get in his

21   car and follow you to the police station, the State Police

22   barracks at Girard so you could get this matter resolved,

23   correct?

24   A        No, I told Mr. Leuschen that he could -- if he wanted

25   to correct it, he could follow me to the station.

1    Q        So at that point it was up to him whether he followed
2    you to the station?
3    A        Yes, it was.
4    Q        So at that point, if he didn't follow you, that would
5    have been the end of it?
6    A        Yes.
7    Q        So at that point in your mind, there was no violation
8    of the law, correct?
9    A        Oh, there was definitely a violation of the law.
10   Q        But you weren't going to fulfill your duty, you were
11   just going to let it go?
12   A        If he would have drove off, I would have followed him
13   and stopped him when I had some help.
14   Q        I'm sorry, I don't follow your statement here, it's
15   probably my fault, but you testified that it was up to him to go
16   to the police station?
17   A        I told him he could follow -- if he wanted to correct
18   the situation, to follow me to the station, yes.
19   Q        Was your understanding that he had to follow you to the
20   police station or not?
21   A        If he hadn't followed me, I would have radioed for
22   another car and followed him until I got some help to stop him.
23   Q        But he did indeed follow you?
24   A        He followed me.
25   Q        Never made an attempt to elude you?

66

1    A    No.

2    Q    No attempt to flee?

3    A    No.

4    Q    Went straight to the police barracks?

5    A    Yes, followed me to the police station.

6         MR. D'ALBA:  Your Honor, I have no further

7    questions.

8         THE COURT:  Mr. Zak?

9         MR. ZAK:  Your Honor, I have a few questions on

10   redirect, if I may pick up where Mr. D'Alba went on.

11

12                      REDIRECT_EXAMINATION

13

14   BY MR. ZAK:

15   Q    When you told Mr. Leuschen to follow you to the police

16   station, did you have his guns in your possession?

17   A    I had them in the back of the patrol vehicle, yes.

18   Q    Okay.  And also, at that point. did you suspect him of

19   being in violation of the law?

20   A    Yes, I did.

21   Q    Why didn't you arrest him then?

22        MR. D'ALBA:  Objection, irrelevant.

23        MR. ZAK:  He brought it up.

24        THE COURT:  I'm going to overrule the objection

25   and direct the witness to answer the question.

1          THE WITNESS:  He was hostile to the point where if

2      I would have made an attempt, we would have had some

3      problems.  And I had nobody coming to assist me because

4      I hadn't ever gotten the opportunity to get back to the

5      radio with what I found when I approached his vehicle.

6  BY MR. ZAK:

7  Q          Okay.  So it would be fair to say that if you wanted

8  help, you had to go back to your car to radio for help?

9  A          And leave him, yeah, leave him and go to the car.

10 Q          Now, why did you pat him down?

11 A          Several times I had to turn my back on him, I wanted to

12 make sure he had no other weapons underneath his coveralls.

13 Q          And are you familiar with the area that you found him

14 in?

15 A          Yes, I am.

16 Q          And how are you familiar with that area?

17 A          I patrol it normally once or twice a shift.

18 Personally, I hunt on that land, been 20 years, 21 years driving

19 through it.

20 Q          All right.  And in February when you patrolled through

21 there have you -- or gone through there for any purpose, do you

22 find hunters there?

23 A          Not in February, no.

24 Q          And you indicate you have hunted on that land, what

25 have you hunted for?

17

1    A       Small game and deer during deer season.

2    Q       You hunt for anything in February?

3    A       No.

4    Q       Does anyone hunt there for anything in February?

5    A       Not that I know of.

6    Q       Are there woodchucks on that property?

7    A       This is a wooded area, it's not fields, it's not

8    normally habitat for woodchucks, I believe.

9    Q       Have you ever hunted woodchuck?

10   A       Yes.

11   Q       And where does one hunt woodchuck?

12   A       Usually in fields, clover fields, hay fields that are

13   mowed and cut.

14   Q       In other words, it's open country?

15   A       Yes, open country.

16   Q       Are there any game that one can hunt all year round in

17   the area in question?

18   A       Woodchucks are one that you can, I believe, I believe

19   you can hunt year round.  I believe crows are migratory, they

20   are not in our area during that period of time.

21   Q       And from your experience, do woodchucks hibernate

22   during that period?

23   A       Yes.

24   Q       Now, did Mr. Leuschen indicate to you in any way what

25   he was shooting at?

1    A        No, not at all.

2    Q        And from your experience in hunting and shooting, do

3    hunters normally leave empty casings where they've ejected from

4    the weapon or do they pick them up?

5    A        It depends on what type, whether he reloads or not.

6    Q        Now, the weapons that you recovered, are those

7    reloadable casings?

