1   A        I reside at 5375 Westgate Drive, Girard, Pennsylvania.

2   Q        And your occupation, sir?

3   A        I'm the owner of Elk Creek Sports Store in Lake City.

4   Q        And what type of sports store is it that you own?

5   A        We cater to the hunters and fishermen, we sell guns,

6   archery equipment, fishing equipment, Boy Scout supplies, so on,

7   so forth.

8   Q        How long have you been in business?

9   A        Ten years, June.

10  Q        Sir, I ask if you know or have been acquainted with Mr.

11  Douglas Leuschen?

12  A        Yes, I do.

13  Q        And Mr. Leuschen, would you agree, is the man in the

14  beige jacket, tan jacket with the water in his hand right now?

15  A        Yes, sir.

16  Q        And what's the basis of your knowledge of Mr. Leuschen,

17  how do you know him?

18  A        He was a customer of mine for several years.

19  Q        At the sports store?

20  A        Yes, sir.

21  Q        And tell us particulars that you can recall, purchases

22  or interactions that you have had with Mr. Leuschen at your

23  business.

24  A        Well, when he first started coming in. it was during

25  summer season, he was mostly a fishing tackle, bait customer and

1    over months it developed into buying as well as fishing tackle,

2    buying guns, ammunition, targets and that type of thing as well

3    as the fishing tackle.

4    Q        Can you estimate for us or else just give us a verbal

5    description of the frequency that Mr. Leuschen and you would

6    have business dealings at your sports store?

7    A        Normally he'd be in the store a couple times a week,

8    sometimes we'd go a week without seeing him, but then the next

9    week you're liable to see him three, four times, so he was in

10   there quite a lot.

11   Q        Would this be constant throughout the year, would it

12   vary or --

13   A        Well, there is a little bit more in the nicer weather,

14   but it went on all year long.  He was ice fishing, salmon

15   fishing in the fall and then hunting, and then spring, fishing,

16   he was mostly all year round.

17   Q        Did you have discussions with Mr. Leuschen about his

18   sporting activities?

19   A        Yeah, we try to talk with all our customers in there.

20   He was in there enough so everybody knew him as well as myself.

21   and, you know, we'd stand around and you chat with everybody on

22   the way to wherever he was going.

23   Q        So, sir, I direct your attention to the month of

24   February just preceding this year, 1989, do you recall ever

25   having any encounters or dealings or conversations with Mr.

1    Leuschen on or about February of 1989?

2    A        The exact dates, no, but up until the time that he had

3    a problem, he was there all the time, I'd say every other week,

4    or two or three times a week that he was in there.  So I can't

5    place any particular conversation in February, but he was always

6    in there, so I'm sure that I chatted with him at the time.

7    Q        Okay.  Are you saying then that he did come into your

8    store during the month of February?

9    A        Relatively positive that he did, although I can't place

10   the particular day, but like I say, not many weeks went by when

11   he did not show up at least once or twice.

12   Q        Okay.  We appreciate your honesty, sir.  Elk Creek

13   Sports Store, where is that in relationship, if you know, to Old

14   Lake Road?

15   A        Well, there is several Old Lake Roads, Elk Creek Sports

16   Store is on Old Lake Road.

17   Q        Approximately a half mile west of Rudd Road in

18   Springfield Township?

19   A        That's the continuation of Old Lake Road in west or

20   north Springfield, depending on where it is.  It goes from Route

21   215 and continues on through Racoon Park on into the steel

22   property.

23   Q        Are you familiar with that area?

24   A        Yes, sir, I have been down there quite a few times.

25   Q        Have you ever participated in hunting or other outdoor

1    activity in that area?

2    A       I have both hunted and fished off of Old Lake Road out

3    in Springfield.

4    Q       Are you also familiar with that area and its propensity

5    for game and the type of game through your customers?

6    A       Yes, sir.

7    Q       What type of game lives in that area, it's a particular

8    species?

9    A       Just about anything that's huntable in the State of

10    Pennsylvania I think is out there, outside of elk.  There is

11    rabbits, squirrels, pheasants. turkey, deer, woodchucks, you

12    know, that's all out there.

13    Q       Okay.

14    A       It's one of the true wilds left here in Erie County.

15    Q       It's relatively undisturbed habitat then?

16    A       The further out Old Lake Road you go, the more it is

17    undisturbed, yes.  There is some houses around the Racoon Park

18    area, but as you get over toward Ohio, there is really not that

19    much out there.

20    Q       Sir, there has been an issue raised in this trial about

21    the reasonableness of hunting woodchuck in that area during the

22    month of February.  Would you have an opinion as to whether it's

23    likely or unlikely that a sportsman might or might not do that?

24    A       Well, it's not the real season for woodchuck, but

25    hunters and fisherman tend to do it as their time allows them,

103

1    and if that's the only thing going at the time, they will do it

2    whether they had a chance to shoot it or catch or it or

3    whatever.  Sportsmen are that way, it just depends on, you know,

4    what they feel like and what season, when they can go hunting.

5    A lot of things are barred from them because of seasons and

6    they're left with just what is possible to hunt.

7    Q        So you're saying that sometimes people will go out even

8    if the likelihood of killing an animal was termed a success?

9             MR. ZAK:  Objection, I'd like the witness to

10            testify, not Mr. D'Alba.  He's leading this witness.

11            THE COURT:  If you want to rephrase the question,

12            in the same area, you're permitted to do that.

13            MR. D'ALBA:  Thank you, Your Honor.

14   BY MR. D'ALBA:

15   Q        Is their a particular formula of success that

16   determines when hunters will go out to the woods?

17   A        I think every hunter thinks he's going to be successful

18   every time he goes out or he probably wouldn't go out, but there

19   is no success ratio that would make a person go out hunting.

20   Q        You testified that Mr. Leuschen has purchased targets

21   from you?

22   A        Uh-huh.

23   Q        Can you just tell us what type of targets for what type

24   of projectile?  Are we talking firearms, are we talking bows and

25   arrows, are we talking something else?

104

1   A      Well, the particular targets were Red Field sight-in

2   targets that I normally carry in the store.  They are used

3   mostly for rifles, you can use them for pistols, single

4   projectile-type ammunition.  It's a sight-in target, standard

5   hundred yard target.

6   Q      Okay.  Based on your knowledge and experience with Mr.

7   Leuschen, do you have an opinion as to his -- the amount of

8   activities he partakes in, sporting, hunting.

9           MR. ZAK:  Objection, he's incapable of answering

10         that question.

11           MR. D'ALBA:  I'll strike the question, thank you.

12           THE COURT:  Okay.

13           MR. D'ALBA:  It's your witness, Mr. Zak.

14           THE COURT:  Mr. Zak?

15

16                  CROSS-EXAMINATION

17

18   BY MR. ZAK:

19   Q      Now, Mr. Seaman, the area we are discussing in this

20   case, you came in later, is Old Lake Road, about a half mile

21   west of Rudd Road, Springfield Township; are you familiar with

22   that area?

