149

1  recollection is accurate and his recollection is

2  flawed.

3        THE COURT:  What's your next question?

4        MR. ZAK:  Because he is not in his best mind at

5  the time.

6        THE COURT:  What's your next question going to be?

7        MR. ZAK:  Depends on his answer, really, I'll be

8  honest.

9        THE COURT:  What if he says, yes, I was pulling my

10  hair, where are you going?

11        MR. ZAK:  Nowhere.

12        THE COURT:  He already testified to that.  Well, I

13  think we've got that.

14        MR. ZAK:  Did he say yes?

15        THE COURT:  Did he give an answer?

16        MR. D'ALBA:  He said I may have been.

17        THE COURT:  Something like that.  Are you done?

18        MR. ZAK:  I think so.

19        THE COURT:  Okay.  Now, tell me, are we going to

20  finish before four-thirty for that juror?

21        MR. ZAK:  It's my intention.

22        THE COURT:  Are you finished with your cross?

23        MR. ZAK:  I want to just review a few things.

24        THE COURT:  What are you going to do after his

25  cross?

1          MR. D'ALBA:  If I ask anything, I promise you it
2     will be very brief.
3          THE COURT:  Okay.  Where are you going after him,
4     have you got more?
5          MR. D'ALBA:  I have another witness that I would
6     intend to discuss with my client, but I believe if we
7     call him, it would be tomorrow morning, Your Honor.
8          THE COURT:  That would be all right, because if
9     you have some rebuttal for tomorrow morning.
10         MR. ZAK:  I'm afraid I'll have to have rebuttal.
11         THE COURT:  Okay.  Then we'll save that guy for
12    tomorrow, whomever.
13         MR. D'ALBA:  Okay.
14         THE COURT:  See if we can finish with this one.
15         (Whereupon, discussion at sidebar was concluded.)
16         THE COURT:  Okay.  Mr. Zak?
17    BY MR. ZAK:
18    Q      Now, Mr. Leuschen, just to clear a matter up, you were
19    approached by Trooper Myers, were you behind -- you were in the
20    driver's seat of your car, is that right?
21    A      Yes, with the door open.
22    Q      Excuse me?
23    A      With the door open.
24    Q      Were you fished with your hunting activities at that
25    time?

1    A        My intention was to go back to Joe Ratajczak's house to

2    see if he was available to go out for the rest of the afternoon

3    to do a little bit of hunting.

4    Q        Rest of the afternoon?  Now, we are after four o'clock

5    now at that time?

6    A        I believe it was a little bit before four o'clock, my

7    intention was to try to get to his house about the time the

8    children would be getting out of school or just prior to then.

9            MR. ZAK:  That's all the questions I have.  Your

10           Honor.

11           THE COURT:  Okay.  Attorney D'Alba?

12

13                         REDIRECT EXAMINATION

14

15   BY MR. D'ALBA:

16   Q        Mr. Leuschen, just getting back to the earlier issue of

17   taking these pistols hunting with you, in your mind is there a

18   distinction between taking something with you and using

19   something to hunt?

20   A        I would say yes.  I take a pocket knife with me

21   sometimes.  Sometimes I take it just to carve on a piece of

22   deadwood or something along the way, something that wouldn't be

23   large enough to field dress an animal, but something that helps

24   me pass the time if I'm sitting and hunting, whatever.

25   Q        You're permitted under the law to also take a pistol

152

1    fishing with you, have you every done that?

2    A        Yes.

3              MR. ZAK:  I'm going to object, that's immaterial,

4        nobody has brought in any evidence at all about

5        fishing.

6              MR. D'ALBA:  First of all, there has been

7        evidence, number one; number two, it's material because

8        Mr. Zak is trying to make an issue out of the gun

9        wasn't proper for hunting and my point is simply this,

10       it doesn't have to be proper for hunting, nor does it

11       have to be proper for fishing because you do not use a

12       gun to fish, you use a fishing pole.

13             THE COURT:  Okay.

14             MR. ZAK:  Just the point --

15             THE COURT:  I'm going to allow you -- the

16       defendant to answer that question then, we are not

17       going to go any further afield there.

18              Would you answer that question, Mr. Leuschen?

19             THE WITNESS:  Would you restate that?

20             THE COURT:  Do you want to read that, Andrea,

21       please.

22              (Whereupon, the requested portion of testimony was

23       read by the court reporter.)

24             THE WITNESS:  Yes, I believe I have.

25             MR. D'ALBA:  Thank you.  I have no further

153

1      questions, Your Honor.

2           THE COURT:  Anything further, Mr. Zak?

3           MR. ZAK:  No, that's all.

4           THE COURT:  Ladies and gentlemen, I think we are

5      going to stop at this point because we have additional

6      witnesses that we are not going to get in today.

7      Unfortunately, as I indicated earlier, we can't start

8      tomorrow until 10:30 because this courtroom is not

9      available, and rather to try to find us another spot, I

10     think we will reconvene right here in those chairs at

11     10:30 tomorrow and we will go until we finish.

12          Now, again, I want to caution you.  You have not

13     heard the whole case yet, there is more coming.  Please

14     don't draw any conclusions or even think about it or

15     discuss it with anybody until you have heard it all and

16     then you can discuss it until your heart's content.  We

17     will adjourn.

18          Gentlemen, I'll see you in my chambers at ten in

19     the morning.  We will go through some preliminary

20     matters and I'll see the jury here at 10:30.

21          (Whereupon, court recessed at 4:21 p.m.)

22

23

24

25

1
2
3
4                    C E R T I F I C A T I O N
5
6          I hereby certify that the proceedings and evidence are
7    contained fully and accurately in the notes taken by me on
8    the trial of the above cause, and that this copy is a correct
9    transcript of the same.
10                       *Andrea C. DeBartolo*
11                     Andrea C. DeBartolo, RPR-CM
                       Official Court Reporter
12
13
14
15
16
17          The foregoing record of the proceedings upon the trial
18    of the above cause is hereby approved and directed to be
19    filed.
20
21                     President Judge Jess S. Jiuliante
22
23
24
25

1

# ORIGINAL

1  COMMONWEALTH OF PENNSYLVANIA     :  IN THE COURT OF COMMON PLEAS

2                VS                 :  OF ERIE COUNTY, PENNSYLVANIA

3  DOUGLAS BURTON LEUSCHEN          :  CRIMINAL DIVISION

4                                   :  NO. 696 OF 1989

5

6

7                                      JURY TRIAL

8                                        (Day 2)

9

10              Proceedings held before the Honorable

11              John R. Falcone, in Courtroom Number 2,

12              Erie County Courthouse, Erie, Pennsylvania,

13              on Friday, July 14, 1989, commencing

14              at 11:00 a.m.