8    A        All but the .22 shells.

9    Q        So the rifle cartridges, the 9mm, the .357, those can

10   be saved and recycled, is that right?

11   A        Right.

12   Q        Is it the practice or is it not the practice of hunters

13   and shooters to save those casings?

14   A        It depends on the hunter, whether they reload or not.

15   Q        And did you find any fishing equipment in the car in

16   question?

17   A        Not that I saw, I was not there during the -- when the

18   car was completely, you know, gone through.

19   Q        And did Mr. Leuschen mention any particular game of any

20   sort?

21            MR. D'ALBA:  The question has been asked and

22            answered, Your Honor.

23            THE COURT:  I'm sorry, I didn't hear your

24            objection.

25            MR. D'ALBA:  The question has been asked and

1    answered.  He asked him if Mr. Leuschen told him what

2    he was shooting at, now he's asked him if he named any

3    particular game that he was shooting at.

4        MR. ZAK:  I'll withdraw it.

5        THE COURT:  I think we have already covered that,

6    I would sustain that objection.

7        MR. D'ALBA:  Thank you, Your Honor.

8        MR. ZAK:  Those are all the questions I have on

9    redirect.

10       THE COURT:  Trooper Myers, this morning we

11   identified as Exhibit Number 4 a rifle, what kind of a

12   rifle was that?

13       THE WITNESS:  It's a .243 Remington, I think it's

14   a game master or 76 model, model 7600.  Is it Model 6?

15   Model 6.

16       THE COURT:  Where did you find that rifle?

17       THE WITNESS:  It was actually in view sitting on

18   the passenger's seat.

19       THE COURT:  In the vehicle Mr. Leuschen --

20       THE WITNESS:  In the vehicle to the right of Mr.

21   Leuschen.

22       THE COURT:  Was that vehicle loaded or unloaded?

23       THE WITNESS:  The weapon was loaded.

24       THE COURT:  All right.  Thank you.  Anything

25   further of Trooper Myers?

1        MR. D'ALBA:  I'd like to recross, if I may.

2        THE COURT:  You can if it's an area we haven't

3    already been over, if it's something I opened up,

4    you're welcome to.

5        MR. D'ALBA:  Not in terms of what you opened up,

6    Your Honor, but in terms of redirect of the

7    Commonwealth.

8        THE COURT:  Well, you ask.  If I find it's

9    redundant, we will stop.

10

11                    RECROSS-EXAMINATION

12

13   BY MR. D'ALBA:

14   Q        Trooper, I just wanted to clarify.  You indicated that

15   there are no woodchucks in that area?

16   A        That area. I don't believe I've ever seen one.

17   Q        But you don't know for a fact that there are no

18   woodchucks there?

19   A        No, I have never seen one in that area, in the

20   patrolling of that area.

21   Q        Trooper, when you hunt, do you hunt solely for the

22   purpose of killing things or do you hunt for sometimes the

23   enjoyment of it?

24   A        I hunt for meat, personally.

25   Q        Do you enjoy hunting?

72

1    A        Yes, I do.

2    Q        And, in fact, there are hunters that hunt for the sake

3    of -- excuse me, I have to speak up, one of the jurors, Your

4    Honor, indicated during voir dire some difficulty hearing, so

5    I'm going to -- it's true, trooper, is it not, that some people

6    hunt simply for the sake of getting out in the woods, tromping

7    around and enjoying themselves, correct?

8    A        That's all part of hunting, yes.

9    Q        And the fact that someone would participate in such an

10   activity at a time when the likelihood of killing something

11   might not be great, that wouldn't necessarily take away from

12   that enjoyment, would it?

13   A        It would actually be illegal, I believe.

14   Q        It would be legal?

15   A        It would be -- I said, I believe it would be illegal.

16   Q        Oh, it would be illegal?

17   A        Yes, you can't hunt deer out of season. you can't hunt

18   small game out of season.

19   Q        But there is nothing illegal in going in the woods

20   during a game season with no intention of killing anything, is

21   there?

22   A        Not during hunting season, no, you don't have to shoot

23   game.

24   Q        And you can hunt all year round in Pennsylvania?

25   A        No, I don't believe you can.

1              (Whereupon, Defendant's Exhibit A

2         was produced and marked for identification.)

3    BY MR. D'ALBA:

4    Q         Trooper, I hand you what's been marked for

5    identification purposes as Defendant's Exhibit A, can you tell

6    us what that is, sir?

7    A         That is the hunting and trapping regulations for

8    Pennsylvania, July 1st, '89 to June 30th, '90.

9    Q         Sir, I direct your attention to -- I believe you just

10   opened to the center of that book which has the seasons for the

11   various game in Pennsylvania that you're permitted to hunt,

12   correct?