23   A      Yes, sir, the other side of Rudd Road, you're starting

24   to get pretty much into the steel property.

25   Q      Exactly.

1    A        From Rudd Road on.

2    Q        Exactly.  Have you been in that territory in that area?

3    A        Have I been in that area?

4    Q        Yeah.

5    A        Yes, sir, it's pretty much wooded area out there in the

6    steel property.

7    Q        Have you ever hunted woodchuck?

8    A        Not in the State of Pennsylvania.

9    Q        Now, where you've hunted, isn't it true you have hunted

10   it over open territory, open field, isn't that right?

11   A        I always did, yes, sir.

12   Q        Indeed, normally when one hunts woodchuck, in fact,

13   part of the sport in it is to shoot with a small caliber high

14   velocity rifle at some distance, isn't that correct?

15   A        A lot of people hunt them that way, yes, sir.

16   Q        Most of the hunting magazines, gun magazines, which

17   you're familiar with, I'm sure, show people shooting woodchuck

18   in that way, isn't that right?

19   A        Yes, that's the Field and Stream, these type of things.

20   Q        Yes.

21   A        I would assume so, yes, that's what I have seen.

22   Q        Okay.  And when a person comes into your store wanting

23   a rifle for woodchuck or weapon for woodchuck, they don't ask

24   for handguns, do they?

25   A        First off, not many people ask for a particular gun for

1   a particular thing.  But no, I wouldn't expect somebody to come

2   in and say I want a pistol to shoot a woodchuck with unless he

3   was in his backyard.

4   Q       All right.  Have you ever hunted in the area in

5   question during February?

6   A       Not to my knowledge, no, sir.

7   Q       Have you been in the area in February, the woods there?

8   A       I've probably driven down that road in February, yes,

9   sir.

10  Q       For what purpose?

11  A       Just sight-seeing would be the only reason.

12  Q       Okay.  Did you see people hunting there?

13  A       You normally see some cars parked out on Rudd Road here

14  and there at different times in the year. I don't know that

15  anybody was hunting or not, but if you see a car, then they

16  could be doing anything out there.

17  Q       Right.  And the targets that Mr. Leuschen purchased

18  from you were hundred yard sight-in targets mainly used for

19  sighting a rifle, is that right, like sighting a scope?

20  A       This is correct, sir.

21  Q       Such as the rifle here we have in the courtroom, this

22  .243 caliber rifle?

23  A       Yes, sir.

24  Q       So if you wanted to adjust the sight on this weapon,

25  you would use a sight like that, take a few shots in order to

1    zero it in, is that right?

2    A        This is correct.

3    Q        Okay.   Normally handguns aren't fired at a hundred

4    yards, are they?

5    A        By most people, no.   Some people do shoot long range

6    with handguns such as in tournaments and stuff, but most people

7    I would say not.

8              MR. ZAK:   Okay.   That's all the questions I have,

9         Your Honor.

10             THE COURT:   Attorney D'Alba?

11             MR. D'ALBA:   Thank you, Your Honor.

12

13                     REDIRECT EXAMINATION

14

15   BY MR. D'ALBA:

16   Q        Mr. Seaman, do hunters carry pistols with them

17   sometimes that they don't intend to use for hunting along with

18   their rifles?

19             MR. ZAK:   I'm going to object.   He can't testify

20        as to what other people intend to do.

21             MR. D'ALBA:   You asked him.

22             THE COURT:   Just a minute.   I'm going to overrule

23        the objection because we have already asked some

24        opinions from their witness and I think that opinion

25        goes right hand-in-hand with what he's already talked

108

1      about.  You may answer the question if you can, Mr.

2      Seaman?

3          THE WITNESS:  Will you rephrase that again for me

4      please?

5  BY MR. D'ALBA:

6  Q      It's not unusual, is it, for someone to carry a pistol

7  along with a hunting rifle, is it?

8  A      No, it's not unusual.  I know people that hunt with

9  both pistols and rifles and take both with them.

10 Q      And you also are aware of people that may take a pistol

11 with them that they don't intend to use for hunting, but just to

12 carry it on their person with them?

13 A      That would be hard to answer.  If they take a pistol, I

14 would assume they were going to use it, but we are hoping to or

15 thinking they might, whether they took it just to take it, I

16 don't know, it would be hard to really answer.

17 Q      But the fact that you take either one weapon or one

18 firearm or more than one firearm, doesn't necessarily mean that

19 you're going to use it, does it?

20          MR. ZAK:  Objection, he's leading his witness.

21          THE COURT:  Yes, if you'd rephrase the question,

22      it probably would be --

23          MR. D'ALBA:  I'll strike the question.  I have no

24      further questions.

25          THE COURT:  Okay.  Thank you.

1        MR. ZAK:  I have no further questions.

2        THE COURT:  Thank you, Mr. Seaman, you may step

3    down.

4        MR. D'ALBA:  Your Honor, if I may just have a half

5    a minute.

6        THE COURT:  Okay.

7        MR. D'ALBA:  Do you have any objection to Mr.

8    Seaman leaving?

9        MR. ZAK:  No, I don't.

10        MR. D'ALBA:  The defense would call the

11    defendant's brother, Duane Leuschen, to the stand.

12        MR. ZAK:  May we approach the bench?

13        (Whereupon, the following discussion occurred

14    on the record at sidebar:)

15        MR. ZAK:  Offer of proof?  We are going to ask for

16    an offer of proof.

17        MR. D'ALBA:  Offer of proof would be that he's

18    gone sporting in this area with his brother for target

19    practicing, and also his knowledge of his brother's

20    propensity and the fact that he hunts groundhog all

21    year, woodchuck, it's synonymous.

22        THE COURT:  That's okay, isn't it?

23        MR. ZAK:  I guess so.

24        THE COURT:  That will be fine, I'd allow that

25    testimony.

110

```
 1              (Whereupon, discussion at sidebar was concluded.)

 2

 3                   DUANE LEUSCHEN,

 4

 5   having been first duly placed under oath, was examined and

 6   testified as follows:

 7

 8                   DIRECT_EXAMINATION

 9

10   BY MR. D'ALBA:

11   Q        Sir, would you please state your name?

12   A        Duane Leuschen.

13   Q        And where do you live, Mr. Leuschen?

14   A        In Fairview.

15   Q        And what is your street address?

16   A        6901 Water Street.

17   Q        Mr. Leuschen, what is your relationship to Douglas

18   Leuschen?

19   A        He's my brother.

20   Q        Is he your older brother or your younger brother?

21   A        He's my oldest brother.

22   Q        Do you two live together?

23   A        No, not really.

24   Q        Are you familiar with your brother's hunting and

25   sporting activities?
```

111

1    A        Somewhat.

2    Q        Have you ever had an occasion to participate in any

3    hunting, sporting activities regarding firearms with your

4    brother?

5    A        Oh, yeah.

6    Q        What activities have you participated with him in?

7    A        Well, just about every kind there is, really, deer

8    hunting, squirrel hunting, rabbit hunting, pheasant, grouse,

9    groundhog, you name it.