15

16

17              APPEARANCES:

18

19              Kenneth Zak, Esquire, appearing on behalf of
                the Commonwealth.

20              Joseph J. D'Alba, Esquire, appearing on behalf of
21              the Defendant.

22

23

24        Andrea C. DeBartolo, RPR-CM -- Official Court Reporter

25

2

1                    I_N_D_E_X

2

3        WITNESSES:

4                        DIRECT  CROSS  REDIRECT  RECROSS

5

6  FOR THE COMMONWEALTH:

7  (Rebuttal witnesses)

8  William Marino            29      32      33       --

9  Richard Myers            35      37      --       --

10

11  FOR THE DEFENDANT:

12  Joseph Ratajczak         22      25      --       --

13

14

15

16        EXHIBITS:

17                     Admitted        Marked

18  FOR THE DEFENDANT:

19  A (hunting regulations)                   29

20  B (provisional licenses)     27           29

21

22

23

24

25

1                    P_R_O_C_E_E_D_I_N_G_S

2

3          (Whereupon, following discussion occurred in

4    chambers.)

5

6          THE COURT:   Early this morning my office had a

7    call from J. Mark Graham, who is our Juror Number 3,

8    he's Number 249, and the message was that he is ill and

9    cannot come in.   That matter has been discussed with

10   both counsel and we all agree that the proper procedure

11   would be to excuse J. Mark Graham and to take our first

12   alternate, Alternate 1, Number 632, who's name is

13   Arlene Slater and sit her in the jury box in place of

14   Mr. Graham.   Now, we did that.

15          The second matter counsel and I discussed in

16   chambers this morning is the handling of the exhibits,

17   in light of the fact we have some weapons and

18   ammunition here.   And we all agree that the rifle,

19   which is Exhibit Number 13, and the envelope with the

20   ammunition for the rifle, which is Exhibit Number 14 of

21   the Commonwealth's, need not go to the jury in that the

22   case involving those is my decision.

23          Now, in addition to that, we have decided that it

24   would be better that no ammunition of any kind goes out

25   with the jury in their deliberations because of safety,

4

1    and the fact that they will have the handguns and we

2    don't want jurors fooling around, loading them, so we

3    have all agreed that although the ammunition are proper

4    exhibits, we will keep them away from the handguns.

5        Now we talk about the State Police information

6    request, that's one we haven't decided yet.

7        MR. ZAK:  Our position on that, Your Honor, is

8    that that is a necessary element of the charge.  The

9    police officer authenticated it, so it was admitted.

10    It was enabled to be admitted into evidence and it's a

11    business record, it's an exception to the hearsay

12    rule -- well, it's an official record.

13        MR. D'ALBA:  No question as to its admissibility.

14        MR. ZAK:  I'm trying to explain it.

15        THE COURT:  One at a time so Andrea can get it.

16        MR. ZAK:  Please, you have been a little frisky.

17        MR. D'ALBA:  I'll be more frisky before the day

18    goes on.

19        MR. ZAK:  And our position on that is it's just a

20    necessary element of the charge.  Now, if the defendant

21    had signed a confession of some sort or there had been

22    some extensive medical record or some piece of paper

23    that the jury would give undo emphasis to, of course,

24    that couldn't go out with the jury, that's the law and

25    that's been the practice and it's fair.  But this is

1     just -- all this says is that he did not have a license

2     to carry a firearm in this Commonwealth, but further,

3     it has something that's -- that partially favors the

4     defendant, and it does indicate that he had the

5     provisional permits for at least two of those guns and

6     those are attached to that also.  So it's just a fair

7     statement and it doesn't indicate anything beyond those

8     statements indicating that he's guilty of any other

9     element of the offense, it just establishes one element

10    of the offense.

11         THE COURT:  Okay.  Mr. D'Alba?

12         MR. D'ALBA:  Your Honor, the question of what

13    exhibits should go to the jury in particular in this

14    case is solely within the discretion of the trial

15    court.  My problem with permitting this document to go

16    to the jury is that if the jury were to understand the

17    rule -- follow the statute only with regard to the

18    section about -- the primary section about no person

19    shall carry a firearm without a license, if they only

20    go that far and stop, them seeing the first indication

21    on that exhibit that there is no license may unduly

22    prejudice the defendant.

23         THE COURT:  Okay.  In response to that, I'm going

24    to let Exhibit 17 go, and I'll instruct them that they

25    absolutely should not stop at that point, they should

6

1    go on to 2 and 3, so I'm going to let 17 go out.   The

2    de minimis argument -- I presume we will have a break

3    before I instruct the jury and I'll decide that at that

4    time.

5         MR. ZAK:   Your Honor, if I may interject, I would

6    like all the jury instructions settled before we do our

7    closing arguments.   I think that would be appropriate,

8    that's fair.

9         THE COURT:   I'll decide that from the bench before

10   we start, before we start our closings, I'll tell you

11   what I have done about the de minimis argument so you

12   know how to frame your argument.

13        MR. ZAK:   If I may speak to that point, since we

14   are on the record, I strenuously object to that because

15   our position of de minimis is a matter of law.   The

16   jury is here to decide only facts and to charge the

17   jury on   de minimis, it would be calling for the

18   possibility of jury nullification, which the

19   Commonwealth certainly doesn't agree with.

20        THE COURT:   Okay.

21        MR. ZAK:   And further, that even just the way the

22   facts are being presented by the Commonwealth in this

23   case, if the jury finds the defendant guilty, just by

24   definition, the offenses are not de minimis.

25        THE COURT:   Do you want to speak to that, Jay, any

7

1  more than you already have?  I know your position, you

2  don't have to, you've already got it, but you're

3  welcome to.

4      MR. ZAK:  Well, he's free to put it on the record.

5      MR. D'ALBA:  The response is simply that

6  de minimis is a principle of law, but it is the

7  exception to the jury being sole fact-finding body in

8  that it permits the jury to apply the facts to the law

9  and determine if that offense is of minor consequence,

10  that they do have the right to acquit on that.

11  Although the principle of the jury nullification, legal

12  principle, has been abolished for over 50 years now in

13  the United States, unfortunately, so this is one last

14  bastion of that.  And in light of that, the jury should

15  be made aware of that and my client should be afforded

16  the right to have that, in spite of the fact that -- of

17  the two other permits and that he attempted to get a

18  permit for the third gun.

19      THE COURT:  Now, before we get into the offer or

20  the motion in limine, do I have everything else

21  covered?

22      MR. D'ALBA:  Just my question would be with regard

23  to the -- will you be giving a charge on

24  semiautomatics?

25      MR. ZAK:  What charge are you referring to?

8

1      MR. D'ALBA:  Well, there is several points that

2  are requested, all regarding that if you find that the

3  other -- that it's within the exception, and that the

4  qualifications of the exception are met, that it

5  doesn't matter if it's a semiautomatic weapon.

6      MR. ZAK:  That's inapplicable for two reasons;

7  one, that if it's in the exception, he still has to

8  have one of those provisional permits, and he didn't

9  have it.