13   A         Yes, it does list the seasons.

14   Q         Isn't it also correct that the season for hunting

15   woodchuck extends from July 1st until June 30th?

16   A         Other than a small exception, yes, unlimited.

17   Q         So, sir, my question to you earlier, isn't it true that

18   it is permissible to hunt in the Commonwealth of Pennsylvania

19   all year round, is that correct?

20   A         Woodchucks, yes.

21   Q         Thank you.  And finally, regarding the casings left

22   behind, you were asked if some hunters leave them and some

23   hunters take them, you indicated that that depended upon whether

24   they reloaded their ammunition?

25   A         Yes.

74

1    Q        Some hunters are more conscientious than others, aren't

2    they?  Some hunters pick up their shotgun casings, don't they?

3    A        Some do that, reload them, others I find that they

4    don't.

5    Q        Some pick up things that can't even be reloaded simply

6    because they don't want to pollute or litter the environment, is

7    that correct?

8    A        That's possible, yes.

9    Q        Some hunters have a greater respect for the

10   environment, for nature, than others, correct?

11   A        Yes, definitely.

12           MR. D'ALBA:  Thank you, I have no further

13           questions.

14           THE COURT:  Anything further, Mr. Zak?

15           MR. ZAK:  No, that was all covered on redirect.

16           THE COURT:  Thank you, trooper, you may step down,

17           thank you.

18           MR. ZAK:  The next witness will be Trooper Marino.

19

20                     WILLIAM MARINO,

21

22   having been first duly placed under oath, was examined and

23   testified as follows:

24

25

75

DIRECT EXAMINATION

BY MR. ZAK

Q       Trooper Marino, would you please state your full name and where you are employed?

A       Trooper William A. Marino, Pennsylvania State Police, Girard.

Q       How long have you been so employed?

A       Twenty years.

Q       And currently, what is your position with the State Police?

A       Right now, member of Crime Unit, PSP Girard.

Q       Okay.  That would be more or less like a detective, is that right?

A       Yes, sir, sort of.

Q       Okay.

        MR. D'ALBA:  Your Honor, if I may, again, we would stipulate to Trooper Marino's qualifications as to his position with the Pennsylvania State Police and his part in this, in the capacity that he did in this matter.

        THE WITNESS:  Thank you.

        THE COURT:  Okay.  We will accept that stipulation.

        MR. D'ALBA:  Thank you, Your Honor.

76

1   BY MR. ZAK:

2   Q        Trooper Marino, on February 24th, 1989 were you working

3   in that capacity?

4   A        Yes, sir, I was.

5   Q        And did Trooper Myers' involvement with Mr. Leuschen

6   come to your attention?

7   A        Yes, sir, it did.

8   Q        And could you tell us how that happened?

9   A        Well, Mr. Leuschen followed Trooper Myers down to the

10  Pennsylvania State Police barracks in Girard.  At that time

11  Trooper Myers advised me of the situation and at that point I

12  brought Mr. Leuschen into the barracks, advised him of his

13  Constitutional rights and interviewed him relative to his

14  possession of the firearms.

15  Q        And did he sign a paper acknowledging that he was

16  informed of his Constitutional rights?

17  A        Yes, he was advised, he was very well advised and he

18  did sign a State Police form indicating he was advised of his

19  Constitutional rights.

20  Q        What did he tell you?

21  A        At that point he told me that, yes, the firearms were

22  loaded and, however, he was using them for hunting.

23  Q        Did he state what he was hunting?

24  A        No, sir.

25  Q        Did he state where he was hunting?

1    A        No, sir.

2    Q        Did he go into any detail at all beyond that as to what

3    he was doing with the firearms?

4    A        No details, no, no, sir.

5    Q        Okay.  Did he make any other statement to you at that

6    point?

7    A        Basically, he did not appear to understand that he was

8    not permitted to have possession of the loaded firearms in his

9    vehicle.

10   Q        Okay.  Then what did you do?

11   A        At that point I advised him that he was going to be

12   charged with the firearms violation.

13   Q        And in your investigation into this matter, what did

14   you do with the firearms in question?

15   A        The firearms were taken into custody and the three

16   firearms were submitted to the Pennsylvania State Police, Erie

17   Regional Lab, to test for operability.

18            MR. D'ALBA:  Excuse me, Your Honor, again just to

19            try to speed things up, we agree and stipulate that all

20            the guns were operable within the meaning of the law,

21            if that's where -- I think that's where you're going.

22            MR. ZAK:  If you're stipulating that --

23            MR. D'ALBA:  All the guns can be fired.

24            MR. ZAK:  Fine.

25            THE COURT:  Is that where you're going?

78

1          MR. ZAK:  Exactly.

2          THE COURT:  We will accept that stipulation as

3      well, thank you.