10   Q        You have hunted groundhogs with your brother?

11   A        Yeah, on one time I do remember hunting groundhog.

12   Q        Okay.   Are you familiar with your brother's hunting

13   activities when you may not have been present?

14   A        No, I'm not.

15   Q        Are you familiar with how frequently your brother

16   participates in hunting?

17   A        Quite a lot, I know that.

18   Q        Is he a regular hunter?

19   A        Yeah, I'd say it.

20   Q        Does he limit his hunting activities to a particular

21   time of the year?

22   A        No, I would say not.

23   Q        How would you describe when, during the time of the

24   year, your brother hunts; does he hunt only part of the year or

25   otherwise?

112

1    A        Pretty much year round.

2             MR. D'ALBA:  I have no further questions.

3             THE COURT:  Mr. Zak?

4

5                        CROSS-EXAMINATION

6

7    BY MR. ZAK:

8    Q        Now, Mr. Leuschen, you said you're somewhat familiar

9    with your brother's hunting activities, do you go hunting with

10   him?

11   A        Oh, yeah.

12   Q        An how often have you gone woodchuck hunting with him?

13   A        Just once that I recall.

14   Q        Did you ever go fox hunting with him?

15   A        No, I haven't.

16   Q        Does he go fox hunting?

17   A        To my knowledge, I don't know.

18   Q        Okay.  When was it you went woodchuck hunting with him?

19   A        I guess it was just before deer season this year.

20   Q        Just before deer season?

21   A        Right.

22   Q        Okay.  That was one time, is that right?

23   A        Yeah.

24   Q        Where did you go?

25   A        That particular time we went out towards Edinboro, out

1    by the pheasant farm there somewhere.

2    Q        Out by a farm?

3    A        By the pheasant farm.

4    Q        Was that in the woods?

5    A        Well, there is woods and there is, you know, there is

6    open areas also there.

7    Q        Okay.  And when you -- did you get any woodchucks?

8    A        Not that day.

9    Q        Well, where was it that you were trying to get them?

10   A        Well, there is a big open field there, that's basically

11   where we hoped to find them in most cases.

12   Q        Okay.  Did you bring any handguns with you that day?

13   A        I don't recall.

14   Q        When you went deer hunting, did you bring any handguns?

15   A        No, I didn't, no.

16   Q        Did your brother?

17   A        I don't think so.

18   Q        Okay.  Did your brother bring any handguns when you

19   went woodchuck hunting?

20   A        Not to my knowledge, no.

21   Q        Okay.  That's all I have, thank you very much.

22           MR. D'ALBA:  Nothing further, Your Honor.

23           THE COURT:  You may step down, Mr. Leuschen, thank

24   you.

25           MR. D'ALBA:  Defense calls the defendant, Douglas

114

1        Leuschen, to the stand, Your Honor.

2

3            DOUGLAS BURTON LEUSCHEN,

4

5   having been first duly placed under oath, was examined and

6   testified as follows:

7

8            DIRECT_EXAMINATION

9

10  BY MR. D'ALBA:

11  Q       Would you please state your name?

12  A       Douglas Burton Leuschen.

13  Q       And Mr. Leuschen, how old are you?

14  A       Forty years old.

15  Q       And Doug, I have been calling you Doug all along in

16  terms of my representation of you, so you don't mind if I call

17  you Doug now, do you?

18  A       No, not at all.

19  Q       Doug, you are the defendant that's been charged in this

20  matter, correct?

21  A       That's correct.

22  Q       First of all, Doug, let's go back to your childhood,

23  can you tell us when you first became active in any type of

24  outdoor, in particular, hunting activities?

25  A       I suppose probably about the time I learned how to

1    walk.   My father and my uncle used to do a lot of hunting and I

2    went out with him before I was old enough to carry a gun, more

3    or less like the bird dog that would go get the game after

4    they'd chalk it.

5    Q        You would have been how old?

6    A        About -- probably about eight or nine years old.

7    Q        How old were you when you got your first gun?

8    A        I believe I was about 14.

9    Q        And did you start hunting at the age of 14?

10    A        Yes.

11    Q        And have you hunted since the age of 14?

12    A        There was a time I did not hunt for a period of

13    probably two or three years, the rest of the time I have been

14    quite an avid hunter.

15    Q        What would have been that period of abstention from

16    hunting?

17    A        That was while I was working in St. Louis and I really

18    don't know too much game that was available out there to hunt.

19    Q        Where did you grow up?

20    A        I grew up in Millcreek Township, Erie.

21    Q        And during your youth, your childhood, did you have any

22    occasion to go out there to the west county area?

23    A        Oh, yeah, I used to ride my bicycle out to Elk Creek

24    all the time during the summer, we'd camp out there with our

25    sleeping bags, go fishing, hunt, that sort of thing.

116

7

1    Q        Do any relatives of yours have any property in that
2    area?
3    A        Several, my uncle's and other relatives owned some of
4    the property that is now Raccoon Park property, that's south of
5    Old Lake Road, and I believe they owned some of the property
6    that's now owned by US Steel.
7    Q        And when would it have been that you -- how old would
8    you have been that you would go out to that property that your
9    family owned, if you remember?
10   A        I was quite young, I'd say somewhere, eight or nine
11   years old we used to go out there to family picnics, 4th of July
12   and that sort of thing.
13   Q        In the course of your adolescence, did you participate
14   in any competitions?
15   A        Yes, I did, my father and I shot in a father-son league
16   at the Glenwood Park YMCA.  We started that when the Glennwood Y
17   was built, I think this was about 1964.
18   Q        Did you receive any awards and citations as a result of
19   this competition?
20   A        Yes, I received quite a few for marksmanship.
21   Q        Did you participate in any other outdoor activities in
22   particular with regards to gaming?
23   A        Fishing, archery, hunting, competition shooting, skeet,
24   trap shoot, that sort of thing.
25   Q        Now, with regards to the particular day in question,

1   which was February 24th of this year, do you recall that day,

2   sir?

3   A        Somewhat, yes.

4   Q        Okay.  Tell us in your own words, Doug, where you were,

5   what were you doing?

6   A        Well, I was involved in therapy for my knee at the time

7   and the doctor recommended that I get exercise.  I was limited

8   on the distance I could walk because of the aggravation of the

9   injury, so I was target practicing, and the walking to and from

10  where I was shooting from the targets was pretty much the

11  exercise I got for my knee.  I went out on good days when my

12  knee felt good and I had a route that I went hunting.  I went

13  out to and I would stop by Camp Lambec, which a friend of mine

14  was the caretaker at the time, and when the camp was closed,

15  there was some hunting I did out there.  I usually found him

16  there during the off season; if I didn't find him there, I would

17  go look for him at his house, which was just up from Raccoon

18  Park.

19  Q        Now, on that particular day, February 4th, did you make

20  any attempt to locate this friend?

21  A        Yes, I stopped by Camp Lambec.  The front gate was

22  locked up, so I knew he wasn't there.