10      MR. D'ALBA:  That's a question of fact for the

11  jury to decide.

12      MR. ZAK:  Well, but he didn't have it, so whatever

13  type of weapon it was, he's clearly in violation.  Any

14  view of their case --

15      THE COURT:  Let me stop you right there, Jay,

16  that's the way I went off last night, after you left.

17  My thought is if he doesn't qualify so that he's

18  eligible for the exception, it doesn't matter what it

19  is he was shooting, whether it's a bazooka --

20      MR. D'ALBA:  Right, Your Honor, but I think the

21  determination of whether he has it or not is left to

22  the jury.  That's fact, they have to find that he

23  doesn't have that --

24      THE COURT:  I understand that.

25      MR. D'ALBA:  -- number one.  And number two, the

1    thing about semiautomatic weapons is just so

2    prejudicial, that there is a recent Federal ban on it,

3    that in lack of that, it may deprive him of a fair

4    trial and due process.

5         MR. ZAK:  I mean, that's ridiculous.  He had the

6    semiautomatic weapon, there is no Federal ban on it,

7    it's a perfectly lawful weapon.  We are only saying

8    that he was using it in an unlawful way.  As far as the

9    semi being carried, a semiautomatic, I mean, the

10   defense wants to use that little hunting manual,

11   hunting regulations, you can't hunt with a

12   semiautomatic pistol.

13        MR. D'ALBA:  Well, the Judge has already corrected

14   you on that misrepresentation of the law.

15        MR. ZAK:  I wasn't corrected at all, in fact, I

16   clarified it by saying, well, in some circumstances you

17   can use a semiautomatic shotgun.  There is no way you

18   could use a semiautomatic single projectile weapon --

19        THE COURT:  Here's what I would conclude with

20   that.  Let's assume for some reason he did receive a

21   permit that involves a 9mm, I would say that even

22   though that might be a violation of game laws to use

23   that weapon, it would qualify for the exception.  I

24   think I would conclude that, Ken, but I'm not sure that

25   we are going to get there because there is no evidence

1   whatsoever that he has a permit, and I don't know how

2   they could ever decide that he does.

3       MR. ZAK:  Well, I don't either, but it's our

4   position that there just -- that 9mm just did not

5   belong in the hunting fields.

6       THE COURT:  But I'll tell you, Jay, I'm not going

7   to charge on that.  I'm not going to prevent either of

8   you from arguing that position, but I think I ought not

9   charge on that.

10      MR. D'ALBA:  Just if I may for the record, Your

11  Honor.  The logic that I'm pursuing is this, is that if

12  we get the instruction on the de minimis, and if they

13  find that he did attempt to get that permit, and they

14  say that that attempt and the failure to adequately

15  provide it, that violation is de minimis, then they are

16  going to say, well, but is that -- having the 9mm

17  improper because it's a semiautomatic?  If they do get

18  that far, I want them to know that the fact that it is

19  a semiautomatic weapon is not prohibitive of a finding

20  of acquittal.

21      THE COURT:  Well, why is that a matter of law

22  rather than a fact for the jurors to decide?

23      MR. D'ALBA:  Well, again --

24      THE COURT:  I don't want to take everything away

25  from them, I think they ought to decide that

1      themselves.

2          MR. D'ALBA:  Well, I'm just asking for the Court

3      to instruct them that so they don't say the

4      semiautomatic weapon -- and to follow Mr. Zak's, what I

5      believe to be incorrect, logic, that you can't even

6      take it with you even though you don't hunt with it,

7      then he'd be prejudiced.  He'd say ultimately you can't

8      shoot anything with it, therefore you can't carry it.

9      And I want the jury to know what the Court, I believe,

10     has concluded, that you can carry a semiautomatic

11     weapon if you have the permit.  And if they find that

12     even though he didn't have the permit, it is a de

13     minimis violation, then it would all --

14         THE COURT:  Okay.  I'll decide that as well before

15     you argue.  The second thing you want me to decide in

16     addition to the de minimis argument is whether or not

17     the 9mm pistol would qualify for the exception, had it

18     been properly registered, or the fact is, we do -- we

19     just consider that it doesn't count at all because it's

20     not a legal hunting weapon, that's basically where we

21     are.

22         MR. D'ALBA:  Correct.

23         MR. ZAK:  Right, but see, a lot of this goes into

24     the area of argument, because the gist of my argument

25     is that -- concerning the hunting laws and regulations,

12

1    is that if this guy were a legitimate hunter, he would

2    be following those laws and regulations.

3         THE COURT:  Okay.  All right.  Now, next thing

4    is -- the only thing we have left now, your offer, you

5    want to know what he's going to do on rebuttal.

6         MR. D'ALBA:  Offer and possible subsequent --

7         MR. ZAK:  Before we do that, I understand the

8    defense's case isn't closed?

9         THE COURT:  What are you going to do next?

10        MR. D'ALBA:  Today we have one more witness to

11   call to verify his activities, hunting in that area.

12        THE COURT:  Okay.  Well, listen, do you want to

13   have an offer on that while we are here?  Who are you

14   going to call and what's he going to do?  We will move

15   along.

16        MR. D'ALBA:  Before I give you his name, I'll tell

17   you -- while I'm looking for his name -- what we are

18   going to call him for.  This is an individual who has

19   hunted on several occasions with my client in that

20   area.  He's also the individual that my client made a

21   reference to in his direct testimony as stopping at his

22   house and stopping at an area where he was caretaker.

23        THE COURT:  Jacobowski or something?

24        MR. D'ALBA:  Exactly.  Joseph Ratajczak.

25        THE COURT:  He's here, you want to start with him?

1     MR. D'ALBA:  I anticipate -- he's supposed to be

2     here at ten o'clock.

3     MR. ZAK:  What else is he going to say?  Is that

4     your whole offer?

5     MR. D'ALBA:  That's the whole gist of it, that he

6     hunted in that area with my client previously.  It's

7     certainly relevant.

8     THE COURT:  Do you object to testimony like that?

9     MR. ZAK:  No.

10    THE COURT:  Okay.  We will take that witness now.

11    After we get him, where are we going?

12    MR. ZAK:  Is that the close of your case?

13    MR. D'ALBA:  I do plan to call the defendant once

14    again.

15    THE COURT:  For what?

16    MR. D'ALBA:  Briefly.

17    MR. ZAK:  He's already testified.

18    THE COURT:  Let me find out why.  I may decide he

19    already testified.  Go ahead.

20    MR. D'ALBA:  I want to introduce the hunting

21    licenses and whatnot through him.  Prosecution has

22    yet -- although we asked for exculpatory evidence, the

23    prosecution has failed up to this point, although I

24    requested it, to surrender to us or to turn over to us

25    the actual license for hunting and fishing that was

1      taken from my client at the time of his arrest.   This

2      is -- although it's been testified to that he did have

3      the licenses, it's a fundamental element, requisite

4      prima facie element of our defense to face an

5      exception.   And I don't want to fail on a technical

6      statement that we didn't introduce it.