4  BY MR. ZAK:

5  Q          And this is a housekeeping matter, but after submitting

6  them to the lab, they were returned to your custody, is that

7  right?

8  A          Yes, sir, they were again recorded in our property

9  room, PSP, Girard.

10  Q          And what did you do to determine whether or not Mr.

11  Leuschen had a license to carry the firearms?

12  A          At the time of the interview, I asked Mr. Leuschen

13  personally if he had a permit for any of the firearms and he

14  could not produce one.  I asked Trooper Myers if he, in fact,

15  was able to obtain a firearm permit from Mr. Leuschen.  He

16  advised me he could not.  I also contacted the Erie County

17  Sheriff's Department to see if he had a record of a license to

18  carry firearms. and they advised me at that time that he did

19  not.

20          (Whereupon, Commonwealth's Exhibit No. 17

21      was produced and marked for identification.)

22  BY MR. ZAK:

23  Q          A number of pieces of paper stapled together, would you

24  tell us what that is?

25  A          This is a Pennsylvania State Police information

1    certification regarding the license to carry firearms.  This is

2    submitted to the Pennsylvania State Police Firearms Division to

3    ascertain if, in fact, any of the individuals have a firearms --

4    license to carry the firearm.

5    Q       And you send that in for a response, is that correct?

6    A       Yes, sir, that's correct.

7    Q       Okay.  And this bears the seal, does it not?

8    A       Yes, sir, it's seal of the commissioner of the

9    Pennsylvania State Police.

10            MR. ZAK:  Mr. D'Alba, are you familiar with this?

11            MR. D'ALBA:  You did provide me with a copy of it,

12       and I have no problem with it, no objection to its

13       admission.

14   BY MR. ZAK:

15   Q       All right.  Now, on Exhibit 17, what does it indicate

16   concerning whether or not Mr. Leuschen has a license or not?

17   A       Indicates that he did not have a valid license to carry

18   firearms issued under the provision of Section 6106(b) of the

19   Crimes Code.

20   Q       That's the provision concerning carrying a firearm

21   without a license, correct?

22   A       Concealed on his person or in a motor vehicle, that's

23   correct.

24   Q       Now, there is another box checked, what does that

25   indicate?

80

1    A        This indicates that he did have a valid provisional

2    firearm registration permit for two of the firearms, one, the

3    .357 Dan Wesson and the Ruger .22.

4    Q        Now, what is a provisional firearms registration permit

5    as opposed to a license to carry firearms?

6    A        In this case, it pertains to the license that's issued

7    to -- it's issued to carry the firearm while hunting in lieu of

8    a rifle.

9    Q        All right.  A firearm, a handgun rather than a rifle?

10   A        Handgun rather than a rifle, correct.

11            MR. ZAK:  At this time I'd offer Commonwealth's

12            Exhibit 17 into evidence.

13            MR. D'ALBA:  May I see that please again?

14            MR. ZAK: Sure.  Okay.  Thank you.

15            MR. D'ALBA: Okay.  Thank you.

16            MR. ZAK:  Do you have any objection to it being

17            admitted?

18            MR. D'ALBA:  No objection.

19            THE COURT:  It's accepted.

20   BY MR. ZAK:

21   Q        Trooper Marino, is Mr. Leuschen in the courtroom?

22   A        Yes, sir, he is.

23   Q        Could you point him out please?

24   A        He's seated next to counsel.

25            MR. ZAK:  Okay.  Let the record indicate the

1          witness has identified the defendant.

2    BY MR. ZAK:

3    Q        How was Mr. Leuschen dressed at the time you

4    interviewed him?

5    A        He had a pair of coveralls on.

6    Q        Okay.  Was he wearing a hunting license?

7    A        No, sir, I did not see a hunting license.

8    Q        Did he have a cap of any sort?

9    A        I do not recall a cap.

10   Q        Was one drawn to your attention by anyone?

11   A        On that particular date?

12   Q        Any time.

13   A        Not that I recall, no, sir.

14   Q        And does his -- is his appearance today the same or any

15   different from the day that you interviewed him?

16              MR. D'ALBA:  Objection to relevance,

17              identification of Mr. Leuschen isn't an issue.

18              THE COURT:  Do you want to come to sidebar and we

19              will talk about that?

20              (Whereupon, the following discussion occurred

21              on the record at sidebar:)

22              MR. ZAK:  Well, I think it goes to change of

23              appearance, his consciousness of guilt.

24              MR. D'ALBA:  I vehemently disagree.  I believe

25              there has been -- he's been incarcerated for four

1      months, he's entitled to clean up.  Anyway, he wanted

2      to for presentation of the jury.  There is no way it's

3      an admission of guilt.