23  Q        So your friend you're referring to --

24  A        Joseph Ratajczak.

25  Q        And did you make any further effort to locate Mr.

1    Ratajczak?

2    A        Yes, on my way to his house, I stopped at Raccoon Creek

3    to see if there were any fish in the creek down there.  I had my

4    fishing pole, I walked down there.  There is a good fishing hole

5    right underneath the bridge.  When I did not see any fish and

6    did not have any luck. I went on to his place to see if he

7    wanted to sight in the rifle, that it was malfunctioning and I

8    just received it back, and we were going to sight the rifle in

9    and take the pistols out and shoot a little bit and go woodchuck

10   hunting after I'd sighted the rifle.

11   Q        Okay.  Now, were you licensed in the Commonwealth of

12   Pennsylvania at that point?

13   A        Yes.

14   Q        Were you licensed to hunt at that point?

15   A        Yes, that's correct.

16   Q        Did you have either of these licenses with you?

17   A        I had all of my licenses with me, fishing and hunting.

18   Q        Okay.  Did you have any license in addition to those

19   two?

20   A        I had a waterfowl stamp and my archery license, also

21   sportsman's permit to carry two of the pistols I had.

22   Q        On February 24th, 1989, what were you wearing, Doug?

23   A        I had a green camouflage one-piece coverall that I was

24   wearing.  It was sort of insulated, I guess you would call it.

25   Q        Go ahead.

119

1    A        I had hunting boots on or work boots, high-top leather

2    waterproof boots.

3    Q        Have anything on your head?

4    A        I had an orange hunting cap or blaze orange, which is

5    what you're supposed to wear when you go hunting.

6    Q        When you were driving to the location at which you

7    ultimately had your encounter with Trooper Myers, did you have

8    your orange cap on in the car?

9    A        No, I didn't.

10   Q        Do you remember what time you arrived at where your car

11   was parked?

12   A        I assume it was close to noon.  I had stopped at the

13   Elk Creek Sports Store on my way out to pick up the rifle, also

14   to check on one of the weapons that was malfunctioning.  And I

15   left shortly before noon.  I was living in the city, so I

16   arrived, say, between 12:00 and 1:30.

17   Q        And you were subsequently -- at least the complaint

18   indicates that you were -- this activity occurred on or about, I

19   believe it was, ten minutes to four or ten minutes to five, is

20   that correct?

21   A        Yes, this is -- as I was coming out of the woods, I had

22   been sighting my rifle and looking for woodchuck.  There were

23   two locations that I had found where woodchuck had been burrowed

24   or had burrowed into the ground during deer season.  One I had

25   watched during archery season the previous fall, the other one I

120

1    had seen on numerous occasions, which was over on the lake side

2    of the road, Lake Road.

3    Q        What was the weather like on this day, Doug?

4    A        It was rather warm, I took off an undershirt or an

5    insulated shirt I had on underneath my coverall outfit because

6    it was that warm, sun was out, the ground was frozen underneath,

7    but it was thawed out probably two inches down because of heat

8    from that afternoon.

9    Q        Okay.  Have you ever gone to this particular area for

10   any other reason other than hunting?

11   A        Just exercise, checking out the area for upcoming

12   seasons, hunting season, I go out there swimming, just to go out

13   and relax, fishing, I like to go out -- I have gotten into

14   identifying plants, different types of plants and what have you.

15   And that area out there is, as people probably know, it's been

16   noted as something that they're trying to turn into state game

17   lands, US Steel property out there.

18   Q        Okay.  Now, Doug, you've heard Trooper Myers testify

19   and he testified when he arrived on the scene, your head was

20   down.  In his opening argument, Mr. Zak said that you were

21   slumped over the steering wheel.

22   A        I wasn't slumped over the steering wheel, I had an

23   urgency call to Mother Nature.  I set my guns down on the seat,

24   stepped away from the car.  When I heard a car approach and I

25   got back into the car to zip up the coverall outfit, that was

1    how I had my head down at the time.  I picked my head up,

2    acknowledged the officer as he pulled towards my car.

3    Q        So at this time or prior to this time had you

4    removed -- where were the guns?

5    A        I had set them on the passenger's seat of the car.

6    Q        Okay.  And at that time were you wearing your

7    florescent hat?

8    A        No.

9    Q        Where did that go?

10   A        I had taken some of the clothing off, my hat, I had

11   taken my hunting license off my back and set the guns down.

12   Q        Now, the officer testified that there was numerous

13   items in your car, did you have any other items in your car

14   regarding gaming or sporting, do you have any?

15   A        Yes, I had a Coleman lantern, sleeping bag, couple

16   changes of clothes, extra pair of shoes, two fishing poles,

17   tackle, I believe I had a fishing vest in there, I'm not quite

18   sure.  I had two shotguns, rounds for waterfowl hunting and for

19   small game, I also had -- well, I guess my car was pretty well

20   equipped that I could spend the night if I needed to.  I had

21   freeze-dried coffee or instant coffee and a thermos of hot

22   coffee, I was pretty well set.

23   Q        How frequently were you participating in outdoors

24   activities at this point?

25   A        As much as I could, weather permitting and barring not

1   having a doctor's appointment or a physical therapist

2   appointment, my knee not bothering me, I was out every

3   opportunity I had.

4   Q       How frequently did you go to physical therapy at this

5   point?

6   A       If I refer to my notes, I could give you an answer on

7   that.

8   Q       Approximately, I mean were you going at this time or

9   not?

10  A       If I wasn't working, I had physical therapy on a daily

11  basis, sometimes twice a day.  Seeing a physical therapist was

12  usually once or twice a week.

13  Q       So it would be correct to say that hunting was not the

14  sole purpose of you going out in the woods that day?

15  A       No, it was not.  The doctor would recommend that I walk

16  to exercise my knee.

17  Q       You know, the big deal that's trying to be made is the

18  fact that you're out there in February; did you think you were

19  going to get any woodchuck that day?

20  A       Well, it's hard to say about woodchuck.  Usually when

21  the weather starts to change and get warm, and we did have a

22  warm spell in February, as I said, the ground was thawed out,

23  the sun was out, it was a very nice day, and I had found two

24  locations where the woodchuck were, one in the woods and one

25  along the border of the woods along the lake, the cliff, the

123

1    lake there.

2    Q        Would you care whether or not you got a woodchuck that

3    day?

4    A        Not really, I had reason to be out there for the

5    exercise.

6    Q        Your brother was asked if you had went hunting with him

7    previously and you had pistols on you at that time, and your

8    brother answered on two different occasions, he believed; he

9    answered one time that he didn't recall and another time he said

10   no.  Would that be correct or incorrect according to your

11   recollection?

12   A        I believe that would be correct.  Beginning of the

13   hunting season I did not have a pistol, my brother had a .22, a

14   pistol that we classify small time, small game hunt.  And I did

15   not purchase the pistol until later on in the season and I did

16   not get a season sportsman carry permit until the day before

17   deer season, I think this was like January 6th.

18   Q        Now, you had the sportsman permit for two out of the

19   three pistols, correct?