7           THE COURT:   Basically, you want to put the

8      defendant on to say I had these two licenses?   Do you

9      have a problem with that?

10          MR. ZAK:   Well, if that's the only purpose, but

11     frankly, I told Mr. D'Alba before he made that

12     statement that he just made now, I told him before we

13     began this session, that I understood that we had the

14     license.   He has a Xerox that was provided in discovery

15     of that license and we are not sitting on any evidence

16     as he just demanded.

17          MR. D'ALBA:   I don't believe we were provided a

18     Xerox, maybe we were.

19          MR. ZAK:   I think Mr. D'Alba is being very unfair

20     to the prosecution, making some sweeping statements

21     which I think umbrage --

22          THE COURT:   You take umbrage because they are not

23     going to affect anything.   We all understand that.   I

24     won't let him do that to the jury.   Do you want to

25     offer the license or the Xerox copy?

1          MR. D'ALBA:  The license itself.

2          THE COURT:  Do you have any problem giving him the

3     licenses for this purpose?

4          MR. ZAK:  Your Honor, if the only reason why he

5     wants to put the defendant on the stand is to

6     authenticate the license, I would stipulate --

7          THE COURT:  That's where I was going.

8          MR. ZAK:  -- that the license was taken off of him

9     at that time and we'd introduce it.  Furthermore, on

10    rebuttal, I want to put both troopers back on.

11         THE COURT:  Why don't you tell me about that.

12         MR. ZAK:  Your Honor, this is relevant.  I want to

13    put both troopers back on and I could introduce it

14    through their testimony.

15         THE COURT:  Okay.

16         MR. ZAK:  Either way.

17         MR. D'ALBA:  Well, I want to introduce it, number

18    one, and I'd like to introduce it through my client,

19    that's part of my strategy.  I think I'm entitled to

20    it.  One brief thing I would like to bring out to

21    verify my client's propensity in trainig outdoors is

22    the fact that he's a Viet Nam Veteran, which we didn't

23    bring up on direct.

24         MR. ZAK:  It's immaterial.

25         MR. D'ALBA:  It's not immaterial, Your Honor.

1    THE COURT:  I wouldn't let you do that.  I would

2    believe that's irrelevant for purposes of what we have.

3    I have no problem with you in your case introducing

4    those two licenses, however you want to do it, but I

5    don't want you to put your defendant on the stand to go

6    through the whole thing again.

7        MR. D'ALBA:  Okay.  If we have a stipulation --

8        THE COURT:  If you can accept -- you can accept

9    Ken's stipulation.  If you would choose not to do it,

10   start, why don't you, with that guy and the

11   defendant -- the defendant to identify the licenses.

12   If you plan to mark them as exhibits, go ahead, you can

13   do that.  Are you going to do that?

14       MR. D'ALBA:  That's fine.  We will do it by

15   stipulation.  We will mark them, do it on the record in

16   the courtroom.

17       THE COURT:  Well, but -- okay.  Okay.  Now, after

18   that's done, you have Ratajczak, you're done.  What are

19   you going to do next, sir?

20       MR. ZAK:  All right.  The defendant, when he was

21   on the stand, stated that he gave these officers, at

22   least one of the officers, targets that he had been

23   shooting at.

24       THE COURT:  Yeah.

25       MR. ZAK:  He stated that he had a red hat.

1          THE COURT:  Okay.

2          MR. ZAK:  He stated --

3          THE COURT:  Listen, you're welcome to put on

4    anything that rebuts what he said, but I don't want to

5    put it on to fortify something that's uncontested.

6          MR. ZAK:  Of course not.

7          THE COURT:  Okay.  Fine.

8          MR. ZAK:  I want to get this trial over with.

9          MR. D'ALBA:  But --

10         MR. ZAK:  I have more to say, Jay.  The defendant

11   had a different view of his statements to the officers.

12         THE COURT:  I understand.

13         MR. ZAK:  And the officers have to take the stand

14   to rebut.

15         THE COURT:  How are you going to do this, through

16   Trooper Myers only?

17         MR. ZAK:  First I want to put Trooper Marino on,

18   he's going on vacation, we are holding him back.

19         THE COURT:  Ken, you can go do that then, ask

20   Myers as to what happened at the car.  We are not going

21   to rehash things that are already in evidence.

22         MR. D'ALBA:  Yes, you are.

23         THE COURT:  No, wait, I'm not going to let him.

24         MR. ZAK:  Gee whiz.

25         THE COURT:  I'll check it, you would have no worry

18

1    about that now, he can do that.

2        MR. ZAK:  It's just matters that were opened up by

3    the defendant under direct and cross-examination of the

4    defendant.

5        THE COURT:  He's allowed to do that.

6        MR. ZAK:  Where he differed with these officers,

7    and we have a right to do that, we have a right to do

8    that.

9        THE COURT:  Okay.

10        MR. ZAK:  For that limited reason.

11        THE COURT:  Now, speak to that if you'd like.

12        MR. D'ALBA:  Your Honor, all of that --

13        MR. ZAK:  Well, there is one more, I'm sorry.

14        THE COURT:  All right.  Go ahead.  Wait, Jay.

15        MR. ZAK:  In cross-examining the defendant, I

16    asked him his address and I don't know if I wrote it

17    down, I have the wrong file with me, but according

18    to -- but the defendant gave the officers at least one

19    or two different addresses other than that which he

20    gave in Court, and we also want to bring that out as to

21    where his place of abode may have been.  There is a

22    contradiction there, and that's to impeach the

23    defendant's testimony and that's proper rebuttal also.

24        THE COURT:  What were you going to say, Jay?

25        MR. D'ALBA:  With the exception of the addresses,

1    all the testimony regarding the hat, the targets and

2    whatnot is already there.  The troopers were asked did

3    you find any target, Trooper Myers said no.  The

4    disagreement about the matter was also brought up by

5    Trooper Myers, it's already on the record.  And being

6    that it's only for rebuttal --

7        THE COURT:  The trooper said -- one of the

8    troopers didn't talk about targets, I think that's sort

9    of a new area.

10        MR. D'ALBA:  No, I believe he did, he was asked

11    because I recall -- and my memory could be wrong, but I

12    recall him saying that he did not see any targets.  He

13    said that the defendant said something about targets,

14    but he didn't see them in the car.

15        MR. ZAK:  Well, see, the defendant testified that

16    he had these red targets, supposedly, he got from his

17    friend who runs the gun store, the sporting store, and

18    that he offered them to the trooper and he showed it.

19    He went into some detail about that.

20        THE COURT:  Yeah, but Kenny, if we already have

21    it -- now, let's talk about the hat.  You put Trooper

22    Myers on to say I didn't see a red hat, then I can put

23    the defendant on again to say, oh, that it is in the

24    car.  We will never get done.