4           MR. ZAK:  Well, I think --

5           MR. D'ALBA:  And I think the attempt to try to

6      introduce it is a cheap shot.

7           MR. ZAK:  At the time he was arrested, and he was

8      not incarcerated at that time, he looked different, and

9      I think the fact that he's cleaned himself up quite

10     beyond the way he was at the time of his arrest is

11     relevant, as indicated, consciousness of guilt.

12          MR. D'ALBA:  Your Honor, to say that the length of

13     one's hair is any indication of guilt or innocence is

14     to say that the --

15          MR. ZAK:  It's not what we are indicating.

16          MR. D'ALBA:  You know --

17          THE COURT:  Okay.  Attorney Zak, if we had been

18     dealing with an identification issue, I would certainly

19     allow that, but other than you showing me some reason

20     why we have identification involved, I'm going to

21     overrule, I'm going to sustain the objection and

22     prevent this line of questioning.

23          MR. D'ALBA:  Thank you, Your Honor.

24          (Whereupon, discussion at sidebar was concluded.)

25  BY MR. ZAK:

1  Q        With regard to the rifle that was recovered, what did

2  you do with the rifle?

3  A        The rifle was turned over to the member of the Game

4  Commission.

5  Q        Okay.  Is that the gentleman here in the courtroom?

6  A        Mr. Hochlander, correct.

7  Q        And for what purpose?

8  A        That he was going to cite Mr. Leuschen for the game

9  violations.

10            MR. ZAK:  That's all the questions that I have at

11            this time, cross-examine.

12            THE COURT:  Attorney D'Alba?

13            MR. D'ALBA:  Thank you, Your Honor, I'll be brief.

14

15                      CROSS-EXAMINATION

16

17  BY MR. D'ALBA:

18  Q        Trooper Marino, you asked Mr. Leuschen numerous

19  questions, did you not, several questions. correct?

20  A        I would agree with several questions, yes, sir.

21  Q        Okay.  Great.  In the course of those several

22  questions, do you have reason to believe that Mr. Leuschen

23  misled you in anyway or attempted to lie to you or falsify any

24  information to you. sir?

25            MR. ZAK:  I'm going to object.

1          THE WITNESS:  Do you want my opinion?

2          MR. ZAK:  That's an argumentative question.

3  BY MR. D'ALBA:

4  Q        Let me ask you this, you asked him what he was doing,

5  he told you he was hunting, correct?

6  A        Yes, sir.

7          MR. D'ALBA:  Thank you, no further questions.

8          THE COURT:  Anything further, Attorney Zak?

9          MR. ZAK:  No.

10          THE COURT:  Thank you, trooper, you may step down.

11          MR. ZAK:  The next Commonwealth witness will be

12          Mr. Hochlander.

13

14                   SHAYNE HOCHLANDER,

15

16  having been first duly placed under oath, was examined and

17  testified as follows:

18

19                   DIRECT_EXAMINATION

20

21  BY MR. ZAK:

22  Q        I have just been corrected.  Mr. Hochlander, is that

23  correct?

24  A        That's correct.

25  Q        Please state your full name and your place of

1    employment.

2    A        Shayne Alan Hochlander, Pennsylvania Game Commission.

3    Q        And how long have you been so employed?

4    A        Four years.

5    Q        And taking you back to last February, were you so

6    employed?

7    A        Yes, I was.

8             MR. D'ALBA:  Again -- excuse me, Officer

9             Hochlander.  Again, Your Honor, we would stipulate that

10            Mr. Hochlander is properly employed by the Pennsylvania

11            Game Commission, he was acting within the scope of his

12            employment at the time of his involvement in this

13            matter, just to try to speed things up.

14            THE COURT:  Okay.  Let the record show that we

15            will accept the stipulation as well and move on.

16   BY MR. ZAK:

17   Q        On February 24th, did Mr. Leuschen and his rifle come

18   to your attention?

19   A        Yes, sir, they did.

20   Q        How was that?

21   A        Shortly after four o'clock I had walked into my home

22   and received a phone call almost immediately from my office

23   requesting me to go to the Girard State Police barracks to

24   investigate a potential violation.

25   Q        Okay.  What did you find when you got there?

1    A        I found Mr. Leuschen was in custody and I talked to

2    Trooper Myers about what he had seen and he informed me about

3    the loaded firearms in the vehicle.  I checked over the firearms

4    and I talked to Mr. Leuschen briefly.

5    Q        Okay.  Now, when you spoke to Mr. Leuschen, what did he

6    say to you?

7    A        He just basically gave me his location and that he was

8    out there hunting.