20   A        That's correct.

21   Q        Did you ever make an attempt to secure a permit for the

22   third pistol?

23   A        Yes, on two occasions, once I spoke to a deputy sheriff

24   and he indicated that I had to go to school, I believe it was

25   Mercyhurst, take college courses, law enforcement courses of

124

1    some sort to gain a concealed weapon permit.

2    Q        Is that required now, do you know?

3    A        No, the law has changed.

4    Q        Okay.  When did you -- the gun that you didn't have the

5    permit for, the hunter's permit, when did you buy that gun?

6    A        I didn't get that until towards the end of January, if

7    I'm not mistaken.

8    Q        That would have been January of which year?

9    A        Of 1989.

10            MR. D'ALBA:  No further questions, Your Honor.

11            THE COURT:  Cross-examine, Attorney Zak?

12

13                        CROSS-EXAMINATION

14

15   BY MR. ZAK:

16   Q        Now, Mr. Leuschen, you testified about an injury you

17   had, what was the nature of that injury?

18   A        Doctor called it a deranged knee, tissue torn in the

19   knee.

20   Q        How did you get that?

21   A        I was working the Flagship Niagara as a shipwright at

22   the time.

23   Q        So you hurt your knee?

24   A        Yes, sir.

25   Q        Among other things, your doctor recommended that you

125

1  walk?

2  A       That's correct.

3  Q       All right.  Now, were you walking the day that you were

4  stopped by the police officer?

5  A       You mean when he arrived and I first saw him or prior

6  to?

7  Q       No, when you were in the woods that day?

8  A       Yes.

9  Q       And now in evidence here there are three handguns and a

10  rifle that were taken from you.  Did you carry all these items

11  while you were walking?

12  A       Yes, except for the .357, I didn't take that out that

13  day.  I had started to take it out and then changed my mind.

14  Q       All right.  So you had that rifle, I know it has a

15  sling?

16  A       Yes.

17  Q       You had the two revolvers and you had the Ruger 9mm;

18  how were you carrying the 9mm?

19  A       I had both of them in my pocket where the pistol part

20  or the grip part of them were sticking out of the pocket.

21  Q       Now, at the time, you knew you did not have any sort of

22  carry permit for the 9mm, isn't that right?

23  A       Excuse me?

24  Q       You knew at the time you had no type of permit to carry

25  that 9mm?

126

1    A        I did not have a permit, no.

2    Q        Okay.  But nevertheless, you carried it as you're

3    walking around, are you with me on that?

4    A        Yes.

5    Q        And now, you have a hunting license, at the time you

6    have a hunting license, am I right on that?

7    A        Yes, I had my hunting license, that's correct.

8    Q        Okay.  And when you -- this isn't the first time you

9    had a hunting license, is it?

10   A        No, I have had a hunting license throughout the years.

11   Q        Now, it's well known among people who hunt, and I'm

12   sure including yourself, that when one transports a gun, any

13   type of a gun in a car, the law requires, common sense requires

14   that it be transported unloaded, isn't that correct?

15   A        I was not transporting it.

16   Q        They were in your car, were they not?

17   A        Yes, sir.

18   Q        And indeed, the .357 which you were not carrying while

19   you were walking around the woods, that was loaded in a box in

20   your car?

21   A        Yes, sir.

22   Q        And were you carrying the rifle with a loaded magazine

23   and a loaded round in the chamber, is that true?

24   A        I don't believe there was one in the chamber, I believe

25   it was the magazine that was loaded on it.

127

1    Q        And there was a round in the chamber of your 9mm

2    automatic pistol, isn't that correct?

3    A        Yes, sir, I believe that's correct.

4    Q        Was someone after you?

5    A        No, sir, I took the 9mm to do a little target

6    practicing as I was hunting.

7    Q        Did you show the officer or tell the officer, either

8    officer -- Trooper Marino or Trooper Myers where you were target

9    practicing?

10   A        Yes, I spoke to Trooper Myers.

11   Q        And what did you tell him?

12   A        I told him I was out target practicing and I was out

13   hunting.  He asked me for my license and I produced it.

14   Q        Well, to back up your story, did you tell him exactly

15   where you were practicing?

16   A        Yes, it was along the lake, north of where he had found

17   me or --

18   Q        Did you offer to show either of these officers where

19   you were shooting and what you were shooting at?

20   A        I pulled the targets that I had in the front seat, I

21   pulled the florescent orange targets out and showed them to

22   Trooper Myers.

23   Q        Now, they testified they didn't see any targets, are

24   they lying?

25   A        I wouldn't go as to say they were lying, but I did show

128

1    him florescent orange targets.

2    Q        A florescent orange rifle target, isn't that correct?

3    A        Well, I wouldn't know the proper name for them, they

4    were approximately ten inches in diameter and they were

5    florescent orange.

6    Q        Did you have any empty casings from that 9mm with you?

7    A        I believe I had a box of empty casings, that was for

8    one of the weapons that I had legally, for reloading.

9    Q        Now, while you were walking in the woods, were you

10   carrying -- one of the reasons why you're carrying these weapons

11   is in case you came across a woodchuck or something you could

12   legitimately hunt, isn't that right?

13   A        That's correct.

14   Q        Now, you're well aware that in Pennsylvania, it is not

15   permitted to use a semiautomatic weapon while hunting, aren't

16   you aware of it?

17   A        No, sir.

18            MR. D'ALBA:  Objection, that's an incorrect

19            statement of law.

20            MR. ZAK:  That's thoroughly --

21            MR. D'ALBA:  It's a completely incorrect statement

22   of law.

23            THE COURT:  Let's do this at sidebar.

24            MR. D'ALBA:  Thank you, Your Honor.

25            (Whereupon, the following discussion occurred on

129

1    the record at sidebar:)

2        MR. ZAK:  Your Honor. I can correct that, now,

3    you're allowed to use a semiautomatic -- why don't you

4    calm down and behave yourself.

5        MR. D'ALBA:  Well, you are prosecuting this man,

6    you're making a misstatement to the jury, you want me

7    to calm down?

8        MR. ZAK:  Yeah, you calm down.

9        THE COURT:  Let's lower our voices now.  Go ahead,

10   Ken.

11       MR. ZAK:  You can use a semiautomatic shotgun for

12   certain tupes of game, but you cannot -- and it's an

13   absolutely correct statement, but you cannot use a

14   semiautomatic single projectile weapon.

15       MR. D'ALBA:  To hunt.

16       MR. ZAK:  To hunt.

17       MR. D'ALBA:  To hunt, that's not the question you

18   asked him.

19       THE COURT:  Yes, but if he does, that's a correct

20   statement of the law if he says that.

21       MR. D'ALBA:  Judge, you can't while you're

22   hunting.  It's incorrect --

23       THE COURT:  We are talking about to hunt.

24       MR. ZAK:  Well, he's in violation every which way.

25       THE COURT:  We will go ahead and strike that.  You

130

1            go ahead and clear that up.

2                    (Whereupon, discussion at sidebar is concluded.)