25        MR. ZAK:  But see, what's important is Trooper

1    Marino when he testified, he said that they searched

2    the car, they got a warrant, they searched the car and

3    no hat appeared.

4        THE COURT:  And you're going to ask him if any hat

5    appeared?

6        MR. ZAK:  Right.

7        THE COURT:  That's okay.

8        MR. D'ALBA:  Your Honor, the only inventory that's

9    been supplied to us regarding evidence seized from that

10   automobile regards guns and ammunition.

11       MR. ZAK:  They didn't see a hat.

12       MR. D'ALBA:  They didn't see a hat, didn't see

13   camping equipment, didn't see any spare tire --

14       THE COURT:  I'm going to let you get to that

15   point, but we are not going to go too far with it.

16       MR. ZAK:  Those items are not evidence, they had

17   no reason to seize them.

18       THE COURT:  Did we get your exhibit on record yet?

19       MR. ZAK:  The hunting license?

20       THE COURT:  No, the page of the game regulations?

21       MR. D'ALBA:  Just to interject, I understand in

22   the rebuttal, you do not intend to produce any more

23   with the guns?

24       MR. ZAK:  Well, the defendant mentioned in his

25   testimony that there were two shotguns in the car and

1    they were under some items and so forth.  I don't have

2    a problem -- well, I don't know.  There is no real

3    need.  We have some photographs of the shotguns, we

4    don't have the actual shotguns.

5         THE COURT:  I wouldn't let the shotguns in any

6    way.

7         MR. ZAK:  They are not really terribly relevant.

8    I'm going to argue it because they mentioned that he

9    had them there.

10        THE COURT:  Yes, they brought them, but I don't

11   want them around.  We will rule it as he has in mind.

12   Now, before you go, Andrea, yesterday, the defendant in

13   his case identified an item called Exhibit A, which was

14   a small summary of the hunting regulations.  The center

15   page of that has been identified by some of the parties

16   to the case, and what I have decided to do is duplicate

17   just the center page, and we have identified that as

18   Defendant's Exhibit A, and that can be an exhibit, the

19   one page as opposed to the whole book.

20        (Whereupon, discussion in chambers was concluded.)

21        THE COURT:  Before you start, Mr. D'Alba, I want to

22   explain something to the jury.  Juror Number 632, is

23   that you?

24        THE JUROR:  Yes.

25        THE COURT:  Okay.  Ladies and gentlemen, I wanted

1          to explain that we had a call this morning from the

2          gentleman who was Juror Number 3 yesterday.  He called

3          this morning and said he was ill, so I met with the

4          attorneys this morning before we got started here and

5          we have decided that the proper thing to do would be to

6          excuse that juror and then select as our replacement

7          juror our first alternate.  So we have done that and we

8          are down now to only one alternate left and we will try

9          to get through with what we have.

10              Mr. D'Alba?

11              MR. D'ALBA:  Thank you, Your Honor.  Your Honor,

12          the defense calls Mr. Joseph Ratajczak to the stand.

13

14                    JOSEPH RATAJCZAK,

15

16     having been first duly placed under oath, was examined and

17     testified as follows:

18

19                    DIRECT EXAMINATION

20

21     BY MR. D'ALBA:

22     Q          Sir, would you please state your name?

23     A          Joseph Ratajczak.

24     Q          And Mr. Ratajczak, where do you reside?

25     A          245 Delp Road (phonetic), East Springfield.

23

1    Q      Mr. Ratajczak, do you know Mr. Douglas Leuschen?

2    A      Yes.

3    Q      How do you know Mr. Leuschen?

4    A      I have hunted and fished with him.

5    Q      And how long have you known Mr. Leuschen?

6    A      Two, three years.

7    Q      And how long have you hunted or fished with him?

8    A      In about the same time.

9    Q      Mr. Leuschen was involved in an incident that occurred

10   on US Steel Property and Old Lake Road, are you familiar with

11   that area?

12   A      Yes.

13   Q      Have you ever been to that area with Mr. Leuschen?

14   A      Yes.

15   Q      For what purpose did you go to this area with Mr.

16   Leuschen?

17   A      To target practice and to hunt.

18   Q      During this last one winter, meaning anywhere from

19   November to February, did you have any occasions to hunt or

20   target practice with Mr. Leuschen?

21   A      Yes.

22   Q      Did you have an occasion to go to the area where this

23   incident occurred?

24   A      Yes.

25   Q      And what did you do in that area?

1    A        I target practiced with him.

2    Q        Did you do any hunting there?

3    A        Yes.

4    Q        Can you tell us during that same period of time,

5    approximately November through February, on how many occasions

6    did you go?

7    A        Oh, I would say six to nine times.

8    Q        And that is with Mr. Leuschen?

9    A        Yes.

10   Q        Did you ever hunt groundhogs in that area with Mr.

11   Leuschen?

12   A        In that area, yes.

13   Q        Do you ever hunt anything else with him in that area?

14   A        Rabbits and deer.

15   Q        Did you ever hunt any groundhogs with Mr. Leuschen

16   during the period of time in November to February?

17   A        Yes.

18   Q        You seem a little bit hesitant, do you want to explain

19   your answer?

20   A        That's because it's off season for groundhogs.  If you

21   do see them, you do shoot them, that's why.

22   Q        Do you expect to see groundhogs when you go out there

23   that time of year?

24   A        Not expect, but you do see them.

25   Q        Okay.  Would you agree that Mr. Leuschen is an avid

25

1    outdoorsman?

2    A        Yes.

3              MR. D'ALBA:  I have no further questions, cross.

4              THE COURT:  You may cross-examine, Mr. Zak.

5

6                    CROSS-EXAMINATION

7

8    BY MR. ZAK:

9    Q        Mr. Ratajczak, you have been out in the area in

10   question, Old Lake Road and Rudd Road, that's where this

11   incident happened, you have been out there with Mr. Leuschen,

12   according to your testimony, shooting what sort of a gun?

13   A        Pistols and rifles.

14   Q        Okay.  What?

15   A        At what?

16   Q        Yes.

17   A        Tin cans, targets we put up.

18   Q        What sort of targets?

19   A        Paper targets, just almost anything.

20   Q        Manufactured paper targets?

21   A        Yes.

22   Q        And when you went out there, what sort of guns did you

23   bring with you?

24   A        My pistol and my rifle.

25   Q        What kind of pistol, what kind of rifle?

1  A      I have a .41 pistol revolver and a .270 Remington

2  rifle.

3  Q      Okay.  Now, you said that around February, you don't

4  really expect to find groundhogs, do you?

5  A      Not too often, no.

6  Q      That's because usually they are hibernating, right?

7  A      Yes.

8          MR. ZAK:  That's all I have, thank you.

9          THE COURT:  Anything further of this witness, Mr.

10  D'Alba?

11          MR. D'ALBA:  No, Your Honor.

12          THE COURT:  Okay.  You may step down, Mr.

13  Ratajczak, thank you very much.

14          MR. D'ALBA:  Thank you, Mr. Ratajczak.  You're

15  free to go.