9    Q        Did he say anything more than that?

10   A        No.

11   Q        And now, the one weapon you cited him with, is that

12   Exhibit 4, this .243 rifle?

13   A        Yes, rifle is correct.

14   Q        Okay.  When you recovered the rifle, did you recover

15   anything else with the rifle?

16   A        I recovered a loaded magazine with the rifle.

17   Q        Okay.  And exactly what violation of the game laws did

18   you cite this man with?

19   A        The section was 2503 of Title 34, and it's loaded

20   firearms in a vehicle, and basically states that you cannot have

21   a loaded firearm in, on or against a vehicle, whether the

22   vehicle is in motion or not.

23   Q        Now, from your experience in the Game Commission, did

24   that apply even if a person was hunting?

25   A        It applies if he is or is not hunting.

1   Q       Okay.  And --

2           MR. D'ALBA:  Excuse me, Your Honor, could we maybe

3       approach the bench briefly?

4           THE COURT:  Surely.

5           (Whereupon, the following discussion occurred

6       on the record at sidebar:)

7           MR. D'ALBA:  Would it be appropriate to let the

8       jury know that it --

9           THE COURT:  I'm going to do that.

10          MR. ZAK:  I have no problem with an instruction.

11          THE COURT:  That's what I was going to do after

12      and explain how it fits, they are going to know.

13          (Whereupon, discussion at sidebar was concluded.)

14  BY MR. ZAK:

15  Q       Is there anything else you did in this matter beyond

16  that?

17  A       No, my involvement was only concerned with a loaded

18  firearm in the vehicle.

19          MR. ZAK:  Cross-examine -- wait.  Before that, just

20      one small question.

21  BY MR. ZAK:

22  Q       Is Mr. Leuschen in the courtroom?

23  A       Yes, he is.

24  Q       Would you please point him out?

25  A       Yes, sir (indicating).

1          THE COURT:  Excuse me, Mr. Leuschen, would you

2      mind standing for me, please?

3          (Whereupon. defendant complies.)

4          THE WITNESS:  That is Mr. Leuschen (indicating).

5          THE COURT:  Let the record show that the witness

6      is pointing to the party who is standing to the left of

7      his lawyer, thank you.

8          MR. ZAK:  If I could have the court's indulgence

9      before cross-examination, before I complete my direct,

10     I had another several questions.

11 BY MR. ZAK:

12 Q      Are you familiar with the area in question on Lake

13 Road?

14 A      Yes, I am.

15 Q      Old Lake Road.  And are you familiar with the type of

16 hunting activity that goes on there?

17 A      Yes, I am.

18 Q      What type of hunting activity goes on there?

19 A      Basically deer, there is very limited waterfowl hunting

20 on the lake, and grouse and woodcock are the primary forms.

21 Q      All right.  And what are the seasons for those

22 creatures?

23          MR. D'ALBA:  Objection to the seasons, that's not

24      in dispute.

25          MR. ZAK:  Well, that was opened up by the defense

1          on cross-examination of the last witness.

2               MR. D'ALBA:  That was with regard to woodchucks.

3               THE COURT:  I'm going to overrule the objection.

4          I'm not so sure how relevant we are at this point, but

5          I'm going to direct the witness to answer the question.

6               MR. D'ALBA:  Thank you, Your Honor.

7               THE WITNESS:  Okay.  The deer season ends in

8          around the first week of January, similar times for

9          grouse and woodcock and waterfowl ends in December.

10     BY MR. ZAK:

11     Q      Is there any season in February?

12     A      Woodchucks, foxes, coyote and there was a crow season

13     in.

14     Q      All right.  At that time of year in that area are there

15     any foxes?

16     A      There would be foxes in that area.

17     Q      How would one hunt the fox in that area?

18               MR. D'ALBA:  Object to that, Your Honor, I think

19          we are getting a little too far astray here.

20               MR. ZAK:  Your Honor, I don't think we are because

21          I believe it's part of the defense in this case that

22          this man was hunting and I think we are allowed to

23          explore what he would be hunting in that area.

24               MR. D'ALBA:  He's indicated foxes can be hunted,

25          fine, that's consistent with what maybe -- what the

1    defense is raising, there is no issue as to how to hunt

2    a particular species.

3    MR. ZAK:  Well, what I'm going to ask is what type

4    of weapon would be used to hunt a fox.

5    THE COURT:  I think we will allow the witness to

6    answer this question, but we won't go any further

7    afield.  I'll overrule the objection and ask the

8    witness to answer that as well.

9    THE WITNESS:  Fox is generally hunted with dogs or

10   with some type of a call and semi -- or shotguns are

11   the standard, semiautomatic rifles or handguns are not

12   legal to hunt with.