3                    THE COURT:  Ladies and gentlemen of the jury,

4            Attorney Zak is going to rephrase the prior question

5            because as it was posed, I'm not sure it was an

6            accurate representation, and just so that there is no

7            ambiguity.  If you would strike from the record and

8            strike from your minds the prior question as to what's

9            legal in the way of a semiautomatic weapon, we will

10           start over at that point.  Attorney Zak?

11  BY MR. ZAK:

12  Q      Mr. Leuschen, you're aware that in Pennsylvania one

13  cannot use a semiautomatic pistol for hunting; are you aware of

14  that?

15  A      No, sir.

16  Q      And how long have you hunted in this state?

17  A      I moved back to Pennsylvania in April of 1986, I

18  believe, or '87.

19  Q      Okay.  Now, you testified earlier that since you were

20  eight or nine, being from this area, you used to hunt, isn't

21  that right?

22  A      That's correct.

23  Q      When did you leave this area?

24  A      In '69 when I went in the service.

25  Q      All right.  So how old were you then?

131

1    A       I believe 19.

2    Q       Okay.  And you were a hunter at that time, weren't you?

3    A       I believe so, yes.

4    Q       You're familiar with the hunting regulations at that

5    time?

6    A       In regards to the regulations that pertain to my type

7    of hunting, yes.

8            MR. D'ALBA:  Your Honor, I don't know what

9            relevance that this whole line of questioning has with

10           the issue of whether he was hunting or not.

11           MR. ZAK:  Well, that was his direct examination.

12           THE COURT:  I'm not sure that the issue is that

13           narrow at this point, so I'm going to overrule the

14           objection and allow Mr. Zak to proceed and you can

15           answer that question, if you will, please.

16           THE WITNESS:  Would you restate that, please?

17   BY MR. ZAK:

18   Q       Well, you were aware all the time you lived in

19   Pennsylvania and hunted in Pennsylvania that you can't use a

20   semiautomatic pistol for hunting, weren't you?

21   A       No, sir, I was not, I did not hunt with a pistol until

22   this year.

23   Q       And you spent a lot of time -- as your witness stated,

24   spent a lot of time in the Sports Store interacting with him and

25   other hunters, isn't that right?

132

1   A       Yes, sir, that's correct.

2   Q       And when you spoke with Trooper Marino, once they got

3   you back to the State Police barracks, you told Trooper Marino

4   that you had these guns for hunting, isn't that correct?

5   A       I don't believe I spoke to Trooper Marino except for

6   maybe one or two occasions throughout the three or four hours I

7   was there.  It was mostly a conversation between the two

8   troopers and in regards to what I had done and what I had spoke

9   to Trooper Myers about.

10  Q       Now, you spoke with this gentleman, Trooper Marino, in

11  fact, he was the one who read you your rights, isn't that right?

12  A       Sir, he did not read me my rights until after I was

13  questioned on my way out to the Magistrate's office.

14  Q       Do you recall what time of day it was when you went to

15  the Magistrate's office?

16              MR. D'ALBA:  Your Honor --

17              THE WITNESS:  It was dark.

18              MR. D'ALBA:  Your Honor, I question as to whether

19              there is relevance to what time of day his rights were

20              given.  It's a suppression issue.  If there was one,

21              it's been waived.  At this point, we are here to try

22              the case.

23              MR. ZAK:  Well, I think I'm going into this man's

24              credibility.

25              THE COURT:  I think that's a proper line of

1          questioning at this point.  I'll overrule the objection

2          and allow Mr. Zak to proceed.

3                  MR. ZAK:  Thank you, Your Honor.

4   BY MR. ZAK:

5   Q       I'm going to show you a paper indicating rights warning

6   and waiver, is that your signature?

7   A       Yes, sir, it is.

8   Q       The time indicated on that?

9   A       I see a time there, but I did not read that waiver.  He

10  told me it was --

11  Q       What is the time on that?

12  A       Sixteen-twenty.

13  Q       Okay.  Military time, that's four-twenty, isn't that

14  right?

15  A       Yes, sir, that's correct.

16  Q       Okay.  And when you arrived at the Magistrate's, it was

17  dark, wasn't it?

18  A       Yes, sir.

19  Q       Was it dark when you were at the police station?

20  A       No, sir, I came in, I believe, around four o'clock or

21  shortly thereafter.

22  Q       Did you tell Trooper Marino that you were out target

23  shooting that day?

24  A       I don't believe I spoke to him in regards to that, but

25  I do remember him bringing that up as an issue between he and

134

1    Trooper Myers.  It sounded like he was reading that from one of

2    the law journals as to the activities in target shooting in

3    regards to weapons.

4    Q        Are you denying that you spoke to this trooper?

5    A        In regards to that, I have no recollection of it.

6    Q        So you don't remember telling him that you had these

7    guns for hunting, is that what you're telling us?

8    A        I spoke to Trooper Myers about the fact that I was

9    hunting, as I said, I don't recall, other than a conversation in

10   the restroom when I asked him to use the restroom, with Trooper

11   Marino, I was handcuffed to a bench.

12   Q        Now, you were in the courtroom while Trooper Marino

13   testified, weren't you?

14   A        Yes, sir.

15   Q        And you listened to his testimony, didn't you?

16   A        Somewhat, yes, sir.

17   Q        Now, he said in his testimony that he spoke with you

18   and you spoke with him; you said you had these guns for hunting,

19   is he lying?

20   A        Sir, I won't say he's lying, but to the best of my

21   recollection, I did not have any conversation in regard to that

22   with him.

23   Q        So you're saying he's wrong?

24   A        Yes, sir.

25   Q        Did you ever meet him before that day?

135

1    A        I believe so, yes.

2    Q        Now, both troopers testified that they didn't see any

3    orange hat, where was your orange hat?

4    A        It was behind the passenger's seat where the .357 was.

5    Q        Okay.  You put your orange hat away?

6    A        Yes, sir.

7    Q        When you were done walking through the woods hunting?

8    A        Yes, sir.

9    Q        And you had placed your guns in your car still loaded,

10   are you with me there?

11   A        Yes.

12   Q        And when the trooper arrived, you say you were just

13   zipping up after answering the call of nature, as you put it?

14   A        I didn't quite get to answer the call of nature.

15   Q        Okay.  Now, when one wears a hunting license on the

16   back of your hunting clothes -- you are required to wear it on

17   your back, isn't that correct?

18   A        That's correct, where it can be seen, easily seen and

19   displayed.

20   Q        So right when you got back to your car, you're still

21   wearing your hunting clothes, but you took off your hunting

22   license?

23   A        Yes, sir.

24   Q        And you took off your hat?

25   A        That's correct.

136

1  Q        And you left your guns loaded?

2  A        Yes.

3  Q        And before going to that area for hunting or target

4  shooting, whatever you did, you first went -- well, first of

5  all, where did you live at the time?