16          (Whereupon, Defendant's Exhibit B was produced and

17  marked for identification.)

18          MR. ZAK:  I'd stipulate to the admission of that.

19          MR. D'ALBA:  I can just tell the jury what it is,

20  Your Honor.

21          THE COURT:  I'll tell them.  Do we have two of

22  them?

23          MR. ZAK:  Excuse me, Your Honor.

24          THE COURT:  Are they both -- is all you're going

25  to present now, this thing?

1       MR. ZAK:  That paper shows the hunting license, it

2  also shows the two provisional firearms licenses.

3       THE COURT:  Okay.  They are all together as

4  exhibits?

5       MR. ZAK:  Those are copies.  We don't have the

6  originals here.

7       THE COURT:  Ladies and gentlemen of the jury, as I

8  indicated yesterday, there are occasions when the

9  attorneys agree to various particular points, and they

10 did that this morning in my chambers.  And this has

11 been submitted as what we'll call Defendant's Exhibit B

12 and Mr. D'Alba would you tell them what this is.

13      MR. D'ALBA:  Yes, Your Honor, that is Mr.

14 Leuschen's hunting license and also there is two

15 provisional licenses for him to carry the pistols

16 during hunting activities.

17      THE COURT:  Okay.  Thank you.  This will be marked

18 as Exhibit B for your review later on when you get to

19 looking at the exhibits.  I'll accept that.

20      MR. D'ALBA:  Your Honor, Mr. Zak, correct me if

21 I'm wrong, there has been also an additional

22 stipulation that Mr. Leuschen was properly licensed for

23 fishing in the Commonwealth of Pennsylvania the date of

24 the occurrence.

25      THE COURT:  Is that your recollection as well, Mr.

28

Zak?

MR. ZAK:  Well, it's our stipulation, Your Honor, that he had a fishing license.

THE COURT:  Okay.  Isn't that also covered by that bottom document there, Mr. D'Alba, on Exhibit B, doesn't that bottom thing refer to fishing as well?

MR. D'ALBA:  No, Your Honor, I believe the bottom document numbered 499639J just is the hunting license.

THE COURT:  Okay.  Ladies and gentlemen, what that means is there is another stipulation in which the attorneys have agreed that Mr. Leuschen at the time of this incident did have a proper fishing license.  I'm not sure you'll have that document before you, but you can take that as factual.  Go ahead, Mr. D'Alba.

MR. D'ALBA:  Your Honor, the defense moves for the introduction of Exhibits A and B.

THE COURT:  Do you have any objection to those, Mr. Zak?

MR. ZAK:  Your Honor, just to simplify matters, it's just been brought to my attention that we have the original -- the firearms licenses and we would offer those.

MR. D'ALBA:  We would --

MR. ZAK:  Best evidence rule.

THE COURT:  Do you want to staple them together

1          and mark them as Exhibit B?

2               MR. D'ALBA:  So now Exhibit B, including the two

3          original provisional licenses we are moving for

4          introduction into evidence.

5               THE COURT:  That would be fine.

6               MR. D'ALBA:  The defense rests, Your Honor.

7               THE COURT:  Mr. Zak, any rebuttal?

8               MR. ZAK:  Your Honor, at this time, yes, there is,

9          Your Honor.  At this time, we will call Trooper Marino

10         to the stand.

11              THE TIPSTAFF:  You remain under oath, trooper.

12

13                    WILLIAM MARINO,

14

15    recalled as a witness, having been previously sworn, was

16    examined and testified as follows:

17

18                    DIRECT_EXAMINATION

19

20    BY MR. ZAK:

21    Q          Trooper, I'll remind you, you're still under oath.

22    Trooper, when you spoke with the defendant at the Girard Police

23    Barracks concerning this matter, did he tell you what he was

24    doing down there at Old Lake Road?

25    A          No, sir, he was not specific with me at that time.

30

```
 1    Q        Did he mention hunting?

 2    A        He said he was using the loaded firearms for hunting.

 3    Q        Did he indicate any animals that he was hunting?

 4    A        I don't recall that he did, no, sir.

 5    Q        Did he indicate any target shooting?

 6    A        I don't recall he indicated that to me either, sir.

 7    Q        Did he mention any targets that he had in his

 8 possession?

 9    A        No, sir, not to me.

10    Q        Did he mention a red hat that he had in his possession?

11    A        He didn't mention it, I did not observe one.

12    Q        Excuse me?

13    A        He did not mention that, I don't recall observing one.

14    Q        Did you go through his belongings in his car?

15    A        Yes, sir, we did, it's a process of the search.

16    Q        In the course of that search, did a red or orange

17 hunting cap come to your attention?

18    A        Not to my recollection.

19    Q        Did any targets come to your attention?

20    A        Not to my recollection.

21    Q        Did you read -- before you spoke with the defendant,

22 did you read to him his Constitutional rights, his miranda

23 rights?

24             MR. D'ALBA:  Objection, this was testified to

25             yesterday, Your Honor.
```

31

1        THE COURT:  Yes, we have already covered that.

2        MR. ZAK:  The defendant denied that.  The

3   defendant said that he was given his rights after his

4   discussion with the trooper and before he was brought

5   to the magistrate.

6        THE COURT:  I'm going to sustain the objection --

7        MR. D'ALBA:  Thank you, Your Honor.

8        THE COURT:  -- in that we will never finish.  If

9   Trooper Marino tells us his version, we will have to

10   put the defendant on to tell his version.  We will go

11   'round and 'round.  The trooper has already testified

12   on direct what the situation was with the Miranda

13   rights.

14        MR. ZAK:  Well, the defendant brought up something

15   completely new on that on the time.

16        THE COURT:  I think the defendant, Mr. Zak, just

17   denied what Trooper Marino had already said.  We

18   already have that before the jury.

19   BY MR. ZAK:

20   Q       Did Mr. Leuschen indicate to you exactly where he was

21   hunting or where he was target shooting?

22   A       He never -- to the best of my recollection, he never

23   related anything about target or hunting.  At that particular

24   time, he simply stated he was -- I was more concerned with the

25   loaded firearms, and he just advised us that he was using them

32

1     for hunting.

2                    MR. ZAK:  Okay.  Cross-examine?

3                    THE COURT:  Mr. D'Alba?

4                    MR. D'ALBA:  Thank you, Your Honor

5

6                         CROSS-EXAMINATION

7

8     BY MR. D'ALBA:

9     Q        Trooper, at this point with your involvement in the

10    case when you were called in, you were not the primary

11    investigating officer, were you?

12    A        No, sir, I wasn't the first man on the scene.

13    Q        That was Trooper Myers, correct?

14    A        That's correct.

15    Q        And basically, like you testified, you were concerned

16    with the loaded firearms, correct?