13   MR. ZAK:  All right.  Okay.

14   MR. D'ALBA:  I'm going to object to the answer as

15   being nonresponsive and request that it be stricken and

16   a cautionary instruction be given to the jury, Your

17   Honor.

18   THE COURT:  Yeah, we will do that.

19   MR. ZAK:  Well, I'd object to part of that because

20   the question was permitted as to what is used to hunt

21   them and he gave the answer.

22   THE COURT:  I'm going to allow the answer as

23   presented that's responsive to the question and, ladies

24   and gentlemen of the jury, we had a question that was

25   posed and partially answered, the beginning of the

1           answer was responsive to the question, but there was a

2           second and possibly a third clause as to what is

3           illegal to use, and that's not responsive.  I'm going

4           to ask the steno to strike that part from the record

5           and I'm going to ask the jury not to pay attention to

6           that second part of the question that was unresponsive

7           to Attorney Zak's question.  You may proceed, Mr. Zak.

8    BY MR. ZAK:

9    Q       Okay.  At that time of year are there woodchucks up and

10   around in that area?

11   A       Normally not, they exhibit hibernation.

12   Q       Okay.  And how about crows?

13   A       Crows basically are in Mexico, South America at that

14   time of the year.

15   Q       Okay.  And are there any other animals that are

16   permitted to be hunted at that time of the year?

17   A       Coyotes, skunks, possums, weasels.

18   Q       All right.  Are there any in that area?

19   A       Yes.

20   Q       And once again, what sort of weapons would be used to

21   hunt those species?

22   A       Generally shotguns and by the same methods that I spoke

23   of before, dogs or some form of call.

24   Q       But the weapon in question would be a shotgun, is that

25   right?

92

1  A        Most often.

2  Q        The weapon of choice?

3  A        A weapon of choice, most often.

4           MR. ZAK:  Okay.  Those are all the questions I

5  have at this time.  Cross-examine?

6           THE COURT:  Thank you, Mr. Zak.  Attorney D'Alba?

7           MR. D'ALBA:  Thank you, if I may have just a

8  moment.

9

10                    CROSS-EXAMINATION

11

12 BY MR. D'ALBA:

13 Q        Officer, excuse me for not using your last name.  I'll

14 do that to save us both embarrassment, but a woodchuck is the

15 same as a groundhog, is that true?

16 A        That's correct.

17 Q        When's Ground Hog's Day?

18 A        February 2nd, I believe.

19 Q        And woodchucks tend to come out of their burrows, for

20 lack of knowledge as to what the particular term is, when the

21 weather gets nice, correct?

22 A        That's correct.

23 Q        Woodchucks don't come out of their burrows on any given

24 calendar because they don't go by that, do they?

25 A        That's correct.

1    Q        They go by nature?

2    A        That's correct.

3    Q        So if it was a nice day and it happened to be a little

4    warmer out after presumably a cold winter, there could very well

5    have been groundhogs or woodchucks out that day, is that

6    correct?

7    A        Correct, it's a possibility, yes.

8    Q        It wouldn't have unreasonable to hunt woodchucks that

9    day, would it?

10   A        No, not unreasonable, unlikely.

11   Q        It might be unlikely, but it wouldn't be unreasonable?

12   A        That's correct.

13   Q        I assume that you're an avid outdoorsman?

14   A        That's correct.

15   Q        You enjoy being out in the woods, walking around?

16   A        Yes.

17   Q        Did you ever go out without your gun?

18   A        Yes.

19   Q        Do you ever go out with your gun and not necessarily an

20   intention of hunting, but maybe we'll hunt if we see something?

21   A        Yes.

22   Q        That's not unusual, is it?

23   A        No, it's not.

24   Q        Mr. Leuschen made a statement to you about his activity

25   that day, correct?

94

1   A       That's correct.

2   Q       And he told you he was hunting?

3   A       Yes.

4            MR. D'ALBA:  No further questions.

5            THE COURT:  Attorney Zak?

6

7                    REDIRECT_EXAMINATION

8

9   BY MR. ZAK:

10   Q       Mr. Hochlander, you indicated in response to Mr.

11  D'Alba's question that it would be reasonable, but unlikely, to

12  be hunting woodchucks; what did you mean by that?

13   A       The chances of seeing one are unlikely, although

14  possible, and I have never checked a woodchuck hunter in that

15  month in my four years.

16   Q       Now, when woodchucks are hunted, would they be hunted

17  in an area that we have described, a wooded area or an open

18  area?

19   A       They generally are hunted in an open area, fields.

20   Q       Now, the area around Old Lake Road that we are

21  discussing, are there any fields?

22   A       No.

23            MR. ZAK:  That's all the questions I have.

24            THE COURT:  Thank you.  Attorney D'Alba, are you

25           finished with the witness?