6  A        In the City of Erie.

7  Q        Where in the City of Erie?

8  A        257 West 21st.

9  Q        Alone?

10  A        Yes, sir.

11  Q        Okay.  You left your home at what time in the morning?

12  A        I would say around 10:30 in the morning.

13  Q        Where did you go?

14  A        I don't know if I'd made any stops before I left the

15  city or not, but I stopped at Elk Creek Sports Store on the way

16  out and then on out to Springfield.

17  Q        What did you do out in Springfield?

18  A        I stopped by Camp Lambec to see if the friend of mine

19  was there.  I stopped at the bridge at Raccoon Creek to see if

20  there were any fish.  I went to Joe Ratajczak's, he was not

21  home.  I decided to go down and check out the woodchuck and

22  sight the rifle in.

23  Q        Sight your rifle in?

24  A        Yes, sir, I'd just received that back.

25  Q        What was wrong with your rifle?

137

1   A        Well, the rifle was jamming, it was sent back to the

2   manufacturer.

3   Q        Now, you had left the rifle with Mr. Seaman to have it

4   fixed?

5   A        That's correct.

6   Q        Now, when you went on these trips, these trips or this

7   ride through the county, did you have all these guns with you?

8   A        Not on all occasions, this time I did.  I was having a

9   problem with the 9mm jamming and I had picked up the rifle on my

10  way out too, I -- so two pistols with me.

11  Q        But you did not leave the 9mm behind at the Sports

12  Store to get fixed?

13  A        No, sir, Mr. Seaman told me that it was because of the

14  reloaded shells, the hollow points that was causing the jamming.

15  Q        Oh, you had hollow points in it?

16  A        They were reload shells that I had reloaded by hand.

17  Q        You did that yourself?

18  A        Yes, sir.

19  Q        Now, it's correct that the pistols had two magazines

20  with it and they were both fully loaded, isn't that right?

21  A        That's correct.

22  Q        And what do you hunt with a 9mm automatic pistol?

23               MR. D'ALBA:  Objection.

24               MR. ZAK:  On what basis?

25               THE COURT:  I'll overrule the objection, I'll

138

1          allow the question.

2                 THE WITNESS:  My intention with the 9mm was to

3          learn how to shoot it.  I had just recently purchased

4          it and I had targets to sight in to find out how it was

5          shooting.

6    BY MR. ZAK:

7    Q        Now, the .357, what were you going to hunt with that?

8    A        I left that behind, there was a difference in the cost

9    of the rounds of ammunition and I couldn't really afford to

10   shoot it like I had.  I do not like the sights on it.  My plan

11   was to get rid of it and get another gun.

12   Q        Now, the 9mm, because I'm familiar with guns, that's a

13   gun designed for the military and the police, isn't that --

14                MR. D'ALBA:  Objection.

15                THE COURT:  Well, let's ask if he knows.  Would

16          you rephrase the question to see if he knows what the

17          purpose of --

18   BY MR. ZAK:

19   Q        Do you know if that's a weapon designed for military

20   and police purposes?

21   A        I knew that Millcreek Police had just been received

22   permission from the supervisors to purchase those for weapons,

23   but it's also used for target practicing and competition, I

24   believe.

25   Q        Right.   9mm round is a 9mm Luger round originally

1    developed for the German Army, isn't that right?

2            MR. D'ALBA:  Excuse me, Your Honor, who developed

3        a particular round for a particular gun is doing

4        nothing but attempting to prejudice this jury in the

5        determination of the case, it's got no relevance.

6            THE COURT:  I'm going to sustain that.  I don't

7        know that development of the round is pertinent to the

8        matter we are to decide.

9            MR. ZAK:  My only point, Your Honor, was that this

10       is not -- this man was not --

11           MR. D'ALBA:  With that gun, no, he wasn't.

12           THE COURT:  Gentlemen, let's not be argumentative.

13       We will save that for your summaries.

14   BY MR. ZAK:

15   Q      Now, when the officer approached you and spoke to you,

16   when Trooper Myers spoke with you, he took these guns from you,

17   didn't he?

18   A      I handed him the weapons when he asked me about the

19   weapons.

20   Q      All right.  And then you followed him to the station?

21   A      Yes, sir, I started out leading, actually.

22   Q      Okay.  And while you were there talking to him, at some

23   point he patted you down, do you remember that?

24   A      No, sir, I do not.

25   Q      You don't remember that?

140

1    A        That was done, I believe, on location.

2    Q        So you heard Trooper Myers testify that while you and

3    he were speaking at the scene where he found you, that during

4    that discussion he patted you down around your waist, do you

5    recall that testimony?

6    A        Yes, sir.

7    Q        Are you saying he didn't pat you down?

8    A        No, sir, I believe he stated that he did that on

9    location in Springfield, not at the police barracks.

10   Q        At any point in your discussion with Trooper Myers, did

11   you point out any -- did you tell him exactly what you were

12   target shooting at?

13   A        Yes, I handed him the florescent orange targets that I

14   had on the floor of my car.

15   Q        And what did he do with them?

16   A        Sir, I do not remember, I believe he put them back in

17   the car.

18   Q        And that's the car that they later searched, you're

19   aware they searched the car?

20   A        I'm aware that he went through it at the location, it's

21   my understanding that he searched it afterwards, too.

22   Q        Now, you testified he had several -- you had several

23   changes of clothes in your car, are we right on that?

24   A        Yes, sir.

25   Q        What for?

1          MR. D'ALBA:  Objection, what is the relevance of

2      what he's going to do with his clothes, Your Honor?

3          MR. ZAK:  It was brought out on direct.

4          THE COURT:  I think I'll allow him to answer the

5      question, and it was his testimony that he voluntarily

6      had them.  You may answer that question, Mr. Leuschen.

7  BY MR. ZAK:

8  Q      Why were there several changes of clothes?

9  A      Because of change in weather conditions and the fact

10 that I didn't know whether I would be fishing or hunting, if I

11 got wet, I had a pair of dry pants to change into.  If I was

12 going to be around water, I wanted something that I had

13 waterproof to keep my feet from getting wet.

14 Q      And you were alone that day?  When you go out hunting

15 and fishing, you usually go out alone, don't you?

16 A      Well, being that most people work a first shift, yes,

17 but this friend, Joe Ratajczak, was working as caretaker and

18 work was slow at that time of the year, so that's generally when

19 we got together for activities such as I was engaged in at that

20 time.

21 Q      Did you fire your revolver that day?

22 A      Yes, sir.

23 Q      At what?

24 A      I shot at targets, empty shotgun shells, I guess that

25 was pretty much it.

142

1  Q        Did you save those empty shotgun shells?

2  A        No, I hadn't used those guns that day.  Those were

3  empty rounds that somebody else had left prior to my being

4  there.

5  Q        Did you tell either trooper that that's what you were

6  shooting at?

7  A        I spoke to them about shooting at targets, yes.

8  Q        Did you say what kind of targets that they were, empty

9  shotgun shells?

10  A        I don't recall mentioning the empty shotgun shells.

11  Q        When you shoot, I know that you testified that you

12  reloaded cartridges for the 9mm, the ones that didn't work very

13  well?