17    A        I believe so, yes, that would be a correct statement.

18    Q        And also as being a Pennsylvania State Police Trooper,

19    your concern is with enforcement of the law and not defense of

20    the law?

21    A        Correct.

22                    MR. ZAK:  I'm going to object to that, that's not

23            germane to this, it's an argumentative question.

24                    THE COURT:  Well, I think we ought to hear the

25            troooper's answer whether it's yes or no, then we go

1          from that.

2                THE WITNESS:  I am an enforcement officer, yes.

3    BY MR. D'ALBA:

4    Q      So you're not concerned with looking for evidence that

5    would exculpate or acquit a particular defendant, especially in

6    a case like this, you were concerned with the firearms and the

7    firearms almost exclusively, correct?

8    A      I believe the correct statement would be that I am

9    looking for any and all evidence that would be pertinent to that

10   investigation.

11   Q      But at that time you weren't looking for a hunting cap,

12   were you?

13   A      In answer to your question, I was looking for any and

14   all evidence that would be pertinent to that case.

15   Q      You weren't specifically looking for a hunting cap,

16   were you?

17   A      I was not specifically looking for a hunting cap, no,

18   sir.

19   Q      You also were not specifically looking for hunting

20   targets, were you?

21   A      At that time, no, sir, I was not.

22   Q      Thank you very much.

23                MR. D'ALBA:  No further questions, Your Honor.

24                THE COURT:  Mr. Zak?

25

34

1                        REDIRECT EXAMINATION

2

3    BY MR. ZAK:

4    Q       Well, did the defendant tell you about a hunting cap?

5            MR. D'ALBA:  Objection, Your Honor, this was

6    covered.

7            MR. ZAK:  He just opened it up on cross, Your

8    Honor.

9            THE COURT:  I'm going to overrule the objection.

10   and ask the officer to answer that question.

11   BY MR. ZAK:

12   Q       During your discussions with the defendant, did he

13   mention a hunting cap?

14   A       No, sir.

15           MR. ZAK:  Thank you very much.  No further

16   questions.

17           THE COURT:  Anything further, Mr. D'Alba?

18           MR. D'ALBA:  Nothing further.

19           THE COURT:  Thank you, trooper, you're excused.

20           MR. ZAK:  I would ask, even though this is the

21   charging officer, if he may be excused at this time due

22   to other commitments.

23           THE COURT:  Do you have any objection to that,

24   Attorney D'Alba?

25           MR. D'ALBA:  I have no objection.  I hope he

1          enjoys his vacation.

2                    MR. ZAK:  Thank you very much, Trooper Marino.

3                    The next rebuttal witness would be Trooper Myers.

4                    THE TIPSTAFF:  Trooper, you also remain under

5          oath.

6

7                         RICHARD MYERS,

8

9    recalled as a witness, having been previously sworn, was

10   examined and testified as follows:

11

12                         DIRECT EXAMINATION

13

14   BY MR. ZAK:

15   Q        Trooper Myers, when you spoke with the defendant at the

16   time you approached him when this incident began, did the

17   defendant show -- first of all, what did the defendant say he

18   was doing there?

19   A        We never got into that right at that point.  During the

20   sequence of events, he did mention he was out there target

21   practicing in the steel property.

22   Q        All right.  Did he show you any targets?

23   A        No, there was no targets visible.

24   Q        Did he indicate where he was shooting?

25   A        No, he did not indicate where he was shooting.

36

1   Q        Did he indicate at any point he was shooting a used

2   shotgun shell?

3   A        No, he did not.

4   Q        Okay.  And did he tell you where he lived?

5   A        At that time he said he was living out of his car.

6   Q        Okay.  Did he give you an address at any point?

7   A        During the course of obtaining information, he

8   mentioned, I believe, the Homer Avenue address as his parents

9   and his mailing address.

10  Q        Okay.  Did he give any other address?

11  A        No, none, although he did say that he was living out in

12  the State of Virginia at one time, or someplace south.

13  Q        Okay.  Did he -- now, when he was sitting in the car,

14  did he make -- when you approached the car, what position was he

15  in?

16          MR. D'ALBA:  Objection, Your Honor, I don't see

17          that this is proper rebuttal evidence.

18          THE COURT:  I think we already have that covered

19          probably from both sides in your cases in chief, so I

20          think we can skip that at this time.

21  BY MR. ZAK:

22  Q        When you obtained the guns in question, did he hand

23  them to you?

24  A        No, he did not.

25          MR. D'ALBA:  Objection, Your Honor, this was

1          covered.

2                THE COURT:  I'm going to overrule that objection

3          in that I'm not really sure we got into the

4          particulars.

5                MR. ZAK:  Well, the defendant denied --

6                THE COURT:  You can answer that, trooper.

7                THE WITNESS:  No, I did not.  I took him out of

8          the car over his objection and his frustration.

9    BY MR. ZAK:

10   Q       All right.  Now, at any point during your encounter

11   with the defendant, did you see a red or hunter-orange hat?

12   A       No, there was none in the car that I saw.

13   Q       Okay.  Did he point out one to you or did any come to

14   your attention in the course of this?

15   A       No, not at all.

16   Q       Okay.  And when he spoke to you, how did he behave?

17                MR. D'ALBA:  Objection, this was covered on

18          direct, Your Honor.

19                THE COURT:  I'm not sure that's proper for

20          rebuttal.  I'll sustain that objection.

21                MR. D'ALBA:  Thank you, Your Honor.

22   BY MR. ZAK:

23   Q       The defendant, during his testimony, stated that his

24   door was open in his car; was it open or closed?

25   A       On my approach to the car, the door was closed.

38

1  Q        And was the car on or off?

2  A        It was running.

3                MR. ZAK:  That's all I have.  Cross-examine?

4                THE COURT:  Attorney D'Alba?

5

6                        CROSS-EXAMINATION

7

8  BY MR. D'ALBA:

9  Q        Trooper Myers, you never asked Mr. Leuschen to see his

10  hunting cap, did you?

11  A        No, I did not.  He did not have one on.

12                MR. D'ALBA:  I have no further questions, Your

13  Honor.

14                THE COURT:  You may step down.

15                MR. ZAK:  We have nothing further of this witness.

16                THE COURT:  Anything further on rebuttal, Attorney

17  Zak?

18                MR. ZAK:  No, Your Honor, that would conclude the

19  Commonwealth's case.

20                THE COURT:  Ladies and gentlemen, the next thing

21  that happens procedurally is that the attorneys will

22  address you.  They take turns and they will tell you

23  how they think the testimony that developed during the

24  course of the case should be viewed.