95

1          MR. D'ALBA:  No questions, Your Honor.

2          THE COURT:  All right.  Thank you, officer, you

3     may step down, thank you very much.

4          Ladies and gentlemen of the jury, I want to tell

5     you something that's going to clarify a little bit.  If

6     you recall this morning, I indicated that the defendant

7     is charged with three crimes and they all relate to a

8     pistol and there are three pistols that have been

9     presented.  Now, in fact, the defendant was charged

10    with a fourth crime, but that is the decision that I

11    make and I decide guilt or innocence on that, and you

12    really don't have anything to do with that, that's the

13    game violation and that's the reason that I allowed the

14    rifle to be presented, and that's the reason why the

15    officers testified about that rifle.  You need not be

16    concerned with how that rifle fits into what we are

17    doing, you decide the first three charges and I will

18    decide that one.  Thank you.  Attorney Zak?

19         MR. ZAK:  If the Court will bear with me for just

20    one moment.

21         (Whereupon, there was a pause in the proceedings.)

22         MR. ZAK:  At this time the prosecution rests.

23         THE COURT:  Thank you.

24         MR. D'ALBA:  Your Honor, I have instructed my

25    first witness to be here.  He informed me that he'd be

1  here at three o'clock, so if I may have a moment to

2  check, hopefully my first witness will be here.

3  THE COURT:  Okay.  Why don't we do this, why don't

4  we stand adjourned for ten minutes.  Let's meet back

5  here at 3:10 and that will give our stenographer a

6  break, then we can get through your part of the case at

7  that time, so we will stand adjourned until 3:10.

8  (Whereupon, court recessed at 2:55 p.m. and

9  reconvened at 3:11 p.m.)

10  THE COURT:  Mr. D'Alba?

11  MR. D'ALBA:  Thank you, Your Honor.  The defense

12  would call Dan Seaman to the stand please.

13  MR. ZAK:  May we approach the bench?

14  THE COURT:  Surely.

15  (Whereupon, the following discussion occurred

16  on the record at sidebar:)

17  MR. ZAK:  I would ask for an offer of proof at

18  this time.

19  MR. D'ALBA:  Mr. Seaman, Your Honor, is the owner

20  of the Elk Creek Sports Club which is in close

21  proximity to the location where my client was hunting

22  that day.  My client has done business with him for a

23  couple years now.  Mr. Seaman will be testifying of his

24  knowledge of my client, of Mr. Leuschen, of his hunting

25  activities, of his fishing activities, and in

97

1    particular, the fact that he was in the store several

2    times a week during the period of time in question.  He

3    won't testify to acknowledge the particular day, he

4    doesn't remember February 24th, but he will be saying

5    he was in the store several times that week, he bought

6    guns, he bought ammunition, he bought targets, et

7    cetera, bought fishing equipment, to the fact that he's

8    an avid outdoorsman, which I think is relevant.

9        MR. ZAK:  I don't think it is.  It's not relevant

10    to what he was doing that day, the fact that he had

11    guns suitable for hunting with him as well as the one

12    that wasn't and had some hunting equipment.  He had a

13    hunting license, we agree with that and he had those

14    provisional permits, we agree with that.  The evidence

15    is really immaterial, I think it's immaterial.

16        THE COURT:  Ken, but we can't restrain Mr. D'Alba

17    from presenting his case in any manner he wants and he

18    can identify the nature of the man, the nature of his

19    person.  I don't have any problem with that.

20        MR. ZAK:  Are you trying to put in character?

21        MR. D'ALBA:  Not at this point, not with this

22    witness.  The prosecution is trying to say that, you

23    know, their argument is that you don't hunt at this

24    time of year; the fact that someone buys hunting

25    supplies regularly at that time of year would be

98

1       relevant.

2           THE COURT:  Well, you could do that. okay.  I will

3       allow that witness to testify to what Mr. D'Alba tells

4       me he's going to testify to.

5           MR. ZAK:  All right.

6           MR. D'ALBA:  Thank you, Your Honor.

7           (Whereupon, discussion at sidebar was concluded.)

8

9               CLARK DANIEL SEAMAN.

10

11  having been first duly placed under oath, was examined and

12  testified as follows:

13

14              DIRECT EXAMINATION

15

16  BY MR. D'ALBA:

17  Q       Sir, would you please state your name for the record?

18  A       My full name is Clark Daniel Seaman.

19  Q       Mr. Seaman, I'd ask that you lean forward a little bit

20  so the jurors can hear everything that you have to say.

21          THE COURT:  Use the mike, if you can.

22  BY MR. D'ALBA:

23  Q       Okay.  Mr. Seaman, would you spell your last name?

24  A       My last name is spelled S-e-a-m-a-n.

25  Q       Okay.  Very good.  What is your residence?