14  A        Yes, sir.

15  Q        You normally save your fired casings, don't you?

16  A        Yes, sir, I did.

17  Q        Okay.  As evidence that you were target shooting, did

18  you show these officers your fired casings?

19  A        I believe I had casings saved that day from the 9mm,

20  one of the problems with that is that when they're ejected out

21  of the gun, it's hard to find them in that kind of terrain.

22  Q        Sure, but did you save some of them, did you show them

23  to the officers is my question?

24  A        No, sir, I don't believe I presented anything other

25  than the targets, except for what he asked for.

1  Q        You say he asked for targets?

2  A        He asked me about the weapons, I showed him the

3  weapons.  He asked me for my driver's license, the hunting

4  license.  I showed him those things.  I volunteered to showing

5  him the targets that I was using.

6  Q        Now, he testified that he didn't see any targets, you

7  heard that?

8  A        Yes, sir.

9  Q        And once again, did you have any problem with this

10 trooper -- let me strike that.

11        Was that trooper lying about this, is Trooper Myers

12 lying also?

13 A        Sir, if I were to go to that location now, I'd be

14 willing to wager that those partially -- those targets would

15 still be where I had been target shooting.

16 Q        But my question was is he lying about not seeing

17 targets?

18            MR. D'ALBA:  Objection, he's asking the witness to

19            read the state of mind of another witness which is

20            beyond the capability of Mr. Leuschen.

21            MR. ZAK:  It's proper cross-examination, Your

22            Honor.

23            THE COURT:  Mr. Leuschen if you can answer that

24            question, I would like you to do it.  And if you can't,

25            you can tell us accordingly.

144

1           THE WITNESS:  Well, I did show him the targets and

2       he did say that he did not see any or hear me speak of

3       targets, so I guess that would be the case, that he did

4       not speak correctly.

5           THE COURT:  Thank you.

6   BY MR. ZAK:

7   Q       Can you offer a reason why he didn't speak correctly?

8   A       No, sir, I could not.

9   Q       Is he an enemy of yours?

10  A       No, sir.

11  Q       Is Trooper Marino an enemy of yours?

12  A       No, sir,

13  Q       Now, you heard testimony from Trooper Myers that you

14  got a little bit aggressive with him, is he lying about that?

15  A       I wouldn't use that term, I would --

16          MR. D'ALBA:  Excuse me, I don't believe that

17      Trooper Myers used that term either.

18          THE COURT:  Let's hear the answer to the question

19      first.  Please go ahead, Mr. Leuschen?

20          THE WITNESS:  I would not use that term, I would

21      use the term frustrated.

22  BY MR. ZAK:

23  Q       Well, what had you frustrated?

24  A       Well, I didn't understand the purpose of his stopping

25  or asking me about my activities.

145

1   Q       You didn't see a problem with having loaded guns in

2   your car?

3   A       No, sir, I didn't understand why he stopped to begin

4   with.

5   Q       You agree that you were parking your car by the road?

6   A       My car was parked on the road, that's correct.

7   Q       And your head was down?

8   A       Yes, sir, I believe when he came around the corner, it

9   was as soon as I saw the vehicle, I sat up in my car.

10  Q       And you were alone?

11  A       Yes, sir, that's correct.

12  Q       And you will also agree that you had a Virginia license

13  plate?

14  A       That's correct.

15  Q       Which was expired?

16  A       That's correct.

17  Q       But yet you still questioned this trooper's right to

18  ask you questions?

19  A       That's correct, there is a mitigating circumstance to

20  that.

21  Q       Pardon me?

22  A       There is an extenuating circumstance to that.

23  Q       Extenuating circumstances to what?

24  A       The expired tags.  I was having difficulty getting my

25  driver's license and registration in the State of Pennsylvania.

146

1   Q        But nevertheless, you drove with those?

2   A        Yes, sir.

3            THE COURT:  Well, let me stop this right here.  We

4            don't have an issue whether or not the trooper was

5            proper in doing what he did to Mr. Leuschen and

6            whatever the justification was, nobody wants to bring

7            that as to an issue in this trial.  And I believe that

8            the defendant has already testified that he was

9            frustrated in that he didn't think that the trooper

10           should have done that.  Now, without making a

11           determination whether the trooper was right or wrong,

12           we ought to leave that alone and go onto something

13           else, if you would please.

14           MR. ZAK:  Very well.

15           MR. D'ALBA:  Thank you.

16  BY MR. ZAK:

17  Q        But you're saying -- when you were at the State Police

18  barracks, having come there more or less voluntarily, before you

19  were formally arrested, were you angry and frustrated at that

20  time?

21  A        Frustrated, not angry.

22  Q        When you were placed under arrest, you were frustrated,

23  weren't you?

24  A        Yes, sir.

25  Q        In fact, on the way downtown here, you were pulling

1    your hair out, weren't you?

2    A      I don't recall that, it could be possible.

3    Q      And talking about how your life is ruined?

4           MR. D'ALBA:  Objection, Your Honor, relevance to

5    how -- you know --

6           THE COURT:  Let's have a sidebar, gentlemen.

7           (Whereupon, the following discussion occurred

8    on the record at sidebar:)

9           THE COURT:  Ken, let me just ask, how far are you

10   going to go on this line?

11          MR. ZAK:  Not terribly far.  I want to establish

12   this guy's state of mind that he isn't just some

13   ordinary citizen who is being unreasonably accosted by

14   the police.  They had good reason to be interested in

15   him at first for two reasons, him being slumped over or

16   bent over alone in the car.

17          MR. D'ALBA:  That's not an issue.

18          MR. ZAK:  Well, it's an issue as far as them being

19   involved with him, then when they -- then when he found

20   these guns, why would a guy who is just merely a

21   sportsman who's misunderstood be screaming about his

22   life being ruined and --

23          MR. D'ALBA:  No one testified about him screaming.

24          THE COURT:  Well, tell me how that's relevant to

25   the unauthorized firearms.

1        MR. ZAK:  I just want to establish --

2        MR. D'ALBA:  No one --

3        THE COURT:  Wait, gentleman.

4        MR. ZAK:  What was on this man's mind.  He wasn't

5    out there hunting.  That's my point, that's all.

6        THE COURT:  How are you going to relate it?  That

7    only -- let's assume he says, yes, I pulled my hair.

8        MR. ZAK:  Some guy who is just irritated is being

9    questioned for a charge of firearms violation or

10   hunting violations, a normal guy isn't going to react

11   like that, isn't going to react in that way.  I'd also

12   want to establish that --

13       THE COURT:  But he's not.

14       MR. ZAK:  That's correct.

15       THE COURT:  You might suspect that he was doing

16   more than that, but he's not charged with anything.

17       MR. ZAK:  I'm not going to argue that he was doing

18   more.  I can't argue that he was doing anything, but

19   I'm just saying --

20       THE COURT:  How does the fact that a guy is

21   pulling his hair affect his credibility?  It might make

22   him a little bit less than normal.

23       MR. ZAK:  Because he's differing with what the two

24   prosecuting officers had to say and I want to establish

25   that they were in their right mind and their