25                Now, we do three things in a row.  Each attorney

1    will address you with his position, and after that, I

2    will instruct you on the law that's applicable.  I

3    don't think we are going to get into those until after

4    lunch because I would like to do that without any

5    breaks, and we can't get it all done between now and

6    then.  But if you remember, early on when I instructed

7    you as to decisions I make from the bench as to

8    objections, we get more of those in the rebuttal phase,

9    the part that we just concluded, because in an effort

10   to streamline a case, the rebuttal part of the case is

11   basically narrow, and we try not to repeat what's been

12   done.  Now, again, you're not to draw any inferences

13   whatsoever, whether I overrule or sustain an objection.

14        Now, before we close, I want to tell you a little

15   bit about it.  At the beginning of the trial, I told

16   you that when the lawyers addressed you preliminarily,

17   those were called opening statements.  Those are not

18   evidence, they are arguments based on the evidence that

19   they intended to present during the trial to try to

20   help you understand their position.  Those are the

21   lawyers chances to persuade and to demonstrate to you

22   what the evidence has shown.  They will do that again

23   in their closing.

24        In deciding the case, when I excuse you to

25   deliberate, you should carefully consider the evidence

1      in light of the various reasons and arguments which

2      each lawyer presents to you.  It's the right and the

3      duty of each of the lawyers to discuss the evidence in

4      a manner which is most favorable to the side he

5      represents.  You should be guided by those arguments to

6      the extent that they are supported by the evidence and

7      insofar as they aid you in applying your own reasons

8      and your own common sense.

9          Now, before the lawyers summarize to you, we call

10     it argument, but it's not an argument as you generally

11     know it in the layman terminology.  Before the lawyers

12     argue their case to you, I want to tell you that there

13     is a difference between arguments by a lawyer and the

14     expression of personal beliefs or opinions by a lawyer.

15     While it is entirely proper, indeed the very purpose of

16     this part of the trial is for a lawyer to argue to you

17     thoroughly and vigorously about what the evidence

18     showed in the case.  At the same time, however, a

19     lawyer may not express a personal belief or a personal

20     opinion during this argument.  Now, the reason for

21     that, of course, is because it's not a lawyer's

22     personal belief or opinion that matters in the case and

23     just as I have told you earlier, it's not my personal

24     belief or opinion.  Any personal belief or opinion that

25     I or the attorneys might express as to the facts or the

1   testimony or the evidence should not affect your

2   consideration in the matter.  The only thing you should

3   decide is what the evidence has shown, and your verdict

4   must be based only on the evidence as it was presented

5   to you from this witness stand in this courtroom.  And

6   in the instructions that I will give you at the

7   conclusion of the lawyers' arguments I will again

8   reiterate that.

9        Now, I think we will stand adjourned and we are

10  going to reconvene at one-thirty, and the purpose for

11  the two-hour delay is that the attorneys and I have

12  some work to do between now and then.  And if we come

13  back at one-thirty, that will give us ample time to do

14  that.  We will stand adjourned until one-thirty.

15       (Whereupon, court recessed at 11:25 a.m. and

16  reconvened at 1:35 p.m.)

17       MR. ZAK:  Good afternoon, Your Honor.

18       MR. D'ALBA:  Good afternoon, Judge.

19       THE COURT:  Good afternoon fellas.  Are you ready?

20  You can start.

21       Let's do a couple of record keeping things on the

22  record.  Do you want to come up, attorneys?

23       (Whereupon, the following discussion occurred

24  on the record at sidebar:)

25       THE COURT:  We will put on the record the things

1     we decided in chambers without Andrea being there.

2          First, Andrea, there is a request by Attorney

3     D'Alba for a de minimis charge and I'm refusing that.

4          MR. ZAK:  Excuse me, Your Honor.

5          (Whereupon, a discussion was held off the

6     record.)

7          THE COURT:  And I'm refusing that charge.

8     Secondly, Attorney D'Alba has asked me to state

9     somewhere in my instructions that a semiautomatic

10    revolver would qualify as part of the exception to the

11    charge, even though it might be illegal for hunting,

12    that would be a game law violation only.  Now, I don't

13    know if we have marked all of our exhibits, but from

14    the defense standpoint, there should be an A and a B,

15    and the A is the single page.  The final ruling is

16    Exhibit 17 of the Commonwealth that you had objected to

17    earlier --

18         MR. D'ALBA:  Excuse me, Your Honor, you didn't

19    indicate you're going to give that second instruction

20    regarding --

21         THE COURT:  Yeah, here's what I thought I would

22    do.  Let me rule on 17.  We are going to allow Exhibit

23    17 to be presented.

24         Now, on the points of your charge, I think instead

25    of reading any of them, I'm going to cover them in my

43

1    charge.  At the conclusion of my charge, if you think

2    you want more, we will talk about whether or not I

3    should do it.  But rather than read your charge, your

4    points, I think when I get to the part, tell them about

5    the trial and the exceptions and, see, I think it will

6    be covered good.

7         MR. D'ALBA:  But you're not referring to my

8    closing argument, you're just referring to your points?

9         THE COURT:  My charges.

10        (Whereupon, discussion at sidebar was concluded.)

11        MR. D'ALBA:  May it please the Court, ladies and

12   gentlemen of the jury, Mr. Prosecutor.

13        First of all, ladies and gentlemen, I'd like to

14   thank you for your participation.  Not only is your

15   participation helpful, but the quality of your

16   participation is excellent.  I have seen several jury

17   trials and especially after your initial ordeal, it's

18   difficult sometimes to pay attention, but your

19   dedication was extraordinary and I thank you all for

20   that.

21        As a defense attorney, I'm frequently asked how

22   can you defend those people.  That's a question that

23   bothers me, it bothers me for a couple reasons.  First

24   of all, it ignores the presumption of innocence.  Mr.

25   Leuschen sits just as each of you and the judge sits,

1    we are all presumed innocent by any offense charged by

2    the government until we are convicted beyond a

3    reasonable doubt.  So that question, first of all,

4    ignores that principle of presumption of innocence.

5    But I can answer that question, how can you defend

6    those people very quickly, very easily, by stating to

7    you, it's easy to represent Douglas Leuschen and

8    innocent people like himself who are unjustly accused,

9    that is how and that is why I defend criminal cases.

10        But the more important question to me are these:

11   How many innocent people are already suffering from

12   unjust accusations and unjust convictions?  And

13   secondly, how can we prevent this from occurring in the

14   future?  Well, the answer to that was provided to us in

15   1859, or one of the answers, by Abraham Lincoln, and he

16   told us, he told us those who would deny freedom to

17   others deserve it not for themselves, and under a just

18   God, cannot long retain it.  Well, ladies and gentlemen

19   if Doug Leuschen can be unjustly accused of being

20   criminal, we are all exposed to that same danger.  We

21   can only protect our liberty by protecting the other

22   man's freedom.  You can only be free if I'm free.

23   Although we may acquire liberty, once we lose that

24   liberty, it is forever lost, it can never be regained.

25        Who is Doug Leuschen?  I suggest to you that he's